**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**


IN RE CREDITRUST CORPORATION  :
SECURITIES LITIGATION                :        Civil Action No. MJG 00 CV 2174


**COMPENDIUM OF UNREPORTED CASES CITED**
**BY PLAINTIFFS IN THEIR MEMORANDA OF LAW IN SUPPORT OF**
**LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**SETTLEMENT AND PLAN OF ALLOCATION AND MOTION**
**BY LEAD PLAINTIFFS AND PLAINTIFFS' COUNSEL FOR AN AWARD**
**OF ATTORNEYS' FEES, REIMBURSEMENT OF ATTORNEY EXPENSES ,**
**AND REIMBURSEMENT OF PLAINTIFFS' EXPENSES**

**COMPENDIUM OF UNREPORTED CASES CITED
BY PLAINTIFFS IN THEIR MEMORANDA OF LAW IN SUPPORT OF
LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENTS AND PLAN OF ALLOCATION AND MOTION
BY LEAD PLAINTIFFS AND PLAINTIFFS' COUNSEL FOR AN AWARD
OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

| DOCUMENT | EXHIBIT |
|---|---|
| *Asch, et al. V. MNC Financial, Inc., et al.*, C.A. No. JFM-91-1208; 90-3151; 91-684, slip op, at 8 (D. Md. Srpt. 25, 1992) | 1 |
| *Bussie v. Allamerica Fin. Corp.*, No. 97-40204-NMG, 1999 WL 342042 at *3 (D. Mass. May 19, 1999) | 2 |
| *Gelfer v. Pegasystems, Inc.*, C.A. No. 98-CV-12527-JLT, slip op. At 7 ID. Mass. Dec. 19, 2000) | 3 |
| *In re Laidlaw Stockholder Litigation*, C.A. No 3:00-CV-855-17 (D.S.C. June 10, 2003) | 4 |
| *In re Manugistics Group, Inc. Sec. Litig.*, Civil Action No. 98-CV-1881 (FNS), slip op. At 6, (D. Md. Oct. 13, 2000) | 5 |
| *In re Medimmune, Inc. Sec. Litig.*, Civil Action No. PJM 93-3980, slip op. at 3 (D. Md. May 6, 1996) | 6 |
| *In re Policy Management Securities Litigation*, C.A. No. 00-CV-130 (D.S.C. June 10, 2003) | 7 |
| *In re Prudential Bache Energy Income P'Ships Sec. Litig.* 1994 U.S. Dist. LEXIS 6621 (E.D. La. May 188, 1994) | 8 |
| *In re Safety Kleen Stockholders Litigation*, C.A. No. 3:00-CV-736-17 (D.S.C. May 2, 2003) | 9 |
| *In re Sirrom Capital Corp. Sec. Litig.*, C.A. No. 3-98-0643, slip op. At 6 (M.D. Tenn. Feb. 4, 2000) | 10 |
| *In re Shiva Corp. Sec. Litig.* Master File No. 97-11159 (D. Mass. October 27, 1999) | 11 |

*In re Xcel Energy Inc. Sec. Litig.* No. Civil 02-2677 (DSD/FLN)
(D.Minn., April 8, 2005)                                        12

*Lemmer v. Golden Books Family Entm't, Inc.*, No. 98 Civ. 5748
(S.D.N.Y., October 12, 1999)                                    13

*Phemister v. Harcourt Brace Jovanovich, Inc.,* 1984 U.S. Dist.
LEXIS 23595, at *40 (N.D. Ill. Sept. 14, 1984)                  14

393461

# EXHIBIT 1

9/25/92
OK.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
------------------------------------
ALFRED ASCH, et al.,               )
                                   )
            Plaintiffs,            )
                                   )
        v.                         )    C.A. No. JFM-91-1208
                                   )
MNC FINANCIAL, INC., et al.        )
                                   )
            Defendants.            )
                                   )
------------------------------------
WILLIAM R. HERSHEY,                )
                                   )
            Plaintiff,             )
                                   )
        v.                         )    C.A. No. JFM 90-3151
                                   )
MNC FINANCIAL, INC., et al.,       )
                                   )
            Defendants.            )
------------------------------------ )
MARSHALL WOLF,                     )
                                   )
            Plaintiff,             )
                                   )
        v.                         )    C.A. No. JFM-91-684
                                   )
MNC FINANCIAL, INC., et al.,       )
                                   )
            Defendants.            )
------------------------------------ )
```

## ORDER AND FINAL JUDGMENT

This proceeding (the "Litigation") consists of consolidated class actions brought by Class Representative Plaintiffs Alfred Asch, David Asch, Delores A. Dunn, Steven P. Wilson, Marshall Wolf, William Hershey, Ira Troy, Robert B. Kelm, Carol D. Hirshman, Sharon I. Cohen, and Dellaware Resources (hereinafter "Plaintiffs"), individually and as representatives of

all Class Members (as hereinafter defined), against Defendants MNC Financial Inc. ("MNC" or the "Company") and Alan P. Hoblitzell, Jr., Daniel J. Callahan, III, William H. Daiger, Jr., Oliver T. Carr, Jr., and A. James Clark, (collectively referred to as the "Individual Defendants") (MNC and the Individual Defendants are collectively referred to as "Defendants").

In the Spring of 1990, a number of class actions were commenced in this Court, ultimately consolidated in the Consolidated Amended Complaint filed on August 8, 1990 under the caption Gollomp v. MNC Financial, Inc., Civil No. JFM 90-2117. Pursuant to an opinion of the Court dated January 10, 1991, the Consolidated Amended Complaint in Gollomp was dismissed. Thereafter, although a Notice of Appeal was filed, the appeal in Gollomp was voluntarily dismissed.

Meanwhile, subsequent to the filing of the motion to dismiss the Consolidated Amended Complaint in Gollomp, several other class action complaints involving claims similar to those asserted in the Consolidated Amended Complaint in Gollomp were filed. Among them was a class action complaint filed on or about December 5, 1990, in this Court captioned Hershey v. MNC Financial, Inc., et al., C.A. No. JFM 90-3151. The Hershey complaint was amended subsequent to the Court's decision of January 10, 1991. The amended Hershey complaint included a consolidation of claims asserted by plaintiffs in the Hershey complaint and by plaintiffs in several other similar complaints filed prior to the Court's decision, and was brought on behalf of an alleged class of persons

2

who purchased or otherwise acquired the common stock of MNC. Shortly after the amended complaint in Hershey was filed on or about March 1, 1991, another class action complaint was filed, captioned Wolf v. MNC Financial Inc. et al., C.A. No. JFM 91-684, on behalf of an alleged class of persons who acquired securities of MNC on or about January 18, 1990, pursuant to the Proxy/Prospectus and Registration statement issued in connection with the merger with Equitable Bancorporation ("Equitable"). Thereafter, on or about May 1, 1991, a class action was filed captioned Asch, et al. v. MNC Financial, Inc., et al., C.A. No. JFM 91-1206, and the complaint in that action was later amended. The Asch complaint was brought on behalf of an alleged class of persons who purchased or otherwise acquired common stock of MNC, including those who purchased or acquired common stock of MNC pursuant to MNC's Dividend Reinvestment Plan, and persons who acquired securities of MNC under the Proxy/Prospectus and Registration statement in connection with the Equitable merger. The various complaints and amended complaints and claims in Hershey, Wolf and Asch are referred to herein as the "Complaints" and the actions in which the Complaints are filed are those identified above as the Litigation.

The Complaints collectively allege, inter alia, violations of §§ 11 and 12 of the Securities Act of 1933 (the "'33 Act") and §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 ("'34 Act") with respect to public disclosures and non-disclosures concerning the financial and operating condition and prospects of

3

MNC during the period January 17, 1989, through and including
October 24, 1990. The Asch Amended Complaint alleges in connection
with the violation of §§ 11 and 12 of the '33 Act and 10(b) and
14(a) of the '34 Act that complete disclosure of the true nature
of MNC's financial and operating condition was not made until
February 1, 1991.

Defendants moved to dismiss each of the Complaints.
After briefing and argument, the Court issued an order on August
19, 1991 providing that the Complaints would not be dismissed but
that certain discovery would be conducted over a specified period
of time. The Court's order contemplated that, after that discovery
was concluded, Defendants would file a motion for summary judgment
and that the Court would then determine whether the Litigation
would be allowed to continue. Such discovery was concluded
pursuant to the Court's order, and Defendants filed their motion
for summary judgment on or about January 15, 1992, seeking judgment
in their favor on all claims in the Complaints. The briefing on
that motion was completed on or about February 13, 1992. This
Settlement was reached prior to oral argument before the Court on
the motion for summary judgment.

The Defendants have denied any wrongdoing and any
liability to Plaintiffs or to the Class they represent. Pursuant
to the Stipulation of Settlement (the "Stipulation") dated May 12,
1992, members of the Class are all persons who purchased or
acquired the common stock of MNC during the period from January 17,
1989, through February 1, 1991, including those persons who

4

purchased or otherwise acquired the common stock of MNC pursuant to the Proxy/Prospectus and Registration Statement issued in connection with the Equitable merger and/or pursuant to MNC"s Dividend Reinvestment Plan and (ii) those persons who acquired shares of MNC Adjustable Rate Cumulative Preferred Stock, Series CC and Series DD, pursuant to the Proxy Statement/Prospectus and Registration Statement issued in connection with the Equitable merger (in each instance excluding the Defendants, their present subsidiaries, affiliates and entities they control, and members of the immediate family of Individual Defendants, provided, however, that MNC and its affiliates and subsidiaries will be considered to be Class Members with respect to common stock of MNC or Adjustable Rate Cumulative Preferred Stock of MNC it or they purchased or acquired solely in a trustee, custodial or other representative capacity for any person or entity other than the Individual Defendants and members of their immediate families). Plaintiffs' Counsel, acting on behalf of the Class, have entered into the Stipulation and have applied to this Court for approval of the Stipulation and the terms thereof pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

On _May 22_ 22, 1992, an Order With Respect to Notice, **Settlement** Hearing and Administration was entered by this Court directing that notice be given to the Class of the proposed Settlement as to MNC and the Individual Defendants, and of a hearing to determine whether the proposed Stipulation and Settlement should be approved as fair, adequate and reasonable, to

5

fix fees, and expense reimbursements of Plaintiffs' Counsel, as well as to hear any objections thereto. Such a hearing was held, as noticed, on _July_ 25, 1992. Prior to the Settlement Hearing, proof of notice, as directed in said Order, was presented and filed. Members of the Class were given the opportunity to file Requests for Exclusion from the Class on or before _August_ 25, 1992, and a sworn statement listing the persons who have timely filed such Requests for Exclusion has been filed with the Court. Members of the Class were also notified of their right to appear at the hearing in support of or in opposition to the proposed Settlement and award of fees and reimbursement of expenses.

The Court having heard counsel for the parties and having reviewed all of the submissions presented with respect to the proposed Settlement, and the Court having determined that the Settlement is fair, adequate and reasonable and having considered the Petition of Plaintiffs' Counsel for awards of fees and expense reimbursements and having reviewed the affidavits, schedules and exhibits submitted in support thereof, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1. The Court has subject matter jurisdiction over this action.

2. The Court incorporates herein by reference the definitions set forth in Paragraph 9 of the Stipulation.

3. Notice to the Class required by Rules 23(c) and (e) of the Federal Rules of Civil Procedure has been given in an adequate and sufficient manner and constitutes the best notice

6

practicable in the circumstances, complying in all respects with such Rules, the Court's previous Order concerning notice and due process.

4.    The members of the Class ("Class Members") are as described above, excluding all persons who timely filed a request to be excluded from the Class pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure.

5.    The proposed Settlement (as provided for by the Stipulation, dated May 8, 1992) is in all respects fair, adequate, reasonable and proper and in the best interests of the Class, and is approved.

6.    Plaintiffs, Class Members and the Defendants shall consummate the Settlement according to the terms of the Stipulation.

7.    The persons who have timely requested exclusion from the Class shall not participate in the proceeds of the Settlement hereby approved or receive any benefit thereunder, and are not bound by this Order.

8.    Plaintiffs and each and every Class Member are permanently barred and enjoined from asserting against Defendants or any of them or any of the other Released Parties mentioned in the Stipulation any and all of the Released Claims.

9.    This Litigation is dismissed with prejudice and on the merits and without award of court costs, and all Released Claims, as defined in the Stipulation, are hereby extinguished.

10. Jurisdiction is hereby retained as to all matters relating to administration and consummation of the Settlement hereby approved, the processing and allowance of claims against the settlement funds and distribution thereof to Class Members.

11. Neither this Final Judgment nor the Stipulation are an admission or concession by any of the Defendants of any actual or potential fault, omission, liability or wrongdoing. This Final Judgment is not a finding of the validity or invalidity of any claims in the Litigation or of any wrongdoing by any of the Defendants. Neither this Final Judgment nor the Stipulation nor the fact of settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document shall be used as an admission of any actual or potential fault or omission by any person or to be offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce the Stipulation.

12. Plaintiffs' Co-Lead Counsel, on behalf of all Plaintiffs' Counsel are jointly awarded the sum of $ 2.64 million as legal fees and $ 140,242 as reimbursement of their costs and out-of-pocket expenses. Such fees shall be paid from the Settlement Fund to Cohen, Milstein, Hausfeld & Toll for further distribution to all Plaintiffs' Counsel. Those fees shall be allocated by Plaintiffs' Co-Lead Counsel among Plaintiffs' Counsel in such proportion as Plaintiffs' Co-Lead Counsel determine is fair

8

and equitable based on all counsel's respective contribution to this Litigation.

13.  In the event that the conditions to the Settlement set forth in the Stipulation are not fulfilled, or the Stipulation is terminated pursuant to its terms for any reason, then this Final Judgment shall, upon further Order of the Court, be rendered null and void and be vacated and the Stipulation and all orders entered in connection therewith shall be rendered null and void.

Dated: September 25, 1992

U.S.D.J.

9

# EXHIBIT 2

Source: Legal > / . . . / > **Federal & State Cases, Combined** 🔳
Terms: **name(bussie)** (Edit Search)

◂Select for FOCUS™ or Delivery
🔲

*50 F. Supp. 2d 59, \*; 1999 U.S. Dist. LEXIS 7792, \*\**

VICTOR **BUSSIE,** MORLEY MORGANA, QUENTIN DAWSON, and MARGARET DAWSON,
individually and as representatives of all others similarly situated, Plaintiffs, v. ALLMERICA
FINANCIAL CORPORATION, SMA FINANCIAL CORPORATION, FIRST ALLMERICA FINANCIAL
LIFE INSURANCE COMPANY, and ALLMERICA FINANCIAL LIFE INSURANCE AND ANNUITY
COMPANY, Defendants.

Civil Action No. 97-40204-NMG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

50 F. Supp. 2d 59; 1999 U.S. Dist. LEXIS 7792

May 19, 1999, Decided

**SUBSEQUENT HISTORY: [\*\*1]** Reported at: 50 F. Supp. 2d 59 ar 78.

**DISPOSITION:** This Action including all individual claims and Class claims dismissed on
merits and with prejudice against plaintiffs and all other Class members without fees or costs
to any party except as otherwise ordered by Court.

**CORE TERMS:** settlement, notice, premium, dividend, entity, surrender, universal, life
insurance policy, credited, predecessors, lawsuit, causes of action, premiums paid, post-
settlement, replacement, indirectly, occurrences, crediting, successors, omissions, assigns,
set forth, variable, life insurance, cash surrender value, cash value, annuity, out-of-pocket,
administrators, negotiation

**COUNSEL:** For VICTOR BUSSIE, RAOUL A. GALAN, JR., QUENTIN DAWSON, MARGARET
DAWSON, Plaintiffs: Glen DeValerio, John P. Zavez, Berman, DeValerio & Pease, L.L.P.,
Boston, MA.

For VICTOR BUSSIE, RAOUL A. GALAN, JR., QUENTIN DAWSON, MARGARET DAWSON,
Plaintiffs: Michael J. Griffin, Sullivan, Sullivan & Pinta, Boston, MA.

For VICTOR BUSSIE, RAOUL A. GALAN, JR., QUENTIN DAWSON, MARGARET DAWSON,
Plaintiffs: Debra B. Hayes, Christopher A. Kesler, Fleming, Hovenkamp & Grayson, P.C.,
Houston, TX.

For VICTOR BUSSIE, RAOUL A. GALAN, JR., QUENTIN DAWSON, MARGARET DAWSON,
Plaintiffs: Jody Anderman, LeBlanc, Maple & Waddell L.L.C., Baton Rouge, LA.

For VICTOR BUSSIE, RAOUL A. GALAN, JR., QUENTIN DAWSON, MARGARET DAWSON,
Plaintiffs: Charles S. Lambert, Jr., LeBlanc, Maples & Waddell, L.L.C., Baton Rouge, LA.

For ALLMERICA FINANCIAL, Allmerica Financial Corporation, SMA FINANCIAL CORPORATION,
FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY, ALLMERICA FINANCIAL
LIFE **[\*\*2]** INSURANCE AND ANNUITY COMPANY, Defendants: Michelle D. Miller, Jeffrey B.
Rudman, Andrea J. Robinson, Michael G. Bonglorno, Hale & Dorr, Boston, MA.

For ALLMERICA FINANCIAL, Allmerica Financial Corporation, Defendant: Barry Z. Aframe, Worcester, MA.

For ALLMERICA FINANCIAL, Allmerica Financial Life Insurance Company, Defendant: Jeffrey B. Rudman, Michael G. Bongiorno, Hale & Dorr, Boston, MA.

**JUDGES:** Nathaniel M. Gorton, United States District Judge.

**OPINIONBY:** Nathaniel M. Gorton

**OPINION: [\*78] FINAL ORDER AND JUDGMENT**

WHEREAS, Victor Bussie, Morley Morgana, Quentin Dawson and Margaret Dawson filed a second amended putative class action complaint captioned Victor Bussie, Morley Morgana, Quentin Dawson and Margaret Dawson, individually and as representatives of all others similarly situated v. Allmerica Financial Corporation, SMA Financial Corporation, First Allmerica Financial Life Insurance Company, and Allmerica Life Insurance and Annuity Company, C.A. No. 97-40204 in the United States District Court for the District of Massachusetts, on November 16, 1998 (the "Action"); and

WHEREAS, the parties and their attorneys have undertaken extensive discovery, including the production **[\*\*3]** to the plaintiffs of in excess of three million pages of written discovery and 1.2 megabytes of computer data, the deposition of 15 witnesses (including key company personnel and each named plaintiff), and the retention of experts familiar with actuarial principles and insurance policy mechanics; and

WHEREAS, counsel for plaintiffs and defendants (collectively "Allmerica" or the "Company"), engaged in arm's length negotiation of a settlement of the Action to avoid the expense, uncertainties, and burden of protracted litigation, and to put to rest any and all claims or causes of action that have been, or could have been, asserted against Allmerica in the Action by the **[\*79]** plaintiffs and/or other members of the putative class; and

WHEREAS, the parties and their attorneys have entered into a Stipulation of Settlement, dated November 12, 1998 ("Stipulation") in which the parties have agreed upon a settlement of the Action subject to the approval and determination of the Court as to the fairness, reasonableness and adequacy of the settlement, which, if approved, will result in dismissal of the Action with prejudice; and

WHEREAS the Court, following a hearing conducted on November 24, 1998, **[\*\*4]** and on motion of the plaintiffs, entered Findings and an Order Certifying a Class for Settlement Purposes, Appointing Lead Counsel for the Class, Directing the Issuance of a Class Notice to the Class and Scheduling a Fairness Hearing ("Hearing Order"); and

WHEREAS the parties have complied with the Hearing Order; and

NOW, upon again reviewing the Stipulation and all exhibits attached thereto (collectively, the "Settlement Agreement") and all prior proceedings held herein, upon reviewing the parties' submissions in support of the settlement (including their legal memoranda and the testimony and expert testimony filed therewith), upon reviewing the objections to the Settlement Agreement filed by class members, and the matter having come before the Court for a fairness hearing on March 19, 1999, it is hereby **ORDERED, ADJUDGED AND DECREED:**

1. This Final Order and Judgment incorporates herein and makes a part hereof the Settlement Agreement.

2. Pursuant to <u>Federal Rule of Civil Procedure 23(a)</u> and <u>23(b)(3)</u>, a class for settlement

purposes is hereby finally certified (the "Class") consisting of all persons or entities who at any time up through and including May 31, 1998, had an **[\*\*5]** ownership interest in one or more whole life, universal life or variable universal life insurance policies issued in the United States by Allmerica (or its predecessors or present or former affiliates or subsidiaries as set forth in the Stipulation and Exhibit C thereto) during the period January 1, 1978, through May 31, 1998 (the "Class Period") with an issue date during the Class Period, but which does not include: *(i)* current or former directors, officers, employees and Producers of the Company; or *(ii)* any individual or entity who, represented by or having consulted with an attorney, signed a document pursuant to a settlement or resolution of an actual or threatened lawsuit that releases Allmerica or its predecessors from any further claims concerning their policy or policies (unless such persons or entities are class members by virtue of their ownership interest in other policies); or *(iii)* persons or entities who timely excluded themselves from the Class pursuant to part 7 of the Stipulation and the Hearing Order. A list of those persons who have timely excluded themselves from the Class and who are therefore not bound by this Final Order and Judgment, has been filed **[\*\*6]** jointly by the parties with the Court and is incorporated herein and made a part hereof.

3. The terms and provisions of the Settlement Agreement, including all exhibits thereto, have been entered into following an arms' length negotiation and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, the Class members; and the parties and Class members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions; provided, however, that Allmerica is hereby authorized, in its sole discretion and without further approval of this Court, to implement the settlement prior to the Final Settlement Date (as that term is defined in the Stipulation); and provided further that the parties are hereby authorized to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement -- including, without limitation, the post-settlement notice materials and the **[\*80]** ADR process manual (Exhibit B to the Stipulation) -- which *(i)* shall be consistent in all material respects with this Final Order and Judgment, and *(ii)* do not diminish the rights of class members. **[\*\*7]**

4. The distribution of the class notice and the publication of the publication notice as provided for by, and undertaken pursuant to, the Hearing Order n1 *(i)* constituted the best practicable notice under the circumstances to Class members, *(ii)* constituted notice that was reasonably calculated, under the circumstances, to apprise Class members of the pendency of the action, their right to object or to exclude themselves from the proposed settlement and to appear at the Fairness Hearing, *(iii)* was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice, and *(iv)* fully complied with the requirements of the United States Constitution, the Federal Rules of Civil Procedure, and the Rules of the Court.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The Hearing Order required the publication of the Notice no later than December 21, 1998. Two newspapers failed to run the Notice until December 22, 1998 due to their own error. Allmerica filed a Motion to Amend Order and Approve Publication of Class Notice, seeking the Court's approval of the issuance of the Publication Notice on December 22 in Rhode Island and Idaho, which motion was allowed at the Fairness Hearing on March 19, 1999.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*8]**

5. The parties are hereby directed to mail and publish the post-settlement notice materials substantially in the forms attached to the Stipulation. The post-settlement publication Notice

shall be published as provided by Stipulation and in the newspaper with the highest circulation in each of the 50 states, the District of Columbia and Puerto Rico. The Court finds that the post-settlement notice materials and methodology set forth in the Settlement Agreement *(i)* constitute the most effective and best practicable notice of this Final Order and Judgment, the relief available to Class members pursuant to this Final Order and Judgment, and applicable time periods, *(ii)* constitute due, adequate and sufficient notice for all other purposes to all Class members, and *(iii)* fully comply with the requirements of the United States Constitution, the Federal Rules of Civil Procedure and the Rules of the Court.

6. Lead Counsel and the Class representatives have adequately represented the Class throughout this litigation.

7. The terms of the Settlement Agreement and of this Final Order and Judgment shall be forever binding on, and shall have res judicata and preclusive effect in, **[\*\*9]** all pending and future lawsuits or other proceedings encompassed by the Release (described and defined infra, P 8) maintained by or on behalf of the plaintiffs and all other Class members, as well as their heirs, executors and administrators, successors and assigns.

8. The release appended hereto as Exhibit A, which also is set forth in part 9 of the Stipulation ("Release"), is expressly incorporated herein in all respects and is effective as of the date of this Final Order and Judgment.

9. The release referred to in Paragraph Eight of this Final Order and Judgment covers, without limitation, any and all claims for attorneys' fees, costs or disbursements incurred by Lead Counsel or any other counsel representing plaintiffs or Class members, or incurred by plaintiffs or the Class members, or any of them, in connection with or related in any manner to this action, the settlement of this action, the administration of such settlement and/or the Released Transactions except to the extent awarded by the Court.

10. All Class members who have not timely excluded themselves from the Class are hereby permanently and forever enjoined from *(i)* filing, commencing, prosecuting, intervening **[\*\*10]** in, or participating (as class members or otherwise) in, any lawsuit in any jurisdiction based on or relating to the claims and causes of action, or the **[\*81]** facts and circumstances relating thereto, in this Action and/or the Released Transactions (as that term is defined in the Release), and from *(ii)* organizing Class members who have not been excluded from the Class into a separate class for purposes of pursuing as a purported class action any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) based on or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this Action and/or the Released Transactions.

11. Allmerica may, in its discretion, require any Class member to resolve through the ADR process as described in the Settlement Agreement any claim that constitutes a Part 8 Claim (as that term is defined in Exhibit A to the Stipulation).

12. Nothing in this Final Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement, nor shall anything in this Final Order and Judgment preclude plaintiffs or Class members from **[\*\*11]** seeking relief in accordance with and subject to the terms of the Settlement Agreement.

13. The Court has personal jurisdiction over all Class members and subject matter jurisdiction to enter this Final Order and Judgment. Without in any way affecting the finality of this Final Order and Judgment, this Court hereby retains jurisdiction as to all matters relating to administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Order and Judgment (including, without limitation, the Release and the permanent injunction described supra, P 10), and for any other necessary purpose.

14. Neither this Final Order and Judgment nor the Settlement Agreement (nor any document referred to herein or any action taken to carry out this Final Order and Judgment) is, may be construed as, or may be used as an admission or concession by or against Allmerica or the other Releasees (as that term is defined in the Release) of the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever. Entering into or carrying out the Settlement Agreement (including the exhibits therein), and any negotiations or proceedings related therein **[\*\*12]** shall not in any event be construed as, or deemed to be evidence of, an admission or concession with regard to the denials or defenses by Allmerica and shall not be offered or received in evidence in any action or proceeding against Allmerica or the other Releasees hereto in any court, administrative agency or other tribunal for any purpose whatsoever other than as evidence of the settlement or to enforce the provisions of this Final Order and Judgment and the Settlement Agreement; provided, however, that this Final Order and Judgment and the Settlement Agreement may be filed in any action against or by Allmerica or the other Releasees to support a defense of res judicata, collateral estoppel, release, good faith settlement, judgment bar, reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

15. This Action, including all individual claims and Class claims resolved herein, is hereby dismissed on the merits and with prejudice against the plaintiffs and all other Class members, without fees or costs to any party except as otherwise ordered by the Court.

**So ordered.**

**Nathaniel M. Gorton**

**United States District  [\*\*13] Judge**

**Dated: May 19, 1999**

**EXHIBIT A**

RELEASE

Release and Waiver. Plaintiffs and all Class Members shall agree to a release and waiver as follows:

A. Definitions. For purposes of this release and waiver ("Release"):

(1) The term "Policies" means all Whole Life, universal life, or variable universal life insurance policies issued by the Company during the period  **[\*82]** from January 1, 1978, through May 31, 1998, including any paid-up additions or other riders or amendments to such policies, but not including any such policies with respect to which the owner has timely requested exclusion from the Class.

(2) The term "Releasees" means the Defendants, their past, present and future parents, subsidiaries, affiliates, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, employees, general agents, agents, producers, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on the behalf or direction of any of them.

(3) The term "Investment Plan" means **[\*\*14]** a pension or retirement plan, investment or savings account, tuition or college-funding or mortgage-protection plan or other type of investment, savings or thrift vehicle.

(4) The term "Released Transactions" means (a) the marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, performance, retention, administration, servicing or replacement (by means of loans or withdrawal of values from, or surrender, partial surrender, and/or termination of, any life insurance policy) of the Policies or (b) the replacement (by means of loans or withdrawal of values from, or surrender, partial surrender, and/or termination of, any life insurance policy) with a Policy or any policy, annuity or mutual fund issued by the Releasees or by another company. Such term shall include, without limitation, the matters described in Section B of this Release.

(5) The term "Vanishing Premium" (including "Quik Pay") means (a) a concept under which an insurance policy's premiums or charges may be paid out of its then-current and anticipated accumulated values, or cash values or dividends, as those charges or premiums become due, (b) a concept under which a single out-of-pocket **[**15]** premium payment or a fixed number of out-of-pocket premium payments -- based on nonguaranteed interest crediting rates, dividends and/or policy charges -- may suffice to cover all policy premiums and/or charges and may keep coverage in force throughout the insured's life, or for a specified period, without reducing the policy's death benefits at all or beyond a fixed amount, or (c) use of this term or the terms "paid up" or "fully paid up" or similar terms in connection with the sale of a Policy.

## B. Release

(1) Plaintiffs and all Class Members hereby expressly agree that they shall release and discharge the Releasees from, and shall not now or hereafter institute, maintain or assert against the Releasees, either directly or indirectly, derivatively, on their own behalf, on behalf of the Class or any other person or entity any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights, of any kind or nature whatsoever, including, without limitation, claims for all damages of any kind, including compensatory, punitive, consequential and those in excess of actual damages, claims for legal fees and claims for mental **[**16]** anguish, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be or could be alleged or asserted now or in the future by Plaintiffs or any Class Member (including, without limitation, **[*83]** their successors and assigns, beneficiaries, officers, directors, employees, agents, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, and any person or entity acting on the behalf or direction of any of them) against the Releasees or any of them in the Action or in any other court action or before any regulatory or administrative body (including any state Department of Insurance, self-regulatory or other regulatory entity or organization), tribunal, arbitration panel, or other adjudicatory body on the basis of, connected with, arising out of, or related to, in whole or in part, the Policies, the Released Transactions and servicing relating to the Released Transactions or Policies, including without limitation:

(a) any or all of the acts, omissions, facts, matters, transactions, occurrences, or any oral or written statements or representations that were directly **[**17]** or indirectly alleged, asserted, described, set forth or referred to in the Action;

(b) any or all of the acts, omissions, facts, matters, transactions, occurrences, or any oral or written statements or representations allegedly made in connection with or directly or indirectly relating to the Released Transactions, including without limitation any acts, omissions, facts, matters, transactions, occurrences, or oral or written statements or representations relating to:

(i) the Vanishing Premium concept;

(ii) the number of out-of-pocket payments that would need to be paid for a life insurance policy or the Policies;

(iii) the ability to keep or not to keep the Policy; or the Policies In-Force based on a fixed number and/or amount of premium payments (less than the number and/or amount of payments required by the terms of the Policies), and/or the amount that would be realized or paid under the Policies based on a fixed number and/or amount of cash payments (less than the number and/or amount of payments required by the terms of the Policies), whether in the form of *(i)* cash value and/or *(ii)* death, retirement or periodic payment benefits, and/or *(iii)* **[\*\*18]** Investment Plan-type benefits;

(iv) The number of premium payments that would be sufficient to maintain certain levels of coverage;

(v) the dividends credited or to be credited to the Policies, including the manner of determination of the amounts of dividends and the allocation of dividends among the Policies and the application of dividends to any Policy;

(vi) the interest rate credited or to be credited to premiums paid on the Policy or the Policies, or to amounts within the Policy or Policies, and the deductions (including all expense and other deductions) charged or to be charged against the Policy or Policies;

(vii) the nature, characteristics, terms, descriptions, operation or relative appropriateness or suitability, of the Policies;

(viii) the fact that the Policies were or were not life insurance or that Plaintiffs' or Class Members' objectives (and/or the fact that the purchaser's goals) would be funded by the cash values and/or benefits derived from a life insurance policy or that the product being sold was life insurance was minimized or disguised;

(ix) whether the Policy or Policies were, would operate or could function as an Investment Plan **[\*\*19]** as defined in Exhibit A to the Stipulation;

**[\*84]** (x) the relationship between the Policy's or Policies' cash surrender value and the cumulative amount of premiums paid;

(xi) whether a part of the premiums paid would not be credited toward an investment or savings account or the Policy's or Policies' cash accumulation value, but would be used to offset Defendants' commission, sales, administration, tax and/or mortality expenses;

(xii) the rate of return on premiums paid in terms of cash value or cash surrender value;

(xiii) the use of an existing policy's or annuity's or mutual fund's, dividend's or cash value or cash surrender value or other values by means of a surrender, withdrawal/partial surrender or loan to purchase or maintain a new Policy;

(xiv) the replacement or rollover of an existing life insurance policy or Policy with or into a new Policy;

(xv) violations of the "twisting" or "churning" or replacement statutes or regulations under applicable state law;

(xvi) the Defendants' dividend, account value, interest crediting, cost of insurance and administrative charge, and direct recognition policies and practices; policy or premium charges and monthly [**20] deductions, including the attribution to the Policy of any taxes imposed on the Company; illustrations of interest crediting rates, account equity rates, account value calculations, policy charges, premium charges, monthly deductions, cost of insurance and administrative charges, cash values or death benefits; or any other matters relating to dividends, interest crediting rates, account equity rates, account value calculations, policy charges, premium charges, monthly deductions or cost of insurance and administrative charges;

(xvii) the adequacy of the disclosure regarding those items in B(1)(a) through B(1)(b)(xx);

(xviii) the operation, administration, appropriateness and/or performance of accounts which were available or were selected as options within variable universal life Policies;

(xix) any actual or alleged violation of any federal or state statute or federal or state regulation or rule or self-regulatory organization rule relating to life insurance sales practices;

(xx) the manner in which the Defendants trained or supervised any of the Releasees; and/or

(c) any or all acts, omissions, facts, matters, transactions, occurrences or oral or written [**21] statements or representations in connection with or directly or indirectly relating to the Settlement Agreement or the settlement of the Action, except as set forth in the proviso of part B(5) below.

(2) Nothing in this Release shall be deemed to alter (i) a Class Member's contractual rights (except to the extent that such rights are altered or affected by the election and award of benefits under the Settlement Agreement) to make a claim for benefits that will become payable in the future pursuant to the express terms of the policy form issued by any of the Defendants or (ii) a Class Member's right to assert any claim which arises in its entirety from facts and circumstances arising after the date on which notice of the settlement is first

mailed to Class Members; provided, however, that this provision shall not entitle a Class Member to assert claims which relate to the allegations contained in **[*85]** the Action or to the matters described in part B(1), above.

(3) Without in any way limiting the scope of the Release, this Release covers, without limitation, any and all claims for attorneys' fees, costs or disbursements incurred by Lead Counsel or any other counsel **[**22]** representing Plaintiffs or Class Members, or by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement and/or the Released Transactions except to the extent otherwise specified in the Settlement Agreement.

(4) Plaintiffs and the Class Members expressly understand that certain principles of law, such as Section 1542 of the Civil Code of the State of California, provide that a general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor. To the extent that, notwithstanding the choice of law provisions in the Settlement Agreement, California or other law may be applicable, Plaintiffs and the Class Members hereby agree that the provisions of Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction which may be applicable herein, are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and **[**23]** the Class Members hereby agree and acknowledge that this is an essential term of this Release.

(5) In connection with this Release, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true with respect to the matters released herein. Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any Action); provided, however, that nothing in this Release shall prevent a Class Member who discovers after the first mailing of notice of the settlement to the Class Members facts that arise out of or relate to the servicing of a Policy after its purchase (not including the matters described above in part B(1)) and that could not have been known with the exercise of reasonable care as of the date when notice of the settlement is first mailed to Class Members from submitting **[**24]** a claim based on such facts to the Alternative Dispute Resolution Process for resolution under Part 8 of Exhibit A to the Settlement Agreement.

(6) Nothing in this Release shall preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein.

Source: Legal > / . . . / > **Federal & State Cases, Combined** 🔲
Terms: name(bussie) (Edit Search)
View: Full
Date/Time: Friday, April 15, 2005 - 6:00 PM EDT

* Signal Legend:
🔴 -  Warning: Negative treatment is indicated
🔲 -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
➕ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 3

Source: Legal > / . . . / > **Federal & State Cases, Combined** 
Terms: **name(gelfer and pegasystems)** (Edit Search)

*96 F. Supp. 2d 10, \*; 2000 U.S. Dist. LEXIS 834, \*\*;*
*Fed. Sec. L. Rep. (CCH) P90,749*

ROMAN **GELFER,** et. al, Plaintiffs, v. **PEGASYSTEMS,** INC., ALAN TREFLER, and IRA
VISHNER, Defendants.

CV No. 98-12527-JLT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

96 F. Supp. 2d 10; 2000 U.S. Dist. LEXIS 834; Fed. Sec. L. Rep. (CCH) P90,749

January 24, 2000, Decided

**DISPOSITION:** **[\*\*1]** Defendants' Motion to Dismiss DENIED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants moved to dismiss, pursuant to Fed. R. Civ. P. 12
(b)(6), 9(b), and the Public Securities Litigation Reform Act, 15 U.S.C.S. § 78u-4(b)(3)
(A), plaintiffs' class claims alleging securities fraud under Sections 10(b) and 20(a) of the
Securities and Exchange Act of 1934, 15 U.S.C.S. §§ 78j(b), 78(t).

**OVERVIEW:** Plaintiffs, a class of individuals purchasing defendants' stock, sued
defendant software corporation, its founder, and officers, alleging securities fraud under
Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (Act), 15 U.S.C.S.
§§ 78j(b), 78(t). Defendants moved to dismiss plaintiffs' complaint. The court denied the
motion as to all defendants, holding that plaintiffs' complaint sufficiently pled control
person liability under § 20(a) of the Act and sufficiently alleged facts establishing
scienter through four factors that supported a strong inference of defendants'
recklessness in making false and misleading statements concerning the corporation's
financial state prior to and during the period during which plaintiffs purchased stock.
Those factors were: 1) similarity to conduct giving rise to liability in a previous lawsuit
involving defendants; 2) the magnitude and frequency of financial restatements; 3)
defendants' dispute with its accountants; and 4) defendants' violation of its own internal
accounting standards.

**OUTCOME:** The motion was denied as to all defendants. Plaintiffs' complaint sufficiently
pled control person liability and alleged facts establishing scienter that supported a
strong inference of defendants' recklessness in making false and misleading statements
concerning the corporation's financial state during the period during which plaintiffs
purchased stock.

**CORE TERMS:** scienter, accounting, restatement, press release, recklessness, fraudulent,
securities fraud, overstatement, false and misleading, magnitude, announced, earnings,
omission, auditor, timing, notice, particularity, misstatement, recklessly, motion to dismiss,
giving rise, suggestive, similarity, reckless, specify, pled, financial statement, resignation,
probative, frequency

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

*HN1* In deciding a defendants' motion to dismiss, the court must assume that plaintiffs' allegations are true and make all reasonable inferences in the plaintiffs' favor.  More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

*HN2* Dismissal is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  More Like This Headnote

Securities Law > Bases for Liability > Private Securities Litigation
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements

*HN3* In addition to the pleading requirements necessary to avoid dismissal for non-securities fraud claims, claims for securities fraud also must meet the stricter pleading requirements of Fed. R. Civ. P. 9(b) and the Public Securities Litigation Reform Act.  More Like This Headnote

Securities Law > Bases for Liability > Private Securities Litigation
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements

*HN4* The First Circuit requires a plaintiff claiming securities fraud to specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. In addition, the First Circuit requires plaintiffs who bring their claims on information and belief to set forth the source of the information and the reason for the belief.  More Like This Headnote

Securities Law > Bases for Liability > Private Securities Litigation

*HN5* In a securities fraud case, where a specific state of mind must be proven, the Public Securities Litigation Reform Act now requires a complaint to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. This requirement, however, does not alter the preexisting definition of scienter adopted by the First Circuit. In the First Circuit, securities fraud requires a minimum scienter of recklessness, defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.  More Like This Headnote

Securities Law > Bases for Liability > Private Securities Litigation
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements

*HN6* In a securities fraud case, a defendant's failure to recognize revenue in accordance with generally accepted accounting practices (GAAP) does not, by itself, suffice to establish scienter sufficiently to meet pleading standards. Instead, the proper question is whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter.  More Like This Headnote

Securities Law > Bases for Liability > Private Securities Litigation
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements

*HN7* The appropriate standard for determining if scienter is properly pled in a securities fraud complaint is whether the complaint 'states with particularity facts giving rise to a strong inference of scienter.  More Like This Headnote

**COUNSEL:** For ROMAN GELFER, Plaintiff: Jeffrey C. Block, Berman, DeValerio & Pease, Boston, MA.

For SCOTT CLAWSON, LINDA CLAWSON, MARK HOLMAN, DAVID JOSWICK, MARK SOTIR, Plaintiffs: Peter A. Pease, Berman, DeValerio & Pease, Boston, MA.

For SCOTT CLAWSON, LINDA CLAWSON, MARK HOLMAN, DAVID JOSWICK, MARK SOTIR, Plaintiffs: Stanley M. Grossman, Murielle J. Steven, Pomerantz, Levy, Hauder, Block & Grossman, New York, NY.

For SCOTT CLAWSON, LINDA CLAWSON, MARK HOLMAN, DAVID JOSWICK, MARK SOTIR, Plaintiffs: Michael T. Matrala, Berman, DeValero & Pease, Boston, MA.

For PEGASYSTEMS, INC., ALAN TREFLER, Defendants: Mary J. Johnson, Jeffrey B. Rudman, Lisa M. Cameron, Mary Jo Johnson, Hale & Dorr, Boston, MA.

For ALAN TREFLER, IRA VISHNER, Defendants: Steven W. Hansen, Bingham, Dana & Gould, Boston, MA.

For IRA VISHNER, Defendant: Colleen A. Manning, Bingham Dana, Boston, MA USA.

**JUDGES:** Joseph L. Tauro, United States District Judge.

**OPINIONBY:** Joseph L. Tauro

**OPINION: [*11]**

MEMORANDUM

January 24, 2000

TAURO, J.,

At issue is Defendants' Motion to Dismiss this claim for securities fraud. For the reasons discussed below, the motion is DENIED. **[**2]**

## I. Background:

Plaintiff Roman Gelfer brings this action individually, and on behalf of a class of individuals, against Defendants Pegasystems, Inc., Alan Trefler, and Ira Vishner alleging securities fraud under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j (b), 78(t), and the rules and regulations promulgated thereunder. Plaintiffs include the class of individuals who purchased Pegasystems stock during the class period April 2, 1998 through November 23, 1998. Defendant Pegasystems ("the Company") is a Massachusetts corporation that provides computer software to various service industries. Defendant Alan Trefler is a founder of Pegasystems as well as its President and Clerk since it Incorporated in 1983. He is also a Director of the Corporation. Defendant Ira Vishner is a founder of Pegasystems and has served as Vice President, Treasurer and CFO since 1983. He resigned as CFO on January 9, 1999. Vishner has been a Director since 1994.

Plaintiffs allege that Defendants made numerous false and misleading statements concerning the financial state of Pegasystems, both prior to and during the class period. These statements **[**3]** were contained in press releases to the public and financial disclosures to the SEC. Plaintiffs claim that these statements were false and misleading, because they contained representations based on accounting practices that were fraudulent and that violated generally accepted accounting principles ("GAAP"). Plaintiffs allege that, as a result

of these misstatements, the market price of Pegasystems stock was artificially inflated during the class period. Plaintiffs further assert that once the fraudulent accounting practices were disclosed, Pegasystems stock price fell considerably, damaging Plaintiffs.

Plaintiffs allegations are based on the following chain of events:

[Pre-Class Period] On October 29, 1997, Pegasystems issued a press release announcing that it was delaying release of its 1997 third quarter financial results, and restating its 1997 second quarter results, because of improper revenue recognition in its accounting methods. The press release went on to implicitly blame Pegasystems's auditors, Ernst & Young ("E&Y"), for the improper revenue recognition. n1 See Amended Complaint at P 32. Following the press release, Pegasystems stock price dropped dramatically. **[\*\*4]** See Id. at P 34.

On October 30, 1997, E&Y resigned as Defendant Pegasystems's independent auditor. See Id. at P 36.

On November 6, 1997, the Company filed a Form 8-K with the SEC disclosing E&Y's resignation and once again blaming E&Y for the restatement of the 1997 second quarter financial statement. n2 See Id. at P 35. **[\*12]**

On November 14, 1997, E&Y filed a letter with the SEC in response to Pegasystems's Form 8-K, denying that it had recommended the revenue recognition mechanisms utilized in the 1997 second quarter 10-Q. See Id. at P 38. To the contrary, E&Y stated that it advised against the improper revenue recognition ultimately used. See id.

[Class Period Begins] On April 2, 1998, Pegasystems issued a Press Release indicating that it would be restating financial statements for the first three quarters of 1997, in part to reflect "changes in the timing of revenue recognition." Attachment A, Defendants' Memorandum in Support of its Motion to Dismiss. n3 The Press Release also contained a statement from Defendant Vishner that: "We have been working closely with our new accountants, and expect that accounting related issues are a thing of the **[\*\*5]** past." Amd. Comp. at P 44 (quoting April 2, 1998 Press Release).

On April 15, 1998, Pegasystems filed Form 10-Q/A's for 1997's first and second quarters, restating financial results for each quarter. See id. at P 41.

On May 11, 1998, the Company announced that its 1998 first quarter earnings were robust, with nearly double the sales of the prior year's first quarter. See id. at P 46. On May 15, 1998, the Company filed a financial statement with the SEC documenting this performance. See id. at P 47.

On July 30, 1998, the Company announced record earnings and revenues for the 1998 second quarter, filing a corresponding financial statement with the SEC on August 14, 1998. See id. at PP 49, 40.

On October 29, 1998, Pegasystems announced record earnings and revenues for the 1998 third quarter. See id. at P 52.

On November 23, 1998, the Company filed a Form 8-K with the SEC stating that it was delaying the filing of its 10-Q for the 1998 third quarter because it was reviewing revenue transactions with its external auditors. See id. at P 54. [Class Period Ends]

Finally, on January 20, 1999, Pegasystems issued a press release stating **[\*\*6]** that it would restate earnings for the first and second quarters of 1998, and revise the 1998 third quarter results announced on October 29, 1998. See id. at P 57. In addition, the Company indicated that it would again restate financial results for the first and second quarters of 1997. See id. Form 10-Q/A's were filed for each of the restated quarters on January 10. See id. at PP 59, 60, 61. A Form 10-Q for the 1998 third quarter, filed with the SEC on the same day, explained that the reason for the 1997 and 1998 restatements was the Company's failure to properly account for certain revenue transactions. See id. at P 57. Once again the accounting difficulties resulted from changes in the timing of revenue recognition. See id.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Defendants stated that the improper revenue recognition from a contract entered into with First Date Resources followed discussions with, and the advice of, E&Y. See Amended Complaint at P 33 (quoting October 29, 1997 Press Release).

n2 The Form 8-K stated: "Contrary to the expectations of [Pegasystems] based on its discussions with E&Y at the time the FDR Transactions were being negotiated, E&Y recently advised [Pegasystems] that $ 5 million of software license revenue recognized by [Pegasystems] in the quarter ending June 30, 1997 from one of the FDR Transactions should not have been recognized in that quarter." Id. at P 35 (quoting November 6, 1997 Form 8-K). **[\*\*7]**

n3 Plaintiffs' Complaint misstates the content of the April 2, 1998 Press Release. See Plaintiffs Opposition to Motion of Defendants to Dismiss at 4, n. 4 (acknowledging error). Defendants attached the Press Release to their pleading to clarify its content.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiffs argue that Defendants' actions constitute securities fraud because certain financial statements filed with the SEC, and public announcements of Pegasystems's financial performance, were based on fraudulent accounting practices. Plaintiffs contend that Defendants knew or should have known of these improper accounting practices during the duration of the class period (April 2, 1998 -- November **[\*13]** 23, 1998) because of the circumstances surrounding the fraudulent statements -- including the accounting problems that arose prior to the class period. Those events, between July 2, 1997 and October 29, 1997, are the subject of a separate class action suit, <u>Chalverus v. Pegasystems, 59 F. Supp. 2d 226,</u> currently before Chief Judge Young ("Pegasystems I"). Plaintiffs assert that Defendants continued to engage in those improper accounting **[\*\*8]** practices during the class period in this case, while filing false financial statements, announcing overstated financial results to the public, and making false statements that accounting problems were resolved.

Defendants now move to dismiss under <u>Fed. R. Civ. P. 12(b)(6)</u>, <u>9(b)</u>, and the Public Securities Litigation Reform Act (PSLRA), <u>15 U.S.C. § 78u-4</u>(b)(3)(A).

## II. Analysis:

HN1⚓In deciding Defendants' motion to dismiss, the court must assume that Plaintiffs' allegations are true and make all reasonable inferences in Plaintiffs' favor. Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 274 (D. Mass. 1998) (quoting Monahan v. Dorchester Counseling Ctr., 961 F.2d 987, 988 (1st Cir. 1992)). HN2⚓Dismissal is appropriate "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp. 2d 211, 217 (D. Mass. 1999) (quoting Roeder v. Alpha Indus., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). [**9]

HN3⚓In addition, claims for securities fraud also must meet the stricter pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. The First Circuit recently addressed for the first time how the PSLRA impacted this Circuit's treatment of the pleading requirements in securities fraud cases. See Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999) ("FTP") (affirming Greebel v. FTP Software, Inc., 182 F.R.D. 370 (D. Mass. 1998) (Tauro, C.J.)). Noting the First Circuit's "strict and rigorous [application of] the Rule 9(b) standard in securities fraud actions," the FTP court determined that "the PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit." 194 F.3d at 193 (citing Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998)). HN4⚓This Circuit requires a plaintiff claiming fraud to "specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." In re Peritus, 52 F. Supp. 2d at 219 (citing Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997)). [**10] See also FTP, 194 F.3d at 193. In addition, this Circuit "require[s] plaintiffs who bring their claims on information and belief to 'set forth the source of the information and the reason for the belief.'" Id. at 194 (citing Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991) (superceded by statute on other grounds, as stated in FTP, 194 F.3d at 196)).

HN5⚓Finally, where a specific state of mind must be proven, "the PSLRA now requires a complaint to 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. (citing PSLRA, 15 U.S.C. § 78u-4(b)(2)). This requirement, however, "does not alter the preexisting definition of scienter adopted by this circuit." 194 F.3d at 201. In this Circuit, securities fraud requires a minimum scienter of recklessness,

defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either [**11] known to the defendant or is so obvious the actor must have been aware of it.

[*14]

Id. at 198. (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).

Defendants' motion to dismiss is based primarily upon their argument that Plaintiffs have failed to meet the rigorous pleading requirements for scienter -- both with regard to the Corporate Defendant and Defendants Trefler and Vishner. Defendants correctly point out that Plaintiffs' pleadings must create a strong inference that Defendant acted with the minimal

scienter -- in this case, recklessness. Defendants argue that Plaintiffs' failed to meet this burden because the restatement of revenue by Defendants does not create a strong inference that any Defendants acted recklessly with regard to Pegasystems's accounting methods. Defendants also challenge Plaintiffs' Section 20(a) claim of control person liability against Defendants Trefler and Vishner. For the reasons discussed below, this court disagrees.

## A. Defendants' Motion to Dismiss for Failure to Sufficiently Allege Scienter

Chief Judge Young's decision in Pegasystems I, 59 F. Supp. 2d 226 (D. Mass. 1999), **[\*\*12]** is instructive on the issue of scienter. Indeed, the allegations there comprise the factual background for this case. In Pegasystems I, Plaintiffs' claims were based on improper revenue recognition which allegedly led to false and misleading statements in two press releases and a filing with the SEC. See id. at 231-32. Here, Plaintiffs' claims are based on four press releases by Pegasystems and two separate quarterly filings by the Company with the SEC. n4 Plaintiffs allege that the releases and filings were false and misleading for the same reason as those in Pegasystems I, i.e., because they relied upon financial results tainted by improper revenue recognition. See Amd. Comp. at PP 53, 57-58; Pegasystems I, 59 F. Supp. 2d at 236. The factual similarities between the two cases, and the legal framework used by Chief Judge Young for analyzing a motion to dismiss this type of claim, lead this court to conclude that Plaintiffs' pleadings create a strong inference of scienter.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 According to Plaintiffs' Complaint, the false and misleading statements occurred on six occasions: an April 2, 1998 press release; a May 11, 1998 press release; a May 15, 1998 Form 10-Q filed with the SEC; a July 30, 1998 press release; an August 14, 1998 Form 10-Q filed with the SEC; and an October 29, 1998 press release. See Amd. Comp. at PP 44, 46-47, 49-50, 52-53.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*13]**

## 1. Defendant Pegasystems's Conduct in Light of Pegasystems I Creates a Strong Inference of Scienter.

Pegasystems I is most instructive for its analysis of scienter in the revenue recognition context. As Defendants point out, Chief Judge Young begins his analysis of scienter by stating that "[HN6☆a] defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to establish scienter." Id., 59 F. Supp. 2d at 233 (citing Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir. 1994) (superceded by statute on other grounds, as stated in FTP, 194 F.3d at 196)). Instead, the proper question is "whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter." Id. (citing In re Peritus, 52 F. Supp. 2d at 224). See also In re Ancor Communications, Inc. Sec. Litig., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)). This approach is wholly consistent with the FTP court's approach to analyzing scienter under the provisions of the PSLRA. See id. 194 F.3d at 196 **[\*\*14]** ("Whatever the characteristic pattern of the facts alleged, those facts must now present a strong inference of scienter."). The factors that Chief Judge Young considered to determine scienter in Pegasystems I included: the magnitude of the accounting overstatement; violations of the Company's internal accounting policy; omissions of fact from public statements; a disagreement with the **[\*15]** Company's auditor; and motives to commit fraud. See 59 F. Supp. 2d at 234-37.

Although the circumstances surrounding the allegedly fraudulent statements in this case are

not identical to those in Pegasystems I, they are equally compelling in their creation of a strong inference of fraudulent intent, in part because they follow the events giving rise to Pegasystems I. Here, Plaintiffs have sufficiently alleged facts implicating four factors that, taken together, support a strong inference that Defendants acted recklessly. Those factors are: 1) the similarity between the conduct giving rise to Pegasystems I and the conduct in this case; 2) the magnitude and frequency of the restatements; 3) Defendants' dispute with E&Y and communications with a subsequent accountant; and 4) Defendants' **[\*\*15]** violation of its own internal accounting standards.

**a. The similarity of Defendants' conduct to that found in Pegasystems I creates a strong inference of scienter.**

The strongest argument presented by Plaintiffs is that Defendants engaged in the same improper accounting practices during the class period here that were utilized during the class period in Pegasystems I. This assertion is strongly probative of scienter because the Defendants were on notice of the improper accounting practices giving rise to Pegasystems I.

Defendants attempt to distinguish this case from Pegasystems I by incorrectly importing into the analysis of scienter a standard that is applied in determining whether a Plaintiff has met the pleading requirements regarding a material misstatement or omission. Defendants cite numerous cases for the proposition that a plaintiff pleading securities fraud based on improper revenue recognition must specify the particular transaction in which revenue was improperly recorded, the customer's name, the terms and timing of the transaction, and the approximate value of the fraudulent transaction. See Defendants' Reply Memorandum at 7 (citing Pegasystems I, 59 F. Supp. 2d at 233; **[\*\*16]** Lirette, 27 F. Supp. 2d at 278. See also In re Peritus, 52 F. Supp. 2d at 223. This proposition is entirely correct as it applies to determining whether a material misstatement or omission took place. But, none of the cited cases apply such a test in determining whether a plaintiff has pled scienter, nor do Defendants argue that Plaintiffs have failed to establish a material misstatement or omission. n5 Whether Plaintiffs in this case, or in Pegasystems I, met some inapplicable standard is irrelevant.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 *HN7* The appropriate standard for determining if scienter is properly pled is whether "a complaint . . . 'state[s] with particularity facts giving rise to a strong inference of [scienter].'" FTP, 194 F.3d at 194 (quoting PSLRA, 15 U.S.C. § 78u-4(b)(2)).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Moreover, Plaintiffs need not prove that the accounting practices at issue here were identical those in Pegasystems I in order to create a strong inference of scienter. Plaintiffs **[\*\*17]** need only prove recklessness -- that Defendants knew or should have known about the improper accounting practices n6 -- in order to meet the requirements of scienter. It is enough then that Plaintiffs show that the questioned accounting practices in this case were sufficiently similar to those questioned in Pegasystems I that Defendant knew or should have known about them.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 As the Court of Appeals notes in FTP, "should have known" when used, as here, in the "reckless disregard" sense, is consistent with the Seventh Circuit's definition of recklessness adopted by this Circuit. See id. at 198-99.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Plaintiffs have met their burden by using Defendants' own admissions. According to the Complaint, Defendants explain the 1997 restatement of revenue (during the class period of Pegasystems I) by stating that "'the restatement reflects changes in the timing of revenue recognition and the expenses on certain contracts.'" Amd. Comp. at P 58 (quoting Defendants' 1997 Form 10K). Defendants' explanation **[\*\*18]** for the revision and restatement **[\*16]** that took place during the class period in this case is nearly identical: "'[they] primarily reflect changes in the timing of revenue recognition.'" Id. (quoting Defendants Third Quarter 1998 Form 10Q). The explanations provided by Defendants in these two instances are so close that the same or substantially similar accounting irregularities must have led to the repeated instances of improper revenue recognition. Defendants were thus on notice that some problem existed with their accounting of revenue. This court finds a strong inference of recklessness in their failure to remedy or prevent the continued improper recognition of revenue.

**b. The magnitude and frequency of the restatements create a strong inference of scienter.**

The magnitude of the revenue overstatements during the class period also tends to support a strong inference of scienter. Defendants restated financial results for the first and second quarters of 1998, and revised results announced for the third quarter, correcting an overstatement of $ 18 million in revenue (or 27% of total revenue) and an overstatement in income of $ 11 million. See Amd. Comp. at PP 57, 62. **[\*\*19]** Over the first three quarters of 1998, these restatements and the revision turned an announced net income of $ 10.9 million into an actual loss of over $ 1 million, an overstatement of 110%. n7 See id. at P 62. This result is similar to that in Pegasystems I, where Defendants' incriminating restatement of revenue turned a $ 2.2 million gain into a $ 2.8 million loss. See 59 F. Supp. 2d at 234, n8

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 Chief Judge Young notes that numerous other district courts have determined that significant financial restatements may support a conclusion that defendants acted with scienter. Pegasystems, 59 F. Supp. 2d at 233 (citing In re Miller Indus., Inc. Sec. Litig., 12 F. Supp. 2d 1323, 1332 (N.D. Ga. 1998) (dramatic overstatement and other factors support strong inference of scienter); In Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1255 (N.D. Ill. 1997) (91% restatement of earnings supports finding of scienter); Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1314 (C.D. Cal. 1996) (significant overstatement supports inference of scienter). **[\*\*20]**

n8 The respective restatements also wiped out Pegasystems "records": in Pegasystems I, the restatement ended the Company's streak of consecutive profitable quarters at 49. See 59 F. Supp. 2d at 234. In this case, the subsequent restatements in 1998 turned "record" second and third quarter profits into losses. See Amd. Comp. at PP 50, 51.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Defendants argue that the magnitude of the restatement is not particularly compelling in this case because their history of accounting problems suggest that they would not "deliberately" continue down a path that led them to continued accounting problems. This argument is

flawed because it self-servingly misstates the requirements for scienter. Defendants' conduct need only be reckless, not deliberate. Defendants' argument also suggests that the court should infer from the allegations in Defendants' favor, which is wholly inappropriate at this stage in the proceedings.

In addition to the magnitude of the restatements, their frequency also lends to the inference of recklessness. Defendants restated revenue on at least four different occasions, twice prior to **[**21]** the class period, and twice during the class period. See Amd. Com. at PP 32, 39-41, 57. Three of these restatements related to 1997 revenues, while the third related to 1998 revenues. See id. These repeated restatements create an inference of recklessness because three of them occurred after the improper accounting methods were brought to light by the resignation of E&Y. The last two restatements, which occurred in January of 1999, took place over a year later than the first, long after Defendants should have remedied their improper accounting methods.

**c. Defendants' conflict with E&Y, and the management letters from Arthur Anderson, create an inference of scienter.**

Next, Plaintiffs argue that Pegasystems' relationship with its independent auditors **[*17]** is strongly suggestive of scienter. This argument is based first on the dispute between the Company and E&Y over recognition of revenue from the First Data Resource contract. Plaintiffs allege that the dispute between Defendants and E&Y is strongly suggestive of scienter because E&Y's statements following their resignation as auditor indicate that Pegasystems improperly recognized revenue against E&Y's explicit recommendation. **[**22]** See Amd. Comp. at PP 37-38. Chief Judge Young expressly rejected this argument in Pegasystems I because a disagreement over proper accounting methods "'does not establish conscious behavior on the part of Defendants.'" 59 F. Supp. 2d at 235-36 (quoting Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1021 (5th Cir. 1996). This argument is more compelling here, however. Where Defendants have allegedly engaged in the same improper accounting practices, the prior dispute looks less like a good faith disagreement over accounting methods, and more like a deliberate or reckless disregard for the appropriate methods. At the very least, the disagreement and subsequent SEC disclosure effectively put Defendants on notice that they needed to change their accounting practices.

In addition, Plaintiffs allege that the management letters prepared by Defendants' new accountant, Arthur Andersen, further support a finding of recklessness because the 1997 letter warns of "material weaknesses in the Company's internal control environment" and recommends changes in "revenue recognition and financial reporting." Amd. Comp. at P 68. The 1998 letter warns of similar **[**23]** "material weaknesses." Id. at P 69. Defendants attempt to undermine this argument by asserting that the letters were not received in time to put them on notice and make their actions during the class period reckless. This argument is without merit. The conflict with E&Y and the need to restate revenue prior to commencement of the class period put Defendants on notice of the deficiencies in their accounting practices. To the extent that these letters document a failure to remedy such practices, they add to the inference of scienter.

**d. Defendants' violations of their own internal policies regarding revenue recognition are probative of scienter.**

Next, Plaintiffs argue that Defendants' violations of their own internal policies regarding revenue recognition strongly suggest scienter. See Amd. Comp. at PP 73-82. While the court in Pegasystems I found such violations suggestive of scienter, see 59 F. Supp. 2d at 234, this factor by itself is not particularly compelling where the violations of internal policies are not materially different from the deviations from GAAP. In this case, Plaintiffs allege that Defendants violated the Software Revenue Recognition Statements of Position **[**24]** ("SOP") 91-1, 97-2, promulgated by the Accounting Standards Executive Committee of the

American Institute of Public Accountants. See Amd. Comp. at PP 79-82. These standards, adopted by Defendant Pegasystems, were allegedly violated by Defendants' "recognition of revenue before the earnings process was complete." Id. at PP 81-82. Defendants' attempts to undermine the sufficiency of Plaintiffs' allegations on this point are unpersuasive. n9 While Defendants' alleged violations of SOP 91-1, 92-2 are not materially different from the alleged GAAP violations, they are probative of scienter because they suggest **[*18]** that Defendants' accounting practices recklessly disregarded another red flag -- accounting standards the company adopted.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 Defendants argue that the violation of internal accounting policy, specifically SOP 91-1 and 97-2, are not sufficiently pled because Plaintiffs' allegations are based on "information and belief" pleading. See Reply Mem. at 14-15. This characterization is specious. Plaintiffs allegations are based on Defendants' own statements, see Amd. Comp. at PP 81-82, and Defendants do not specify how those allegations are insufficient. Instead, Defendants use this characterization, and the different time periods in which the standards applied, to distinguish the violations in this case from those in Pegasystems I. Whether such distinctions exist is irrelevant. The important question in this inquiry is whether violations of internal policy took place, not whether those violations were the same or different from previous ones.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**25]**

Considering these four factors, Plaintiffs have pleaded with particularity facts sufficient to create a strong inference that Defendant Pegasystems acted with recklessness. Defendants' Motion to Dismiss for failure to sufficiently plead scienter, as it applies to Pegasystems, is therefore DENIED.

### 2. Plaintiffs Have Alleged Facts Sufficient to Create a Strong Inference of Scienter Regarding Defendants Trefler and Vishner.

Defendants also argue that Plaintiffs have failed to allege specific facts to "support a conclusion that [Defendants] Trefler and Vishner had personal knowledge" of the fraudulent nature of the financial statements made during the class period. Defendants' Reply Memorandum at 17-18. Defendants assert, rather, that Plaintiffs simply plead that Trefler and Vishner, as President and Chief Financial Officer, should have such knowledge based solely on their positions with the company. See id. This line of argument both misstates the standard for scienter and understates the efficacy of Plaintiffs' Complaint. Plaintiffs allege that Trefler and Vishner both had personal knowledge of the accounting improprieties that gave rise to Pegasystems I. In public statements **[**26]** on April 2, 1998, made after the 1997 restatement, Trefler and Vishner both make assurances that the Company's accounting problems have been resolved. See Amd. Comp. at P 44. Plaintiffs' allegations suggest that the accounting problems were not resolved, and that the Corporate Defendant was reckless in not correcting or preventing the same or substantially similar problems. Taken together, this suggests that Trefler and Vishner also acted recklessly by allowing Pegasystems to continue to release false and misleading financial statements. To put it another way: Trefler and Vishner cannot plead ignorance to a problem they claimed to have fixed.

Defendants' Motion to Dismiss for failure to sufficiently plead scienter, as it applies to Defendants Trefler and Vishner, is therefore DENIED.

### B. Defendants Trefler and Vishner are Control Persons Under Section 20(a)

Finally, Defendants argue that claims arising under Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a), should be dismissed because Plaintiffs have not established an underlying securities violations. In addition, they assert that such claims against Trefler also should be dismissed because Plaintiffs have not met **[**27]** the pleading requirements for control person liability. These arguments are without merit. First, as discussed above, Plaintiffs have adequately pleaded the underlying securities violation. Second, as for Trefler, he cannot escape control person liability where he made the allegedly false and misleading statement. See Pegasystems I, 59 F. Supp. 2d at 236 (citing In re PLC Systems, Inc., Sec. Lit., 41 F. Supp. 2d 106, 122 (D. Mass. 1999). Here Plaintiffs have alleged that Trefler made materially false and misleading statement in press releases on May 11, 1998 and October 29, 1998. Defendants Trefler and Vishner are thus both subject to control person liability under Section 20(a), and their Motion to Dismiss is DENIED as it applies to this claim.

## III. Conclusion:

Defendants' Motion to Dismiss is DENIED in its entirety because Plaintiffs have alleged with particularity facts sufficient to create a strong inference of scienter, and have sufficiently pleaded control person liability under Section 20(a).

AN ORDER SHALL ISSUE.

Joseph L. Tauro

United States District Judge

ORDER

January 24, 2000

TAURO, J.,

The court hereby orders as follows: **[**28]**

(1) Defendants' Motion to Dismiss [# 16-1] is DENIED;

(2) Defendants shall file an Answer by February 28, 2000; and

(3) the Parties shall appear for a Rule 16(b)/Rule 26 Scheduling Conference on April 27, 2000, at 10:30 a.m.

IT IS SO ORDERED.

Joseph L. Tauro

United States District Judge

Source:  Legal > / . . . / > Federal & State Cases, Combined 🖾
Terms:  name(gelfer and pegasystems)  (Edit Search)
View:  Full
Date/Time:  Friday, April 15, 2005 - 5:58 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
🖾 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated

**Ⓐ** -  Citing Refs. With Analysis Available

**ⓘ** -  Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 4



UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

IN RE LAIDLAW
STOCKHOLDERS LITIGATION

C.A. 3:00-CV-855-17

## FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE

Plaintiffs and Class Representatives, and Defendants PricewaterhouseCoopers

LLP, a limited liability partnership established under the laws of the Province of Ontario,

Canada ("PwC Canada"), and PricewaterhouseCoopers LLP, a limited liability

partnership established under the laws of the State of Delaware ("PwC US"), by and

through their respective counsel, having executed and filed a Stipulation of Settlement

dated as of February 14, 2003 (the "Stipulation") providing for a settlement of this Action

as between them (the "Settlement"); the Court having entered its Order of Preliminary

Approval of the Settlement on February 21, 2003 (the "Preliminary Approval Order"),

directing that notice of the proposed Settlement be mailed to the Settlement Class and

published, and scheduling a Hearing to determine whether:  (i) the Settlement Class

meets all requirements of, and should be certified under Rule 23, Fed. R. Civ. P., for

purposes of the proposed Settlement; (ii) the proposed Settlement should be approved as

fair, reasonable, adequate, and in the best interests of the Settlement Class; (iii) the

allocation of the Gross and Net Settlement Fund should be approved; and (iv) Plaintiffs'

Lead Counsel's application for Attorneys' Fees and Expenses and compensatory awards

to the Class Representatives should be approved; said notice having been given; a

included individual notice to all members of the Settlement Class identified by reasonable efforts. The affidavits and declarations of mailing filed with this Court on June 3, 2003, demonstrate that this Court's Preliminary Approval Order has been complied with, and that the best notice practicable under the circumstances was in fact given and constituted valid, due and sufficient notice to the members of the Settlement Class, complying fully with due process, Rule 23 of the Federal Rules of Civil Procedure, and Section 21(D)(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995.

H.    The parties to the Settlement have applied to the Court for approval of the terms of the Stipulation and for the entry of this Judgment. Pursuant to the Notice and Summary Notice, and upon notice to all parties, a Hearing was held before this Court on June 10, 2003 to consider whether the Settlement set forth in the Stipulation should be approved by this Court as fair, reasonable, adequate, and in the best interests of the Settlement Class, to approve the allocation of the Gross and Net Settlement Fund, and to consider an award of Attorneys' Fees and Expenses to Plaintiffs' Lead Counsel and compensatory awards to the Class Representatives. Members of the Settlement Class were given notice and the opportunity to appear personally to object to the Settlement or to exclude themselves from the Settlement Class. The Court has received and considered all written and oral submissions of interested parties.

I.    Approval of the Stipulation will result in substantial savings in time and money to the Court and the litigants and will further the interests of justice.

J.    The Stipulation is the product of good faith arm's-length negotiations by the parties thereto.

4

NOW THEREFORE, UPON CONSIDERATION OF THE FOREGOING, THE

FILINGS IN THIS ACTION, AND THE ENTIRE RECORD, AND GOOD CAUSE

APPEARING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.    The definitions set forth in the Stipulation are incorporated herein.

2.    The Court has jurisdiction over the subject matter of this Action and the

parties, and venue is proper in this district.

3.    The members of the Settlement Class are so numerous as to make joinder

of them impracticable. There are questions of law and fact common to the Settlement

Class, and such questions predominate over any questions affecting only individual

members of the Settlement Class. The claims of Class Representatives and the defenses

asserted thereto are typical of the claims of the members of the Settlement Class and the

defenses asserted thereto. Class Representatives and their counsel have fairly and

adequately protected the interests of the members of the Settlement Class throughout the

Action. A class action is superior to all other available methods for fairly and efficiently

resolving the Action. The Court therefore determines for purposes of approving the

Settlement that the Action satisfies the prerequisites to a class action set forth in Rule

23(a), Fed. R. Civ. P., and may be maintained as a class action under Rule 23(b)(3),

Fed. R. Civ. P., with the Class Representatives representing the Settlement Class, defined

as follows, which the Court hereby certifies:

> All persons and entities who purchased the common stock of
> Laidlaw Inc. during the period from October 15, 1997
> through January 21, 2001, inclusive, and who suffered
> damages thereby. Excluded from this Settlement Class are
> the defendants in this Action, members of the Individual
> Defendants' families, any entity in which any defendant has a
> controlling interest or is a part or subsidiary of or is controlled

> by Laidlaw Inc., and the officers, directors, employees,
> affiliates, legal representatives, heirs, predecessors,
> successors and assigns of any of the defendants.

4.    The Stipulation and Settlement are fair, reasonable, adequate, and in the best interests of the Settlement Class, and are hereby finally approved in all respects.

5.    The Class Members are bound by this Judgment and by the Stipulation and Settlement, including the releases provided in this Judgment. The members of the Settlement Class who have filed timely and valid requests for exclusion are not Class Members and are not bound by this Judgment. A listing of those persons is attached hereto as Exhibit A. Members of the Settlement Class who are excluded may pursue their own individual remedies if any. Those persons may not participate in any of the benefits of the Settlement and shall not receive any proceeds from the Net Settlement Fund.

6.    This Court hereby decrees that neither the Stipulation, the Settlement, nor the fact of the Settlement, is an admission by PwC Canada or PwC US, and this Judgment is not a finding of the validity of any claims in the Action or of any wrongdoing by them. Furthermore, neither the Stipulation nor the Settlement is a concession by PwC Canada or PwC US, and neither shall be used as an admission of any fault or omission by any person. Neither this Judgment, nor the Stipulation and any document referred to therein, nor any action taken to carry out the Stipulation is, may be construed as, or may be used as, an admission by, or against, either PwC Canada or PwC US of any fault, wrongdoing or liability whatsoever. Entering into, or carrying out the Stipulation and the Settlement, and any negotiations or proceedings related thereto, and any related documents, shall not in any event be construed as, or deemed to be evidence of, or an admission of, liability or

6

JJ*Q* *any other actions related to the financial reporting of Safety-Kleen Corp., Laidlaw Inc., and/or any of their predecessors* wrongdoing, or a concession with regard to the denials or defenses asserted by PwC *affiliates,* Canada or PwC US, and shall not be offered or received in evidence in any action or *subsidiaries* proceeding in any court, administrative agency or other tribunal for any purpose whatsoever, other than to enforce the provisions of this Judgment, the Stipulation, or any related agreement or release; except that the Stipulation and this Judgment may be filed in the Action or ~~related litigation~~ as evidence of the Settlement or in any subsequent action against, or by, ~~PwC Canada or PwC US~~ *any party to this case JJ*Q** to support a defense of *res judicata,* *or the non proportionate liability, fairness of a subsequent settlement,* collateral estoppel, release, or other theory of claim preclusion, issue preclusion, or judgment reduction under any applicable principle of law, or similar defense.

7.     This Court hereby dismisses this Action and the Complaint with prejudice as against PwC Canada and PwC US, without costs to any of the settling parties as against the other.

8.     All Class Members are hereby forever barred and enjoined from commencing, instituting or prosecuting, either directly or indirectly, the Settled Claims or any action or other proceeding against any of the Released Parties with respect to, based on, relating to, or arising from the Settled Claims.

9.     Each and all of the Released Parties are hereby unconditionally, fully, finally and forever released and discharged by the Releasors as of the Effective Date with respect to any and all of the Settled Claims.

10.     Pursuant to 15 U.S.C. § 78u-4(f)(7)(A), all claims for contribution arising out of the instant action against PwC Canada and PwC US are hereby barred, and PwC Canada and PwC US are hereby discharged from the same.

7

11.    Pursuant to 15 U.S.C. § 78u-4(c)(1), the Court finds that all settling parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings in this Action.

12.    Plaintiffs' Lead Counsel is hereby awarded attorneys' fees in the amount of $4,200,000, and reimbursement of their expenses in the amount of $458,493.03; and Class Representatives David I. L. Sunstein, Misty Management, Inc. and Barry Schwartz each are awarded $5,000, and Class Representatives Allan Borghesi and Borghesi Building and Engineering Co., Inc., jointly, are awarded $5,000. All of these amounts are to be paid from the Gross Settlement Fund, at the time and pursuant to the procedure set forth in the Stipulation. Plaintiffs' Lead Counsel is hereby authorized to distribute said attorneys' fees in their sole discretion among all Plaintiffs' Counsel.

13.    The Court reserves jurisdiction, without affecting the finality of this Judgment, over:  (a) implementing, administering and enforcing this Settlement and the Stipulation and any award or distribution of the Gross or Net Settlement Fund; (b) disposition of the Gross or Net Settlement Fund; and (c) other matters related or ancillary to the foregoing.

14.    An appeal of the portion of this Judgment which awards attorneys' fees or expenses or compensatory awards to the Class Representatives shall have no effect whatsoever on the finality of any other portion of this Judgment, and shall not affect the Effective Date of the Settlement.

15.    The proposed Plan of Allocation of the Net Settlement Fund, as set forth in the Stipulation, is approved. PwC Canada, PwC US and their counsel shall have no responsibility for, interest in, or liability whatsoever with respect to, the investment or

8

distribution of the Gross or Net Settlement Fund, the Plan of Allocation, the

determination, administration, or calculation of claims, the payment or withholding of

any local, state or federal governmental charge, levy, or tax lawfully imposed thereon, or

any losses incurred in connection therewith.

      16.    All objections to the Settlement are overruled and denied in all respects.

      17.    In the event that the Settlement does not become effective or is canceled or

terminated in accordance with the terms of the Stipulation, then this Judgment shall be

rendered null and void and be vacated, except Paragraph 6 hereof, which shall survive,

and all orders entered in connection therewith by this Court shall be rendered null and

void.

      18.    The Court finds that no just reason exists for delay in entering final

judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  Accordingly,

the Clerk is hereby directed to enter this Judgment forthwith pursuant to Rule 54(b).

Dated: June 10 , 2003

**IT IS SO ORDERED:**

Joseph F. Anderson, Jr.
United States District Court Judge

## IN RE LAIDLAW STOCKHOLDERS LITIGATION
## OPT-OUT LIST

William B. Moure, Jr.
P.O. Box 61
Falun, Alberta
Canada T0C 1H0

WMJ Metals Ltd.
P.O. Box 51
Falun, Alberta
Canada T0C 1H0

Robert Sofonio
2360 Boulevard De Blois
Laval, Québec
Canada H7E 1P9

Gordon A. Unger
28 Ash Street
Thompson, Manitoba
Canada R8N 0N8

Ron Freeman & Donna Freeman
555 Alan Avenue
Welland, Ontario
Canada L3C 2Z1

David Freeman
66 Woodington Plce
Welland, Ontario
Canada L3C 2J2

Andrew Timberlake
134 Springhurst Avenue, Apt. 4
Toronto, Ontario
Canada M6K 1C1

Nim Hing Yip & Queenie S.F. Woo
44 Hookwood Drive
Scarborough, Ontario
Canada M1S 2P1

Thomas N. Kelleher
58 Hastings Road
Manchester, NJ 08759
and
A.J. Calabrese
3725 Wexford Hollow Road
Jacksonville, FL 32224

Ken & Margaret McIntyre
Box # 1605
Marathon, Ontario
Canada P0T 2E0

Keith Raygor
P.O. Box 215
Higgins, TX 79046

Michael Watty
4 McCutcheon Court
Barrie, Ontario
Canada L4N 7C6

Gerald Wright Smith
38 Cowan Avenue
St. John's NL
Canada A1E 3N7

Otis Tuttle
212 Telford Court
Leduc, Alberta
Canada T9E 5M6

Patrick Mothersill
1207 Lyall Street
Victoria, B.C.
Canada V9A 5G8

1

# EXHIBIT 5

98-142

FILED ——— ENTERED
——— LODGED ———— RECEIVED

OCT 1 3 2000

AT
CLERK U.S.
DISTRICT OF MARYLAND        DEPUTY
BY

1 0/13 c

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DISTRICT

In Re:                                          )
                                                )
                                                )  CIVIL ACTION NO. 98-CV-1881
MANUGISTICS GROUP, INC. SECURITIES              )  (FNS)
LITIGATION                                      )
                                                )
                                                )
                                                )
                                                )
                                                )
                                                )

## ORDER AND FINAL JUDGMENT

On this 13ᵗʰ day of _October_, 2000, a hearing having been held before this

Court to determine: (1) whether the terms and conditions of the Stipulation and Agreement of

Settlement. dated July 14, 2000 (the "Settlement Stipulation") are fair. reasonable and adequate

for the settlement of all claims asserted by the Class against the Defendants in the complaint now

pending in this Court under the above caption. including the release of the Defendants and the

Released Parties. and should be approved: (2) whether judgment should be entered dismissing

the complaint on the merits and with prejudice in favor of the Defendants and as against all

persons or entities who are members of the Class herein who have not requested exclusion

therefrom: (3) whether to approve the Plan of Allocation as a fair and reasonable method to

allocate the settlement proceeds among the members of the Class: and (4) whether and in what

amount to award Plaintiffs' Counsel fees and reimbursement of expenses. The Court having

P.02

predominate over any questions affecting only individual members of the Class; and (vi) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure this Court hereby finally certifies this action as a class action on behalf of all persons who purchased shares of Manugistics common stock during the time period between February 24, 1998 and May 22, 1998, inclusive (the "Class Period") and who were damaged thereby, including a subclass consisting of all purchasers of Manugistics stock who purchased such stock contemporaneously with the sales of Manugistics stock by defendants William M. Gibson and Peter Q. Repetti, which took place on April 2, April 3 and April 8, 1998 (the "Subclass"). Excluded from both the Class and the Subclass are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are the persons and/or entities who requested exclusion from the Class as listed on Exhibit A annexed hereto.

5.    The Settlement Stipulation is approved as fair, reasonable and adequate, and in the best interests of the Class, and the Class Members and the Parties are directed to consummate the Settlement Stipulation in accordance with its terms and provisions.

6.    The Complaint, which the Court finds was filed on a good faith basis in accordance with the Private Securities Litigation Reform Act and Rule 11 of the Federal Rules of Civil Procedure based upon all publicly available information, is hereby dismissed with prejudice and without costs, except as provided in the Stipulation, as against any and all of the Defendants

3

(

and their current and former directors, officers, employees, attorneys, accountants, agents, insurers, co-insurers, and reinsurers.

7.    Members of the Class and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, any and all claims, rights or causes of action or liabilities whatsoever, whether based on federal, state, local, statutory or common law or any other law, rule or regulation, including both known claims and Unknown Claims, that have been or could have been asserted in any forum by the Class Members or any of them against any of the Released Parties which arise out of purchases of Manugistics Group, Inc. common stock during the Class Period (the "Settled Claims") against any and all of the Defendants and their current and former directors, officers, employees, attorneys, accountants, agents, insurers, co-insurers, and reinsurers (the "Released Parties"). The Settled Claims are hereby compromised, settled, released, discharged and dismissed as against the Released Parties on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

8.    The Defendants and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, any Settled Defendants' Claims against any of the Plaintiffs, Class Members or their attorneys. The Settled Defendants' Claims are hereby compromised, settled, released, discharged and dismissed on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

4

9)      Neither the Settlement Stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

a.      offered or received against the Defendants as evidence of or construed as or deemed to be evidence of any presumption, concession, or admission by any of the Defendants of the truth of any fact alleged by Plaintiffs or the validity of any claim that had been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of Defendants;

b.      offered or received against the Defendants as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any Defendant, or against the Plaintiffs and the Class as evidence of any infirmity in the claims of Plaintiffs and the Class;

c.      offered or received against the Defendants as evidence of a presumption, concession or admission of any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the parties to this Stipulation, in any other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; provided, however, that if this Stipulation is approved by the Court, Defendants may refer to it to effectuate the liability protection granted them hereunder;

5

       d      construed against the Defendants or the Plaintiffs and the Class as an

admission or concession that the consideration to be given hereunder represents the amount

which could be or would have been recovered after trial; or

       e.      construed as or received in evidence as an admission, concession or

presumption against Plaintiffs or the Class or any of them that any of their claims are without

merit or that damages recoverable under the Consolidated Complaint would not have exceeded

the Settlement Fund.

      10.     The Plan of Allocation is approved as fair and reasonable, and in the best interests

of the Class, and Plaintiffs' Co-Lead Counsel and the Claims Administrator are directed to

administer the Stipulation in accordance with its terms and provisions.

      11.     The Court finds that all parties and their counsel have complied with each

requirement of Rule 11(b) Fed.R.Civ.P. as to the complaint, the responsive pleadings and the

motion to dismiss.

      12     Plaintiffs' Counsel are hereby awarded the sum of $ 607,547.78 in fees, which

sum the Court finds to be fair and reasonable, and $ 69,760.09 in reimbursement of expenses,

which shall be paid to Plaintiffs' Co-Lead Counsel from the Settlement Fund with interest from

the date such Settlement Fund was funded to the date of payment at the same rate that the

Settlement Amount earns. The award of attorneys' fees shall be allocated among Plaintiffs'

Counsel in a fashion which, in the opinion of Plaintiffs' Co-Lead Counsel, fairly compensates

Plaintiffs' Counsel  for their respective contributions in the prosecution of the litigation.

      13.     Exclusive jurisdiction is hereby retained over the Parties and the Class Members

for all matters relating to this litigation, including the administration, interpretation, effectuation

or enforcement of the Settlement Stipulation and this Order and Final Judgment, and including

any application for fees and expenses incurred in connection with administering and distributing

the settlement proceeds to the members of the Class.  Without further order of the Court, the

Parties may agree to reasonable extensions of time to carry out any of the provisions of the

Settlement Stipulation.

Dated:        Baltimore, Maryland
              October 13, 2000

              _____
              UNITED STATES DISTRICT JUDGE

7

EXHIBIT A

| Toomas M. Koppel and Sumire C. Sugimoto |
| Ricky S. Millet as custodian for Nathan S. Millet |
| Ken Drebenstedt |

I:\MIAMI\GIST ING\00229 w.pd - October 12, 1999 (2:09PM)

# EXHIBIT 6

Source: Legal > / . . . / > Federal & State Cases, Combined [i]
Terms: name(medimmune, inc.) (Edit Search)

☞Select for FOCUS™ or Delivery
▢

*873 F. Supp. 953, \*; 1995 U.S. Dist. LEXIS 296, \*\*;*
*Fed. Sec. L. Rep. (CCH) P98,715*

IN RE **MEDIMMUNE, INC.**, SECURITIES LITIGATION

Civil No. PJM 93-3980

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

873 F. Supp. 953; 1995 U.S. Dist. LEXIS 296; Fed. Sec. L. Rep. (CCH) P98,715

January 10, 1995, Decided
January 10, 1995, filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant corporation filed a motion to dismiss for failure to state a claim under Fed. R. Civ. Proc. 12(b)(6) and failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b). Plaintiff stockholders sued the corporation and various of its officers, alleging violations of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), common law fraud, and negligent misrepresentation.

**OVERVIEW:** The corporation, as a manufacturer of therapeutics and vaccines, had an emerging drug under review at the U.S. Food and Drug Administration (FDA). With the filing of the product license application, the value of the corporation's stock began to soar. The stock's value fell dramatically when the FDA cited various flaws in the drug's design and criticized the trial studies. The stockholders contended that the corporation knew or recklessly disregarded the drug's design limitations from the outset. The stockholders cited multiple statements made by the corporation that were allegedly false and misleading. The court held that the core fraud claim alleged under the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and rule 10(b)5 in 17 C.F.R. §240-10b-5 required a false statement made with scienter upon which the stockholders justifiably relied, causing proximate damage. The court reviewed all of the statements and found only four to be actionable. The court denied the stockholders' request to replead because the bulk of the stockholders' claims were unsupported allegations of fraud. Specific allegations of control and culpable conduct of each corporate officer were required.

**OUTCOME:** The court denied the corporation's motion to dismiss in part. Four statements were publicly made by the corporation that were actionable as fraud under the Securities Exchange Act of 1934. However, the bulk of the stockholder's allegations were dismissed as not actionable. The court dismissed the stockholder's claims of common law fraud and negligent misrepresentation because their pleading did not state a cause of action under state law.

**CORE TERMS:** efficacy, patient, advisory committee, press release, infection, plead, misleading, stock, disease, site, marketing, investor, phase, prevention, effective, analysts, infant, high risk, hospitalization, dropouts, staffer, season, common law fraud, secondary liability, review process, randomization, randomized, announced, safe, bias

## LexisNexis(R) Headnotes ♦ Hide Headnotes

Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act 📄
**HN1**⚓The usual sequence prior to the filing of a product license application (PLA) is for a drug to undergo preclinical testing in the laboratory and on animal subjects and three phases of clinical testing. The PLA, a compilation of all relevant data regarding the drug, is reviewed by a team of U.S. Food and Drug Administration (FDA) personnel and, in significant instances, forwarded to an advisory committee of outside experts, pursuant to 21 C.F.R. §§ 14.1, 14.100(b)(3). The committee reviews the data and ultimately recommends to the FDA whether the PLA should be approved and for what uses. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss 📄
**HN2**⚓In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court takes all allegations of material fact in a complaint as true, construing them in a light most favorable to the plaintiffs. More Like This Headnote

Securities Law > Bases for Liability > Misleading Statements 📄
**HN3**⚓Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and Rule 10(b)5, in 17 C.F.R. § 240.10b-5, consists of four elements: (1) a false statement or omission of material fact made by defendant; (2) with scienter; (3) upon which the plaintiff justifiably relied; and (4) proximate damage to the plaintiff. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Interpretation 📄
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements 📄
**HN4**⚓While the court must liberally construe a complaint and must accept the material factual allegations as true, pursuant to Fed. R. Civ. P. 12(b)(6), the complaint must be read in conjunction with Fed. R. Civ. P. 9(b), which imposes special pleading requirements on securities and other fraud claims. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements 📄
**HN5**⚓Particularity of pleading is required with regard to the time, place, speaker and contents of the allegedly false statements, as well as the manner in which statements are supposedly false and the specific facts which raise an inference of fraud. Moreover, specific statements must be attributed to specific individuals. More Like This Headnote

Securities Law > Bases for Liability > Misleading Statements 📄
Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements 📄
**HN6**⚓Specificity is required where the plaintiffs attempt to fix liability on every defendant for every statement made by every other defendant based on Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 786(a), which imposes secondary liability for § 10(b) and Rule 10(b)-5 violations upon "controlling persons" for acts committed by persons under their control. Allegations of "control" must set forth that a given defendant had both the power to control a person and that the defendant, in bad faith, directly or indirectly induced the act constituting the violation. Finally, to the extent that independent statements of third parties may be involved, the complaint must plead with specificity which defendant supplied the information to the third party, how it was supplied, and how the defendant could

have controlled the content of the statement.  More Like This Headnote

Securities Law > Bases for Liability > Misleading Statements 🔖
*HN7* Mere expressions of hope or expectation regarding future approval, not worded as guarantees, are not actionable under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b).  More Like This Headnote

Securities Law > Bases for Liability > Misleading Statements 🔖
*HN8* Statements of independent market analysts are not actionable under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), unless the plaintiffs can plead with particularity who among the defendants supplied the information, how it was supplied, and how the defendants could have controlled the content of the statement. The same is true with regard to newspaper accounts.  More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements 🔖
*HN9* Mere allegations of "fraud by hindsight" will not satisfy the requirements of Fed. R. Civ. P. 9(b).  More Like This Headnote

Securities Law > Bases for Liability > Misleading Statements 🔖
*HN10* To fulfill the materiality requirement in the context of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and Rule 10(b)5, in 17 C.F.R. § 240.10b-5, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  More Like This Headnote

Torts > Business & Employment Torts > Deceit & Fraud 🔖
Securities Law > Bases for Liability > Misleading Statements 🔖
*HN11* With regard to common law fraud, the plaintiffs are required to plead that a particular representation was false, made with knowledge of its falsity, made with the intent that the plaintiffs rely on it, and that there was reliance in fact. The most prominent distinction between common law fraud and a violation under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78j(b), and Rule 10(b)5, in 17 C.F.R. § 240.10b-5, is that the latter permits recovery based on a "fraud on the market" theory which presumes reliance, while the former requires proof of actual reliance.  More Like This Headnote

Torts > Business & Employment Torts > Negligent Misrepresentation 🔖
*HN12* Negligent misrepresentation is a cause of action separate and distinct from common law fraud. Negligent misrepresentation consists of (1) a duty of care owed by the defendant to the plaintiff; (2) negligent assertion of a false statement by the defendant; (3) intent on the part of the defendant that plaintiff act upon the statement; (4) knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (5) the plaintiff's justifiable and actual reliance on the statement; and (6) proximate damage to the plaintiff.  More Like This Headnote

**COUNSEL:** [**1] Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA.

Harvey Kurzweil, Dewey Ballantine, New York, NY.

**JUDGES:** PETER J. MESSITTE, UNITED STATES DISTRICT JUDGE

**OPINIONBY:** PETER J. MESSITTE

**OPINION: [*956]** OPINION

I.

Plaintiffs, who seek to represent a class of persons purchasing common stock of Defendant MedImmune, Inc. between January 4 and December 2, 1993, have sued the corporation and various of its officers, alleging violations of federal securities law, common law fraud, and negligent misrepresentation. Defendants have filed a Motion to Dismiss for failure to state a claim under Fed. R. Civ. Proc. 12(b)(6) and failure to plead fraud with particularity as required by Rule 9(b). The Court has determined to grant the Motion, except with regard to:

(1) Defendant Mott's statement of April 27, 1993 that "there's absolutely no question about efficacy (of the drug Respivir)";

(2) Defendant Hockmeyer's statement of September 1, 1993 of the reasons why the U.S. Food and Drug Administration (FDA) postponed its review of the product licensing application for Respivir;

(3) Hockmeyer's alleged statement on September 8, 1993 regarding the reasons for the delay of review of the drug by the FDA;

(4) Defendant MedImmune's **[**2]** press release of November 17, 1993, insofar as it endorsed the New England Journal of Medicine article on the Respivir study, specifically the assertion in the article that the study was conducted on an "intention to treat" basis; and

(5) The New England Journal of Medicine article of November 18, 1993, as co-authored by Defendant Top and endorsed by MedImmune, specifically insofar as the article reported that the study of Respivir had been conducted on an "intention to treat" basis.

The Motion to Dismiss will be granted as to all other statements and as to all Defendants except those expressly making or endorsing one of the above-referenced statements, i.e., except as to Defendants MedImmune, Hockmeyer, Mott and Top.

II.

Defendant MedImmune, a Delaware corporation based in Gaithersburg, Maryland, researches, develops, manufactures and markets therapeutics and vaccines for the treatment and prevention of certain infectious diseases. The company's common stock is listed and traded on the National Market System. The company has only one product approved for sale by the U.S. Food and Drug Administration (FDA), namely CytoGam, a polyclonal antibody product for the prevention **[**3]** of disease in kidney transplant patients. A second product known as Respivir (or Respigam or RSVIG), was at all relevant times under review for marketing approval by the FDA. The present lawsuit concerns Respivir.

Respivir, a blood plasma derivative, is a polyclonal antibody product used intravenously for the prevention of respiratory syncytial virus (RSV). RSV is the leading cause of pneumonia and bronchiolitis or lower respiratory infection (LRI) in infants, primarily children less than 2 years of age. According to an April 27, 1994 press release of MedImmune, more than 90,000 hospitalizations and 4,500 deaths occur each year in the United States as a result of RSV infection in children. As of December 1992, when MedImmune filed a product license application (PLA) seeking marketing approval for Respivir from the FDA, n1 no other product was licensed for the prevention of RSV disease in the United States.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 *HN1* The usual sequence prior to the filing of a PLA is for a drug to undergo preclinical testing (i.e. in the laboratory and on animal subjects) and three phases of clinical testing. See In re Synergen, Inc. Sec. Litig., 863 F. Supp. 1409, Fed. Sec. L. Rep. (CCH) P98,410 (D.Colo. 1994). The PLA, a compilation of all relevant data regarding the drug, is reviewed by a team of FDA personnel and, in significant instances, forwarded to an advisory committee of outside experts. See 21 C.F.R. §§ 14.1, 14.100(b)(3). The committee reviews the data and ultimately recommends to the FDA whether the PLA should be approved and for what uses. Respivir proceeded according to this sequence, with the data being forwarded to the FDA's Blood Products Advisory Committee.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**4]**

With the filing of the PLA, MedImmune's financial prospects began to soar. On July 14, 1993, MedImmune announced that it had **[*957]** signed a letter of intent with American Cyanamid Company to form an alliance in the United States for the development and marketing of three generations of products for RSV (as well as for the marketing of a new product developed by Cyanamid). On August 13, 1993, MedImmune announced a $ 21 million private placement of newly issued common stock with a number of institutional investors. According to the announcement, MedImmune intended to use the net proceeds from the placement for, among other things, operating expenses and investments in inventory and receivables associated with preparing for and launching Respivir. On September 14, 1993, MedImmune announced that it had signed a letter of intent to acquire Melville Biologics, a developer of blood derivative products, for $ 40 million in newly issued shares of MedImmune, an acquisition which, according to MedImmune, would provide additional manufacturing capacity for Respivir. On November 9, 1993, the company reported improved third quarter results and publicized that it had signed a definitive agreement with **[**5]** Cyanamid to form the previously publicized alliance.

On December 2, 1993, the bottom fell out of the market for MedImmune stock. n2 On that date, the Blood Products Advisory Committee of the FDA held its hearing on the PLA for Respivir and, citing various flaws in the study design, voted 11 to 0 against recommending approval of the drug by the FDA.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The stock, which had traded as high as $ 31.25 per share as of November, 1993, fell to $ 11.75 per share on December 3, 1993.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

At the hearing various presenters came forth to make the case that Respivir was safe and effective. n3 The presenters included Dr. George Siber, Director of the Massachusetts Public Health Biological Laboratories, Associate Professor of Medicine at Harvard University and consulting physician in infectious diseases at the Dana-Farber Cancer Institute and Children's Hospital in Boston; Dr. Jessie Groothuis of the University of Colorado Children's Medical Center; and Defendant Top, who was identified to the panel by Dr. Siber as a pediatric infectious **[**6]** disease specialist with special interest in respiratory viral infections and one who, prior to joining MedImmune, had been Director of the Walter Reed Army Institute of Research.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 In connection with the Motion to Dismiss, the parties have submitted the transcript of the Advisory Committee hearing as well as numerous other documents to the Court. The Court considers these documents inasmuch as they are referred to in the Consolidated Amended Complaint and relied upon by Plaintiffs in bringing the action. See Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991), cert. den., 112 S. Ct. 1561, 118 L. Ed. 2d 208 (1992).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Dr. Siber told the Committee of the development of Respivir and described studies relative to the preparation of the drug. Dr. Groothuis described the multi-center double blind evaluation of Respivir in preventing RSV infections as reported in an article published just a few weeks before in the New England Journal of Medicine; and Dr. Top discussed [**7] the safety of Respivir in high risk children. Dr. Siber stressed the "truly ... collaborative effort" that characterized the development and evaluation of Respivir.

He concluded the presentation to the Advisory Committee by summarizing several main points:

> First . . ., RSV is the single most common cause of respiratory infection in children. This virus causes particularly severe illness, with substantial morbidity, in high risk children with prematurity and chronic lung disease. About one in 4 high risk infants develop RSV LRI (lower respiratory infection) in any given season.

> Second, there is currently no effective preventive measure available for RSV. RSVIG (Respivir) thus offers a unique therapeutic modality. RSVIG is a well-characterized immune globulin which is selectively enriched, about five to ten-fold, in RSV neutralizing activity.

> [Further], RSVIG . . . is safe in infants with prematurity and chronic pulmonary disease.

> [Finally], RSVIG clearly prevented severe disease, not only as measured by an objective scoring system, but also by more practical real life measures, such as hospitalization [*958] with RSV infection and ICU admission with RSV infection.

Dr. Siber closed [**8] on the following note:

> I'd like to conclude by thanking our colleagues at FDA for their extraordinary efforts in reviewing our PLA submissions in a thorough and timely manner so that this meeting could be scheduled at this time, just before the onset of the RSV season.

> If the product is promptly approved, we believe that we can make it available to a substantial number of high risk children during this season and then fully introduce the product before the onset of the next season.

In the question and answer period that followed, however, Advisory Committee members expressed concern that inadvertent bias in the study design might have undermined the reliability of the data. For instance, although FDA staffers agreed that the deaths of 6 of the 249 children participating in the study were not statistically significant and that there was no evidence linking the deaths to the drug, Committee members favored further study to determine the extent to which treatment with the drug may have contributed to the deaths. At least a few members, however, stated unequivocally that they believed the data indicated the deaths were not related in any way to the treatments. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 In the July 21, 1994 edition of the New England Journal of Medicine, published several months after the Blood Products Advisory Committee hearing, FDA staffers commented on the concern they had had with this issue during the review process:

> As the report made clear, six children in this study died, none from RSV infection. . . . None of these deaths were clearly attributable to treatment, although in two cases treatment could have exacerbated the fluid overload that contributed to the deaths.

The authors of the study replied in the same New England Journal of Medicine issue:

> Space limitations in our article did not permit us to describe the extensive investigation of the deaths of study patients that we presented to the FDA. A review of case histories by two independent pediatric cardiologists yielded that no temporal association or plausible link between the study infusion and death in five patients with cardiac disease.

As to the infant who died, the authors continued, that infant had bronchopulmonary dysplasia and died 3 months after the infusion of the drug. However, according to the authors, "in a subsequent open-label trial of high-dose intravenous RSV immune globulin in 68 infants with bronchopulmonary dysplasia or prematurity, no deaths have occurred to date."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - [**9]

At the December 1993 meeting, Advisory Committee members also expressed concern about the concentration of treatment response at the Denver site, as well as the enrollment procedure used there, which they believed might have compromised random assignment of trial participants to treatment groups. Specifically, the nurse coordinator who enrolled the children in the study at the Denver site was said to have known the patient histories and interim results of the trial and therefore was not blinded to the test participants. While there was no evidence of purposeful assignment by the nurse coordinator in Denver, inadequate randomization and blinding at that site apparently gave the Committee pause because the incidence of RSV LRI and evidence of a treatment effect were in fact considerably higher at Denver than at the other four test sites and thus may have driven the overall study results. Some Committee members, however, acknowledged that possible explanations for the more significant results at the Denver site might have been Denver's high altitude or other local

environmental factors as opposed to selection bias. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Moreover, in the July 21, 1994 New England Journal of Medicine, the authors of the study indicated that: "although the advisory committee expressed concern about the method of randomization at Denver, a thorough audit revealed no evidence of bias in treatment assignment by the study nurse."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**10]**

Finally, Advisory Committee members expressed concern about the lack of follow-up data for 17 patients who had dropped out of the trial, on the grounds that, without knowing if any of the dropouts had contracted RSV LRI, the statistical significance of the 17 dropouts could not be properly measured. n6

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 FDA staffers elaborated this concern in the July 21, 1994 issue of the New England Journal of Medicine:

> The published report stated that all analyses followed the intention-to-treat principle. The material submitted to the FDA specifically stated that all children who underwent randomization and for whom written informed consent was obtained were followed for outcome assessment. In fact, this was not the case. Eight children who were identified as study participants were not followed, because of failure to obtain written informed consent or ineligibility discovered after entry into the study. Seven of these eight were assigned to an active-treatment group. Seventeen children were known to be eligible and to have had written consent provided, but they were not followed and therefore were not included in the report. All 17 children had been assigned to one of the two active-treatment groups. Although the numbers are small, these children appeared to differ from the children remaining in the study in a number of ways. They tended to be younger, had lower birth weights, were more likely to be female and nonwhite, had fewer prior infections, and in almost all cases had bronchopulmonary dysplasia or premature birth. Furthermore, the dropouts were predominantly from two of the five study sites. All these imbalances, particularly the imbalance in treatment assignment, suggest that the dropouts were not a random subsample of the originally randomized group, hence the assumption that they were prognostically similar to the other children may not be valid.

To this the authors replied:

> Our report analyzed all 249 children described by the investigators, whether or not the children received any treatment. While our article was in press, an FDA-requested review identified 25 dropouts who had been randomized but not included in the analysis. . . . For all 25 children, we reviewed the hospital records or interviewed the parents or physicians, and we found that there had been two additional hospitalizations related to RSV, both in the high-dose group. . . . The efficacy of high-dose treatment remains significant after the inclusion of all the

dropouts in the intention-to-treat analysis. An intention-to-treat analysis of all 257 randomized, eligible, enrolled children yields a 65 percent reduction in hospitalization with RSV in the high-dose group (p = 0.01)."

The authors ended their response by reaffirming their confidence in the study: "We continue to believe that intravenous RSV immune globulin is safe and effective in preventing severe RSV disease in infants at high risk."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**11]

[*959]  The day following the Advisory Committee vote Biocentury (The Bernstein Report on Biobusiness) carried an article reporting the vote. The article indicated that at least some FDA analysts believed the data supported MedImmune's assertion that Respivir reduced the frequency and severity of RSV LRI. Moreover, the same article quoted Jay Epstein, Acting Director of the FDA's Office of Blood Research and Review, as saying that the Advisory Committee's failure to recommend Respivir for approval "could have been prevented with better attention all around," including communications between and among the FDA, the National Institutes of Health, and MedImmune. Epstein reportedly told Biocentury that "the error was in not recognizing that the less rigorous procedures were not acceptable." On the other hand, Dorothy Scott, a staff fellow in the same FDA office, reportedly told Biocentury that the FDA had been warning MedImmune "for a long time" about problems with the study design, suggesting that there could have been problems with randomization "as early as August, when a letter was sent out asking for more information." Scott is reported to have further stated that MedImmune appeared [**12] to understand FDA's position and simply disagreed.

III.

A.

Plaintiffs contend that Defendants knew about or recklessly disregarded the Respivir study design limitations from the outset. In particular, Plaintiffs say, Defendants knew or should have known:

(a) that the deaths of the 6 patients in the study might have been related in some way to the administering of the drug;

(b) that there were problems with randomization of the Denver patients and that those Denver results disproportionately contributed to the conclusion that Respivir was effective in preventing RSV;

(c) that the study at the Denver site was not properly blinded to prevent bias; and

(d) that the trial was not conducted on an "intention to treat" basis because the data did not include results for patients who had been enrolled in the trial but had dropped out and were not subsequently followed to see if they developed further infections.

Each of these concerns, Plaintiffs suggest, was communicated by FDA to Defendants at various stages of the PLA review process [*960] and constituted unmistakable notice that ultimate approval of the drug by the FDA was in jeopardy.

According to Plaintiffs, Defendants nonetheless caused false [**13] or misleading statements to be made or omitted to make clarifying statements, which had the effect of

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 *HN10*To fulfill the materiality requirement in the § 10(b) and Rule 10(b)-5 context, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The third category of potentially misleading statements, those involving MedImmune's explanations for the postponement of the Blood Products Advisory Committee hearing, also survives dismissal at this stage. When MedImmune announced on September 1, 1993, that FDA had postponed its review of the Respivir PLA, Defendant Hockmeyer was quoted as saying,

> There are a lot of things that had to happen in a short time frame and a few pieces of data that need to continue to be analyzed. Until they (the FDA) reach a comfort level of having gone through everything, they **[**41]** don't feel comfortable going through the advisory committee. I don't think it's anything more than that. We understand and accept that.

A week later, on September 8, 1993, Hockmeyer was quoted in the Baltimore Daily Record to the effect that "the FDA simply has been unable to complete all of its necessary work on the application. . . ."

Arguably both of these statements were attempts to reassure the public that FDA's postponement of the drug review was not a cause for concern and simply a matter of routine. But the comments of Dorothy Scott, staff fellow at FDA's Office of Blood Research and Review, reported in Biocentury the day after the Advisory Committee vote, suggest that, by the time of the statements, FDA may have taken a harder line and MedImmune may in fact have been aware of considerably more serious reasons for the postponement. Scott reportedly said that FDA had notified MedImmune of problems with randomization "as early as August, when a letter was sent out asking for more **[*968]** information." If FDA had indeed communicated such concern to MedImmune and did so in such a way as to indicate that ultimate approval of Respivir looked problematic, then Hockmeyer's statements **[**42]** could possibly have misled an investor into thinking that the review process remained totally problem-free. These statements, therefore, remain in the case for purposes of discovery and trial.

Finally there is the statement made, inter alia, by Defendant Top in the New England Journal of Medicine Article dated November 18, 1993, which indicates that the Respivir study was conducted on the basis of the "intention to treat" principle. That article, hence the specific representation regarding "intention to treat," was endorsed by MedImmune, which offered to send copies of reprints to its investors. Although Defendants may dispute the precise meaning of the term, Plaintiffs have pled that "intention to treat" is a term of art with specific meaning, i.e. that all patients who are enrolled and randomized in a drug study are to be followed and their outcomes reported and included in the statistical analyses even if the patients do not in fact complete the course of treatment. Moreover, according to Plaintiffs, the FDA study protocol for Respivir stated that all patients who signed consent forms and

were randomized into the study would be followed and their outcomes reported, a procedure **[\*\*43]** which would be consistent with the intention to treat principle. n13 But in fact at least 17 children known to be eligible for participation in the study, all of whom had written consent provided, dropped out of the study, were not followed and therefore were not included in the report. According to Plaintiffs (as well as the Advisory Blood Products Committee), the absence of reliable outcome data on those 17 dropouts would make it impossible to determine which of the children experienced RSV LRI and which did not and might therefore bias the result. An investor sophisticated enough either to know the meaning of "intention to treat" or to inquire about it could arguably have been led to believe that, since the principle had reportedly have been utilized, the statistical dependability of the study was better than it in fact was; in short, the investor could have been misled. The statement, therefore, must also remain in the case.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n13 Defendants dispute that "intention to treat" was part of the protocol, at least initially. That, of course, is irrelevant. The New England Journal of Medicine article still states that the "intention to treat" principle was followed and the question remains whether use of that term was false or misleading under the circumstances.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*\*44]**

V.



**HN11**With regard to common law fraud (Count III), Plaintiffs are required to plead that a particular representation was false, made with knowledge of its falsity, made with the intent that Plaintiffs rely on it, and that there was reliance in fact. See Martens Chevrolet Inc. v. Seney, 292 Md. 328, 439 A.2d 534 (1982). The most prominent distinction between common law fraud and a 10(b)-5 violation is that the latter permits recovery based on a "fraud on the market" theory which presumes reliance, while the former requires proof of actual reliance. Most state courts have rejected the fraud on the market concept in connection with common law fraud claims, see, e.g., Peil v. Speiser, 806 F.2d 1154, 1163 n.17 (3d Cir. 1986); In re Bexar Co. Health Facility Dev. Corp. Litig., 125 F.R.D. 625, 636 (E.D.Pa. 1989), but see, e.g., South Carolina Nat'l Bank v. Stone, 139 F.R.D. 325, 333-34 (D.S.C. 1991), and there is no reason to suppose that Maryland courts would do otherwise. Cf. PPM America, Inc. v. Marriott Corp., 820 F. Supp. 970, 979 (D.Md. 1993) **[\*\*45]** (apparently finding individual reliance adequately pled); cf. also In Re Kirschner Medical Corp. Sec. Litig., 139 F.R.D. 74, 83 (D.Md. 1991) (recognizing that "plaintiffs may be required to prove individual reliance"). Since failure to plead actual reliance is grounds for dismissal of the common law count, see, e.g., Morse v. Abbott Labs, 756 F. Supp. 1108, 1112 (N.D. Ill. 1991), In re Wyse Technology Sec. Litig., 744 F. Supp. 207, 209 (N.D.Cal. 1990), Plaintiffs' failure to plead that element occasions dismissal of the count in this case.

VI.

Plaintiffs have also pled **HN12**negligent misrepresentation (Count II), a cause of **[\*969]** action separate and distinct from common law fraud. See Martens Chevrolet, Inc., 292 Md. 328, 439 A.2d 534. Negligent misrepresentation consists of (1) a duty of care owed by defendant to plaintiff; (2) negligent assertion of a false statement by defendant; (3) intent on the part of defendant that plaintiff act upon the statement; (4) knowledge that plaintiff will probably rely on the statement which, if erroneous, will cause loss **[\*\*46]** or injury; (5) plaintiff's justifiable and actual reliance on the statement; and (6) proximate damage to plaintiff. Id. As with the common law fraud count, failure to plead actual reliance element is fatal to the negligent misrepresentation count, but there is more. On the facts pled, the Court

finds that under Maryland law Defendants would have no duty to Plaintiffs to disclose information with care. Unless an "intimate nexus" exists between a defendant and plaintiff, e.g. one satisfied by "contractual privity or its equivalent," see Jacques v. First National Bank, 307 Md. 527, 534-35, 515 A.2d 756 (1986), no duty of care arises. General public statements, including press releases aimed at the "general universe" as opposed to an identifiable group of individuals, will not give rise to the duty. PPM Am., Inc., 820 F. Supp. at 979; Tischler v. Baltimore Bancorp, 801 F. Supp. 1493, 1506 (D.Md. 1992). Since Plaintiffs' claim is clearly comprised of statements aimed at the "general universe," their pleading states no cause of action for negligent misrepresentation under [**47] Maryland law, and the count must be dismissed.

VII.

A final word is in order with regard to whether Plaintiffs should be granted leave to amend their complaint further. This action began on December 3, 1993. Plaintiffs amended their complaints once in the course of consolidating the various actions, a process that took over four months. The current Consolidated Amended Complaint is 50 pages long and refers to and incorporates by reference extensive additional documents. Out of a mountain of alleged actionable statements, but four have survived the Motion to Dismiss and those may or may not ultimately prove successful. Under the circumstances, the Court agrees, except as specifically set forth in this opinion, that Plaintiffs should not be granted leave to replead. As in USF&G, U.S. Dist. LEXIS 10064, at 24-25, despite a ponderous complaint and an earlier opportunity to cure pleading deficiencies, Plaintiffs have "failed to demonstrate that the underlying facts set forth a proper subject relief." Plaintiffs are not entitled to another "opportunity to test the merits of their claim," Id., since, as Chief Judge Motz phrased it in Gollomp, 756 F. Supp. at 232, [**48] "a fraud suit cannot itself be the vehicle for initially uncovering fraud." Finally, as in USF&G, at least as to the vast bulk of Plaintiffs' claims, "another round of repleading would inflict undue prejudice on defendants, whose reputations have suffered under the weight of an unsupported allegation of fraud." USF&G, U.S. Dist. LEXIS 10064, at 24-25.

VIII.

A separate Order will be entered implementing this Opinion.

PETER J. MESSITTE

UNITED STATES DISTRICT JUDGE

January 10, 1995

ORDER

Upon consideration of Defendants' Motion to Dismiss and Plaintiffs' Opposition thereto, oral argument having been held thereon, it is 10th day of January, 1995

ORDERED that Defendants' Motion is hereby DENIED IN PART and GRANTED IN PART; and it is further

ORDERED that Defendants' Motion is DENIED with respect to the following statements:

1) Defendant Mott's alleged statement of April 27, 1993 that "there is absolutely no question about the efficacy (of Respivir)";

2) Defendant Hockmeyer's September 1, 1993 statement of the reasons why the FDA had postponed its review of the Respivir product licensing application;

3) Defendant Hockmeyer's alleged statement of September 8, 1993, regarding the **[\*\*49]** reasons for the delay of review of the drug by the FDA;

4) Defendant MedImmune's press release of November 17, 1993, insofar as it endorsed the upcoming New England Journal of Medicine **[\*970]** article, specifically the assertion in the article that the Respivir study was conducted on an "intention to treat" basis; and

5) The New England Journal of Medicine article of November 18, 1993, as co-authored by Defendant Top and endorsed by Defendant MedImmune, specifically insofar as the article claimed that the study of Respivir had been conducted on an "intention to treat" basis; and it is further

ORDERED that the Motion to Dismiss is hereby GRANTED, without leave to amend, as to all other statements contained in the Consolidated Amended Complaint; and it is further

ORDERED that Counts II and III of the Consolidated Amended Complaint are hereby DISMISSED; and it is further

ORDERED that the Court's stay of discovery is hereby lifted and discovery may proceed forthwith.

PETER J. MESSITTE

UNITED STATES DISTRICT JUDGE

Source:  Legal > / . . . / > **Federal & State Cases, Combined** 📖
Terms:  **name(medimmune, inc.)** (Edit Search)
View:  Full
Date/Time:  Friday, April 15, 2005 - 5:36 PM EDT

\* Signal Legend:
  ● -  Warning: Negative treatment is indicated
  ▦ -  Questioned: Validity questioned by citing refs
  ▲ -  Caution: Possible negative treatment
  ◆ -  Positive treatment is indicated
  Ⓐ -  Citing Refs. With Analysis Available
  ❶ -  Citation information available
\* Click on any *Shepard's* signal to *Shepardize*® that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 7

RECEIVED MAY 3 0 1995

**FILED**

MAY 2 6 1995

LARRY W. PROPES, CLERK
COLUMBIA S.C.

Entered: 5-26-95

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

IN RE: POLICY MANAGEMENT SYSTEMS
CORPORATION

                  :  Civil Action
                  :  No. 3:93-0807-17 (175)

SAMUEL SPEAR, LEE FOY EARLY, D.A.
EARLY, III, FREDERICK R. ENNIS, DR.
JERRY ROSENBAUM, BARRY ROSEMAN,
as Trustee of the Barry Roseman
Profit Sharing Plan, and THOMAS
MOORE, on behalf of themselves and
all others similarly situated,

                  :  Civil Action
                  :  No. 3:94-1150-17 (81)

          Plaintiffs,

         vs.

                  :  THIS ORDER REPLACES ORDER
                  :  DATED MAY 25, 1995

ERNST & YOUNG, and ARTHUR
ANDERSEN & CO.,

         Defendants.

---

**FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE**
**CORRECTED ORDER**

        The Plaintiffs and the Defendants, (as those terms are
defined in the Stipulation of Settlement dated as of March 10,
1995) (the "Stipulation"), by and through their attorneys or their
counsel of record, having executed and filed the Stipulation; the
Court having entered its Order thereon dated March 20, 1995,

EXHIBIT 12    #19720

96

directing that notice of the proposed Settlement[1] of the Litigation
be mailed to the Class and scheduling a Hearing to be held to
determine, among other things whether: (1) the proposed Settlement
should be approved as fair, reasonable and adequate; and (2) the
application of Plaintiffs' Counsel for the payment of attorneys'
fees and expenses and incentive awards to Plaintiffs is reasonable
and should be approved said notice having been given; a Hearing
having been held on May 25, 1995 at which all interested persons
were given an opportunity to be heard; and the Court having read
and considered all submissions in connection with the proposed
Settlement, and having reviewed and considered the files and
records herein, the Court finds and concludes that:

This Litigation was commenced in April, 1993.   Five
actions were consolidated as In re Policy Management Systems
Corporation, No. 3-93-0807-17 (the "Main Action").  In April, 1994,
a further action, Samuel Spear, et al. v. Ernst & Young, et al.,
No. 3-94-1150-17, was filed against PMSC's former auditors, Ernst
& Young (now Ernst & Young LLP) and Arthur Andersen & Co. (now
Arthur Andersen LLP).

The First Consolidated Amended Class Action Complaint,
filed in the Main Action, alleged claims for violations of Sections
10(b), 20(a) and 22A of the Securities Exchange Act of 1934, 15
U.S.C. 578 et seq. (the "Exchange Act"), and Rule 10b-5 of the
Securities and Exchange Commission ("SEC").  The complaint in the

---

[1]     All capitalized terms have the meaning or definition set
forth in the Stipulation.

- 2 -

JUL 15 '95 16:47 FF    BER & MONTAGUE    215 875 4673    192236030916192 P.19/35

Accountants' Action alleged claims for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  Both complaints also alleged claims under the South Carolina securities statutes and common law.

Defendants PMSC, David T. Bailey, G. Larry Wilson and Bernard C. Mazon in the Main Action answered the Consolidated Complaint.  The remaining Defendants in the Main Action moved to dismiss the Consolidated Complaint.  The Court granted in part and denied in part the moving defendants' motions to dismiss.  The Court denied the motions to dismiss the claims under Sections 10(b) and 20(a) of the Exchange Act, with the exception of the aiding and abetting and conspiracy claims, and the South Carolina statutes.  The Court denied the motions to dismiss with respect to the insider trading claims under Section 20A of the Exchange Act against Robert L. Gresham and granted the motions to dismiss with respect to the claims against defendants Donald A. Coggiola, Charles E. Callahan and Bernard C. Mazon.  With respect to the negligent misrepresentation claim, the Court granted Plaintiffs leave to replead so as to set out a subclass of Persons who purchased securities in reliance upon the alleged misrepresentations of the Defendants and the moving defendants subsequently answered.

Defendants Ernst & Young and Arthur Andersen moved to dismiss the complaint in the Accountants' Action.  The Court denied Ernst & Young's motion to dismiss the claims under Section 10(b) of the Exchange Act.  The Court granted Arthur Andersen's motion to dismiss the claims under Section 10(b) of the Exchange Act with

- 3 -

JUN 15 '95 16:47 F    ERGER & MONTAGUE    215 675 4673    ;592236200916192 P.28/35

respect to all plaintiffs, but one. The Court granted Ernst & Young's and Arthur Andersen's motion to dismiss the state securities law claims and common law claim of negligent misrepresentation.

In the Approval Order dated March 20, 1995, the Court approved the Plaintiffs as representatives of the Class and conditionally certified, for purposes of the Settlement, a Class comprised of:

> All persons who purchased shares of common stock of Policy Management Systems Corporation ("PMSC") during the period from March 18, 1992 through and including July 8, 1993 (the "Class Period"), excluding: defendants PMSC, Ernst & Young LLP, Arthur Andersen LLP, and their officers, directors, partners, corporate affiliates, and subsidiaries; the Individual Defendants, their heirs, successors, and assigns, and the immediate families of the Individual Defendants; and International Business Machines Corporation ("IBM") and its officers, directors, corporate affiliates, and subsidiaries.

This definition of the Class applies for purposes of the Litigation, the Settlement and this Final Judgment and Order of Dismissal With Prejudice (the "Final Judgment").

The Stipulation between and among the Plaintiffs and Defendants provides for the Settlement of the Litigation on behalf of the Plaintiffs and all Class Members with the Defendants subject to approval by this Court of its terms and to the entry of this Final Judgment. The Court scheduled a Hearing to consider the approval of the Stipulation, and directed that notice of the proposed Settlement and Hearing be mailed to all members of the Class.

- 4 -



101

In accordance with the Stipulation, and an Approval Order of the Court entered on March 20, 1995, Settlement Counsel caused to be mailed to the Class, a notice (the "Notice") dated March 27, 1995 and caused to be published in the national edition of The Wall Street Journal and The State, a South Carolina newspaper, a summary notice (the "Summary Notice") of the proposed Settlement of the Litigation and of the opportunity to object to the Settlement. Affidavits and/or declarations of mailing of the Notice and publication of the Summary Notice were filed with the Court on May 19, 1995.

The Notice and Summary Notice provided to potential members of the Class constitute the best and most practicable notice under the circumstances and include individual notice to all members of the Class who could be identified by reasonable effort. The affidavits or declarations of mailing filed with this Court demonstrate that this Court's orders with respect to the Notice and Summary Notice have been complied with and further, that the best and most practicable notice under the circumstances was in fact given and constituted valid, due, and sufficient notice to members of the Class, complying fully with due process and Rule 23 of the Federal Rules of Civil Procedure and any other applicable law.

Plaintiffs and the Defendants have applied to the Court for approval of the terms of the Stipulation and for the entry of this Final Judgment. Pursuant to the Notice and Summary Notice, and upon notice to all parties, a Hearing was held before this Court on May 25, 1995, to consider, among other things, whether the

- 5 -

1:2

JUN 15 '95 16:49 FR  TRGER & MONTAGUE    215 875 4673 ·  5522368090916192 P.22/35

Settlement set forth in the Stipulation should be approved by this Court as fair, reasonable, and adequate and whether the application of Plaintiffs' Counsel for the payment of attorneys' fees and expenses and incentive awards to Plaintiffs is reasonable and should be approved by this Court.

Approval of the Stipulation will result in substantial savings in time and money to the Court and the litigants and will further the interests of justice.

The Stipulation is the product of good faith arm's length negotiations by the Parties thereto.

NOW THEREFORE, GOOD CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1.    The Court has jurisdiction over the subject matter of this Litigation and all Parties in this Litigation, including all Class Members.

2.    The members of the Class who have filed timely and valid requests for exclusion (and who are therefore not Class Members) are not bound by this Final Judgment. A listing of those persons is attached hereto as Exhibit 'A'. All Class Members who purchased FMSC common stock during the period from March 18, 1992 through and including July 8, 1993 are bound by this Final Judgment and by the Settlement, including the releases provided for in this Final Judgment.

3.    The Stipulation and Settlement are not an admission by the Defendants, and this Final Judgment is not a finding of the validity of any claims in the Litigation or of any wrongdoing by

· 6 ·



1·6

Defendants.     Furthermore, neither the Stipulation nor the Settlement are a concession by any Defendant and neither shall be used as an admission of any fault or omission by any person. Neither this Final Judgment, the Stipulation nor any document referred to herein nor any action taken to carry out this Stipulation, is, may be construed as, or may be used as an admission by or against the Defendants of any fault, wrongdoing or liability whatsoever.     Entering into or carrying out the Stipulation, and the Exhibits thereto, and any negotiations or proceedings related thereto shall not in any event be construed as, or deemed to be evidence of, an admission or concession with regard to the denials or defenses by any of the Defendants and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, other than to enforce the provisions of this Final Judgment, the Stipulation, or the provisions of this Final Judgment or any related agreement or release; except that the Stipulation and the Exhibits may be filed in this litigation or related litigation as evidence of the Settlement or in any subsequent action against or by the Defendants to support a defense of res judicata, collateral estoppel, release, or other theory of issue preclusion or similar defense.

4.     The Stipulation and Settlement are fair, reasonable and adequate as to the Class, and the Stipulation and Settlement are hereby finally approved in all respects, and the Parties to the

- 7 -

104

Stipulation are hereby directed to consummate and perform its
terms.

5.    This Litigation is dismissed on the merits, with
prejudice    and without costs to any Party as
against any other, and all Class Members (except those identified
in Exhibit "A" who have requested exclusion from the Class) are
forever barred from commencing or prosecuting, either directly,
derivatively, in a representative capacity, or in any other
capacity, a class action or any other action against the Defendants
and the Released Parties (as defined in the Stipulation) with
respect to, based on, arising from, or for any and all Settled
Claims, including Unknown Claims, demands, rights, liabilities and
causes of action of every nature and description whatsoever, known
or unknown, asserted or that might have been asserted, including
but not limited to, claims for negligence, gross negligence, breach
of duty of care and/or breach of duty of loyalty, breach of duty of
candor, fraud, negligent misrepresentation, breach of fiduciary
duty or violations of any state or federal statutes, rules or
regulations by any Class Member arising out of, relating to, or in
connection with purchases, sales, or ownership of PMSC common stock
during the Class Period or arising out of or related to any of the
acts, omissions, misrepresentations, facts, events, matters,
transactions or occurrences referred to or which could have been
referred to in any of the complaints or other pleadings filed in
the Litigation or otherwise alleged, asserted or contended in the
Litigation based upon the facts alleged in any of the complaints.

- 8 -

105

6. On the Effective Date, as defined in the Stipulation, each member of the Class who has not timely and validly requested exclusion shall be deemed conclusively to have released the Settled Claims, including Unknown Claims, against the Defendants and the Released Parties. Notwithstanding that the Plaintiffs and/or Class Members may hereafter discover facts in addition to or different from those which the Plaintiffs or Class Members now know or believe to be true with respect to the Litigation and the Settled Claims, including Unknown Claims, or to the subject matter of the release, each such Plaintiff and Class Member shall be deemed, upon the Effective Date, to fully, finally and forever settle and release any and all Settled Claims, including Unknown Claims, against the Defendants and the Released Parties, including all claims known or unknown, suspected or unsuspected, contingent or non-contingent, which now exist, may hereafter exist, or heretofore have existed, and without regard to the subsequent discovery or existence of such different or additional facts.

7. From and after the Effective Date, each Class Member individually, completely, voluntarily, knowingly, unconditionally and forever releases, remises, acquits and discharges Plaintiffs and Plaintiffs' Counsel from every and all asserted or potential, separate, joint, individual claim, class claim, or other claims, actions, rights, causes of action, demands, liabilities, losses and damages of every kind and nature, anticipated or unanticipated, direct or indirect, fixed or contingent, known or unknown, under

- 9 -

106

JUN 15 '95 16:49 F  BERGER & MONTAGUE    215 875 4673    1592236008916192 P.26/35

federal, state or common law or any other law or regulation, or at equity, against Plaintiffs and Plaintiffs' Counsel or any of them, which are based upon or arise out of the institution, prosecution, assertion or resolution of the Litigation or the Settled Claims, including Unknown Claims.

8.    Defendants shall be deemed conclusively to have released the Plaintiffs and Plaintiffs' Counsel from only those claims or potential claims against Plaintiffs and Plaintiffs' Counsel which are based upon or arise out of the institution, assertion, prosecution or resolution of this Litigation, or the Settled Claims, including Unknown Claims, except that nothing herein releases any claim arising out of a violation of the Stipulation or a violation by Plaintiffs or Plaintiffs' Counsel of the Confidentiality Orders in place in the Litigation.

9.    Each member of the Class who did not timely and validly request exclusion is barred and permanently enjoined from commencing and prosecuting, either directly, derivatively, in a representative capacity, or in any other capacity, against the Defendants and the Released Parties, any and all of the Settled Claims, including Unknown Claims.

10.   Members of the Class who have validly and timely requested exclusion may pursue their own individual remedies, if any.

11.   The law firms representing Plaintiffs and the Class are hereby awarded, from the Settlement Fund, attorneys' fees in the amount of $ 9,300,000.00   , representing  30  % of the

- 10 -



107

JUN 15  95 16:49 F' BERGER & MONTAGUE    215 875 4673    1552236208916192 P.27/35

Settlement Fund, and the reimbursement of their expenses in the amount of $1,495,860.43 plus a proportionate share of the interest earned by the Settlement Fund of those amounts.  Both amounts shall be paid at the time indicated in the Stipulation.  In the event the Settlement is cancelled or terminated, Plaintiffs' Counsel shall, within ten days of notice of termination or cancellation, refund any and all Attorneys' Fees and Expenses distributed to them from the Settlement Fund, together with accrued interest, in accordance with the Stipulation.

12.  Each named Plaintiff is awarded, from the Settlement Fund, an incentive payment in the amount of $5,000.00    to be paid to each named Plaintiff, on the Effective Date, as defined in the Stipulation.  Such amount shall be paid in addition to each Plaintiff's pro rata share of the Net Settlement Fund.

13.  The Court reserves jurisdiction, without affecting the finality of this Final Judgment, over:  (a) implementation of this Settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Net Settlement Fund; (c) enforcing and administering the Stipulation including any releases executed in connection therewith; and (d) other matters related or ancillary to the foregoing.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.
United States District Judge

May 26    , 1995.
Columbia, South Carolina

/hml

- 11 -

108

# EXHIBIT 8

Case 1:00-cv-02174-MJG     Document 158-6     Filed 04/18/2005     Page 83 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 1 of 14

Service: **Get by LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 6621**

*1994 U.S. Dist. LEXIS 6621, \**

IN RE: PRUDENTIAL-BACHE ENERGY INCOME PARTNERSHIPS SECURITIES LITIGATION

MDL DOCKET NO. 888 SECTION: "E"

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

1994 U.S. Dist. LEXIS 6621

May 18, 1994, Decided
May 18, 1994, Filed, Entered

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner attorneys sought an award in the sum equal to 25 percent of a final settlement pool, attorney fees, and expenses. The attorneys initially sought an award based on a 30 percent calculation.

**OVERVIEW:** Attorneys represented class members in a class action lawsuit. A settlement notice was mailed to the class members, and it stated that the attorneys would apply for a fee of up to 30 percent of the settlement pool. The court awarded attorney fees and expense reimbursement in an amount representing 25 percent of the final settlement amount. It held that the attorneys achieved a result that was fair and reasonable under the circumstances. The relationship between the attorneys and the members of the class was contingent in nature and suggested that the fee sought was eminently fair and reasonable. The settlement fund was placed in an interest-bearing account, and the attorneys were granted interest on the fees and expenses awarded at the same rate as interest was earned by the settlement fund.

**OUTCOME:** The court awarded the attorneys the fees and expenses they requested. An award of $ 525,000.00, attorney fees and expenses inclusive, together with accrued interest thereon, was made.

**CORE TERMS:** lodestar, settlement, fee award, partnership, skill, objector's, reduction, aggregate, duplication, contingent, reputation, class action, common fund, chair, deposition, spent, multiplier, recommendation, reimbursement, compensate, inclusive, pool, results obtained, prevailing, customary, hourly, complex litigation, fee request, memorandum, coordination

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount 🔍
Civil Procedure > Costs & Attorney Fees > Attorney Fees 🔍
*HN1* ⚖ The factors considered in a lodestar/multiplier analysis are: (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) awards in

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 84 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 2 of 14

similar cases. <u>More Like This Headnote</u>

Civil Procedure > <u>Costs & Attorney Fees</u> > <u>Reasonable Fee Amount</u> 
HN2⚓In determining a reasonable attorney fee amount, first considered is the time and
labor required, the lodestar, which begins with a calculation of the number of hours
reasonably expended multiplied by the prevailing hourly rate in the community for
similar work. <u>More Like This Headnote</u>

Civil Procedure > <u>Costs & Attorney Fees</u> > <u>Reasonable Fee Amount</u>
HN3⚓When an attorney's customary billing rate is the rate at which the attorney
requests the lodestar be computed and that rate is within the range of prevailing
market rates, the trial court should consider this rate when fixing the hourly rate to
be allowed. When that rate is not contested, it is prima facie
reasonable. <u>More Like This Headnote</u>

Civil Procedure > <u>Costs & Attorney Fees</u> > <u>Reasonable Fee Amount</u>
HN4⚓A step in the process to arrive at a final fee award is to adjust the lodestar amount
on the basis of any of the remaining factors that are applicable to the particular
case and that were not taken into account when calculating the initial
lodestar. <u>More Like This Headnote</u>

**JUDGES:** **[*1]** LIVAUDAIS, JR.

**OPINIONBY:** MARCEL LIVAUDAIS, JR.

**OPINION: FINDINGS AND CONCLUSIONS ON AWARD OF ATTORNEY'S FEES AND
EXPENSES**

The Court fully incorporates herein its earlier Memorandum to the Record (Record Document
- R. D. 334) and its First Partial Findings and Conclusions on Award of Attorney's Fees and
Expenses (R. D. 354).

The settlement pool or common fund amounts to approximately $ 90 million. The Court will
award 25% thereof, attorney's fees and expenses inclusive (the Award) to participating
counsel. The Court has considered, inter alia, that the settlement notice which was mailed to
some 130,000 class members stated that counsel would apply for a fee award of up to 30%
of the settlement pool and that any class member could object to the fee application. No
member of the class has, to the Court's knowledge, filed any meaningful objection to this
amount.

Initially counsel sought an Award based on a 30% calculation (R. D. 271), but now seek and
have stipulated n1 to an Award in the sum equal to 25% of the final settlement pool, fees
and expenses inclusive. (R. D. 373).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Former Objector's counsel, the firm of Fleming, Hovenkamp & Grayson, P.C. (Fleming)
was not a party to this stipulation.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*2]**

Though a percentage method has been utilized in making this Award, the Court also

undertakes a lodestar/multiplier analysis considering the 12 factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). n2 Each approach results in a near identical result.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 *HN1* The Johnson factors are: (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) awards in similar cases. Johnson, 488 F.2d at 717-19.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

A review of the requests as of December 1993 for attorney's fees and reimbursement **[*3]** of expenses made by the various class counsel law firms (R.D. 271) reveals:

| Firm | Lodestar Fees | Hours | Attorney Rates | Expenses |
|---|---|---|---|---|
| Bernstein Litowitz | $ 1,870,863.75 | 5,919.75 | $ 425-170 | $ 652,826.49 |
| Gainsburgh Benjamin | 92,769.50 | 717.40 | 250-125 | 28,487.51 |
| Simon Peragine | 719,630.00 | 3,589.00 | 250-150 | 92,807.17 |
| Lieff Cabraser | 593,797.00 | 2,781.00 | 450-200 | 123,746.87 |
| Milberg Weiss | 497,941.25 | 2,015.75 | 425-125 | 43,184.10 |
| Wechsler Skirnick | 589,335.50 | 1,750.40 | 450-210 | 61,985.60 |
| Spector Roseman | 86,388.75 | 440.75 | 365-175 | 9,183.50 |
| Kantor Bernstein | 285,020.65 | 955.41 | 330-125 | 35,670.52 |
| Goodkind Labaton | 841,426.50 | 2,839.85 | 425-150 | 50,182.88 |
| Rudolph Seidner | 4,231.25 | 15.75 | 275-195 | 14.00 |
| Levin Fishbein | 14,211.25 | 36.25 | 400-235 | 222.66 |
| Garwin Bronzaft | 31,166.25 | 158.25 | 395-175 | 8,499.90 |
| Gilman Pastor | 117,337.50 | 396.50 | 300-180 | 14,219.36 |
| Beigel Schy | 256,731.25 | 882.00 | 400-225 | 27,288.89 |
| TOTAL | $ 6,000,850.40 | 22,498.06 | --- | $ 1,148,319.43 |

And a review of the similar requests made by former objectors law firms, excluding Fleming, Hovenkamp and Grayson, P.C. (Fleming), (R.D. 276 through 281) reveals:

| | | | | |
|---|---|---|---|---|
| Monroe Lemann | $ 331,770.95 | 1,987.27 | $ 235-120 | 51,776.08 |
| Krislov | 485,683.00 | 1,935.25 | 310-175 | 55,175.00 |
| Murray | 205,314.00 | 867.05 | 250-125 | 11,772.82 |
| Karen | 353,832.00 | 1,933.10 | 225-175 | 18,232.17 |
| Cohen Malad | 342,629.25 | 1,369.20 | 300-175 | 31,869.52 |
| Cin Schwachman | 232,274.00 | 988.40 | 235 | 9,636.33 |
| TOTAL | $ 1,951,503.20 | 9,080.27 | ---- | $ 178,461.92 |
| COMBINED TOTAL | $ 7,952,353.60 | 31,578.33 | ---- | $ 1,326,781.35 |

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 86 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 4 of 14

**[*4]**

The Court is aware that subsequent to the above requests not insignificant time and expense has been incurred by most counsel. Most significant is the preparation for and participation in the three day settlement fairness hearing in January of this year. The record reflects other activity in addition. The Court is further aware that having chosen the reasonable percentage method as opposed to the lodestar method of arriving at this Award, it is unnecessary for the Court to delve the intricacies of the fee paying market. The Award is not paid by the defendant as a losing party, instead the class members shoulder the burden of paying out of the common fund which the attorneys have created on their behalf. Additionally, a contingency enhancement is reasonable in this instant Award to the attorneys whose skill and effort helped create the fund. Were this not a class action, attorney's fees would range between 30% and 40%, the percentages commonly contracted for in contingency cases. Had the same skill and effort produced a much greater settlement pool, whether the result of a larger number of class members or otherwise, this Award would, of course, be calculated on a reduced percentage. **[*5]**  What the Court seeks to do here is to fashion an Award which is reasonable in light of the circumstances.

In accord with Longden v. Sunderman, 979 F.2d 1095 (5th Cir. 1992), the Court undertakes a Johnson factors analysis. **HN2**First considered is the time and labor required, the lodestar, which begins with a calculation of "the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work." Copper Liquor, Inc. v. Adolph Coors Co., 684 F.2d 1087, 1093 (5th Cir. 1982). Here the lodestar for all Class Counsel and Objectors' Counsel in this action excluding Fleming is $ 7,952,353.60. The breakdown of information with respect to the total lodestar is contained in individual firm affidavits for each petitioning firm. (R.D. 271, 276-281). Those affidavits set forth the names of the lawyers or paralegals of each firm who worked on the litigation, the hourly rates currently chargeable by each such professional, the lodestar value of the time, the hours, the major categories of work, the disbursements, the activities performed and the background and experience of each firm.

In considering **[*6]**  this lodestar information, several factors should be considered. First, as the history of the litigation and the accompanying affidavits of counsel make clear, the services they performed were of the highest quality to produce the substantial recovery for the Class.

Second, counsel have provided their services for the reasonable hourly rates charged to their clients for non-contingent cases or otherwise charged in similar litigation. Here, "the 'requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation,'" and, therefore, those rates are presumptively reasonable. Powell v. C.I.R., 891 F.2d 1167, 1173 (5th Cir. 1990) (quoting Blum v. Stenson, 465 U.S. 886, 895-96 n. 11, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984)). See also Major v. Treen, 700 F. Supp. 1422, 1434 (E. D. La. 1988) ("As the Supreme Court decisions have also made clear, experienced and expert attorneys who exhibit a high degree of skill have the right to have those factors calculated into the hourly rates"). **[*7]**  As stated by the Fifth Circuit:

**HN3**

When an attorney's customary billing rate is the rate at which the attorney requests the lodestar be computed and that rate is within the range of prevailing market rates, the court should consider this rate when fixing the hourly rate to be allowed. When that rate is not contested, it is prima facie reasonable.

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 87 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 5 of 14

Islamic Center of Miss., Inc. v. City of Starkville, Miss., 876 F.2d 465, 469 (5th Cir. 1989).

*HN4* The next step in the process to arrive at a final fee award is to adjust the lodestar amount on the basis of any of the remaining Johnson factors that are applicable to the particular case and that were not taken into account when calculating the initial lodestar, Cooper Liquor, Inc., 684 F.2d at 1092-93. Here, illustratively, counsel seek a multiplier of perhaps 2.5 - 3 as an adjustment to the lodestar amount, which they submit, is reasonable given, among other things, the contingent nature of the case, the results obtained and plaintiffs' counsel's experience in complex securities class actions such as the present litigation.

In accordance with the Manual for Complex **[*8]** Litigation, the Court's Case Management Order No. 1, entered on August 19, 1991, (R.D. 2), established a Plaintiffs' Executive Committee, with Edward Grossmann as Chair, and established a Committee of the Whole. Two local firms were appointed as Liaison Counsel. The Executive Committee, through its Chair, was responsible for coordinating and organizing the plaintiffs in the conduct of the litigation and coordinating and communicating with defendants' counsel. The Court has perceived that throughout this litigation Class Counsel operated in accordance with its order and attempted to avoid duplication and unnecessary effort.

Though it is often difficult to determine duplication from time records, in the two instances where objective data is available -- depositions and court conferences -- Class Counsel appear to have attempted to be judicious in their use of legal resources. For the most part, only one or two Class attorneys attended the status conferences, and a local and an out-of-town class attorney attended the depositions. It does not appear from the information available that Class Counsel inflated their lodestars through unnecessary duplication of work. Further, time records **[*9]** were properly kept contemporaneously.

Pursuant to the form of Order Approving Award of Attorney's Fees and Expenses attached as Exhibit "C" to the Court's Second Preliminary Order in Connection with Settlement Proceedings, (R. D. 258), Class Counsel's fee award is to be made to Class Counsel as a group, and not to the particular Class Counsel firms. The approved order provides that the "attorney's fees shall be allocated among the Class Counsel in a fashion which, in the opinion of the Chair of Plaintiffs' Executive Committee, fairly compensates Class Counsel for their respective contributions in the prosecution of the Consolidated Actions." For this reason, the Court addresses the fee application of Class Counsel as a group, and not with respect to particular firms. The Court's review does, however, reflect some deficiencies.

First, the class firms spent approximately 286 hours doing work relating to their attorneys' fee applications. Work relating to attorneys' fees applications is not compensable from a common fund since it only benefits counsel, not the fund. Thus a reduction in Class Counsel's aggregate lodestar to account for the time spent on fee applications must be considered. **[*10]**

Second, the class firms spent a number of hours on work related to a potential lawsuit against Parker & Parsley, which time is obviously not compensable in this case. They also seek compensation for an excessive amount of time reviewing documents and materials relating to the sale of the partnerships to Parker & Parsley, which time is also not compensable. Thus a further reduction in their aggregate lodestar must be considered.

Third, there are numerous instances in the time records of various Class Counsel where vague and nonspecific descriptions such as "work on file," "review of file," and "attention to file" are used excessively. While these deficiencies cannot be quantified in dollars, they warrant consideration of a further reduction in the aggregate lodestar of Class Counsel.

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 88 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 6 of 14

Other criticisms that could be made of Class Counsel's fee applications are largely subjective -- that too much time was spent reviewing documents, that there were too many intrafirm conferences, etc. Such problems are noted but not quantified as specific deductions to be made from lodestars.

Excluding the Fleming firm, six former objectors law firms have submitted fee and expense applications for their **[*11]** efforts. All of these firms were aligned in interest and were in a position to act in concert and coordinate their efforts from at least the date this Court entered its February 19, 1993, Order neither approving nor disapproving the initial proposed settlement. (R. D. 127). These firms seek an aggregate of $ 2,129,965.12 in fees and expenses.

These firms had a duty to the class and to the Court to act efficiently and, where possible, in concert to minimize cost to the class. The "traditional procedures -- which assume that all papers and documents are served on all attorneys and that each attorney will file motions, present arguments, and conduct examinations" -- must be reshaped in a complex case in the interest of economy and efficiency particularly for class cases where there is no client pressure to minimize cost. See Manual For Complex Litigation, Second, § 20.22 (1985). Scrutiny is needed to ensure that counsel act efficiently to avoid wasteful duplication which provides no benefit to the class. The Court should exclude from a fee request hours that are excessive.

Inasmuch as these six former objectors firms have agreed on the manner in which their portion of the attorney's **[*12]** fee award would be allocated amongst themselves, the Court addresses their fee application as a group as it did that of Class Counsel. Their agreement sets forth this division:

| | |
|---|---|
| Monroe Lemann | 20% |
| Krislov | 21 1/4% |
| Murray | 20% |
| Karen | 7% |
| Cohen Malad | 20% |
| Cin Schwachman | 11 3/4% |

A review of the documentation submitted in support of this fee application reveals that there was insufficient effort to avoid duplication in several instances. Multiple lawyers performed certain tasks when perhaps one or two would have been sufficient. These instances involve document analysis, motion practice, court conferences, depositions, and analysis of the partnership sales process and stands in contrast to the coordination exhibited by Class Counsel.

The Court does not and cannot second guess counsel's work or say that particular tasks need not have been done or took too long, nor does the Court perceive a pattern of duplication. It does appear, however, that counsel might have better coordinated their work with respect to depositions. In contrast to Class Counsel, which generally sent one or two representatives to each deposition, these counsel usually had three to five in attendance.

Similarly, on **[*13]** many occasions, multiple counsel travelled to New Orleans to attend the status conferences before the Court, when perhaps one or two would have been sufficient. For example, for the April 30, 1993 and May 17, 1993 conferences, there were five in attendance, three travelling from out of town. For no apparent reason, there were eight in attendance for the July 18, 1993, August 13, 1993, and October 26, 1993, conferences. In each case, six had travelled from out of town for the conference. At times, two from the

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 89 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 7 of 14

same firm travelled to New Orleans for a conference. In almost all instances, those who attended were affiliated with local counsel. And, generally, it was the same few who addressed the Court, while the rest were for the most part silent.

As a further example, seven took a trip to Houston in March of 1993 to meet with Parker & Parsley. Counsel also spent a significant amount of time doing other work related to the partnership sales process, a matter somewhat outside of the scope of their proper role. Although it is difficult to quantify the amount of time spent on the partnership sales process, it is questionable whether any of this work resulted in significant benefit to the **[*14]** Class. The successful bid by Parker & Parsley for the partnerships may have resulted from the Company's longstanding interest in the Income Funds and from the hostile offer by George Kaiser.

The fee applications submitted by counsel are to a degree out of line with their contribution to this case. As a group, counsel basically had one significant idea: the original settlement was unfair because of the amount of cash paid and the reorganization of the partnership into a new corporate entity. The Court does not dispute counsel's entitlement to reasonable fees for their efforts in connection with the initial fairness hearing in February of 1993 and thereafter.

Awarding of attorneys' fees is a matter within the Court's discretion. However, some of the lodestars for both the former objectors and Class Counsel should be reduced were the Court to make a lodestar award. Even in making a percentage-of-the-fund award, this has been taken into account.

Considering the remaining Johnson factors the Court observes that the issues, though not necessarily novel, posed difficulties which counsel overcame. In confronting the complex issues presented, Class Counsel were required to agree among **[*15]** themselves on a plan for the efficient coordination and management of class actions filed throughout the United States. Class Counsel put aside their differences and developed a case management structure which has resulted in effective coordination of what might have otherwise been almost unmanageable litigation. Significant and difficult questions were involved in this case, including substantive issues involved in the claims asserted and questions relating to the statute of limitations and class certification. Counsel were obviously possessed of the requisite skill to perform the requisite legal services properly.

The magnitude of this litigation has demanded prosecution on a priority basis. The Executive Committee, its Chairman, and all counsel have devoted themselves to the prosecution of this matter to the preclusion to some degree of other employment throughout the pendency of the litigation. The magnitude of losses, the exigencies of the litigation, the need of the Class for prompt relief, and the effort required to successfully implement the settlement have mandated that counsel devote their utmost priority to the prosecution of this litigation.

Customary fees in common fund **[*16]** cases appear to range from 20% to 40%. Counsel have provided numerous citations in this regard. (R. D. 271 Memorandum at pp. 25-30).

This action was prosecuted by counsel entirely on a contingent fee basis. Although today it might appear that risk was not great based on Prudential Securities' global settlement with the Securities and Exchange Commission, such was not the case when the action was commenced and throughout most of the litigation. Counsel's contingent fee risk is an important factor in determining the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

The Court does not perceive any time limitations imposed by the class members or the

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 90 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 8 of 14

circumstances. What with much publicity and client solicitation occurring on an increasing basis as the matter progressed, class members obviously became anxious to see the matter concluded.

The amount involved and the results obtained are given added weight in this case since the efforts of counsel were instrumental in realizing **[*17]** a recovery on behalf of the class. Here, counsel have achieved a substantial benefit considering that the present settlement consists of an all cash Settlement Fund of up to $ 120 million. This result was obtained only after extensive efforts and hard-fought negotiations by counsel on behalf the class in order to secure the most beneficial settlement. Moreover, those class members who, for their own reasons, chose to pursue claims against defendants through counsel of their own choosing or through the SEC procedure did so by simply "opting out" of the settlement.

Counsel were all experienced, possessed high professional reputations and were known for their abilities. Their cooperative effort in efficiently bringing this litigation to a successful conclusion is the best indicator of their experience and ability.

The Chairman of the Executive Committee, Edward A. Grossman and Bernstein, Litowitz, Berger & Grossman, has 19 years experience in litigation under the federal securities laws. The Bernstein Litowitz firm served as co-lead counsel and Chairman of the Executive Committee in the Washington Public Power Supply System Litig., (MDL 551), which achieved the largest securities **[*18]** class action recovery of over $ 800 million for class members. The firm also served as lead or co-lead counsel in a number of other significant class actions, as detailed in the Bernstein Litowitz fee affidavit. Bernstein Litowitz's selection to chair the Executive Committee is evidence of the firm's professional standing among its peers.

The attorneys appointed by the Court to serve as liaison counsel also bring distinguished reputations and outstanding abilities to bear on behalf of the Class. Robert Redfearn and the firm of Simon, Peragine, Smith & Redfearn bring extensive experience in both prosecution and defense of complex litigation, including securities actions, as well as in-depth experience not only in oil and gas litigation but also in the development and structuring of oil and gas investment partnerships such as those in this matter. Jack C. Benjamin of Gainsburgh, Benjamin, Fallon, David & Ates has a similarly distinguished record of advocacy and extensive experience in civil litigation in Louisiana's state and federal courts and is lead counsel in the Taxable Municipal Bond Securities Litig., (MDL 863).

The Executive Committee is comprised of law firms with national **[*19]** reputations in the prosecution of securities class action and derivative litigation. The biographical summaries submitted by each member of the Executive Committee attest to the accumulated experience and record of success these firms have compiled. (R.D. 271).

The Court would be remiss not to also recognize the obvious skill, competence and cooperation demonstrated by all other counsel. Their biographical summaries also attest to their experience and achievements and the Court has noted and appreciated this during the course of the litigation.

The last Johnson factors may be briefly commented on. The case was not undesirable. The relationship of the class representative and class members to Class Counsel worked well. Neither the class representatives nor any class members were required to advance costs or fees to Class Counsel. Awards in similar class action securities cases have, of course, varied depending on their respective circumstances.

The Court perceives that the combined lodestar of all counsel, except Fleming, amounts to $ 7.9 million. If reduced, say 10% by the Court, and a reasonable multiplier applied, n3 and then some $ 1.3 million expenses added and, finally, an **[*20]** award of fees and expenses to Fleming is added, the result is nearly identical to the 25% of the $ 90 million common

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 91 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                Page 9 of 14

fund approach.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The jurisprudence reflects that the average multiplier is 3.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In summary, counsel have achieved a result which is fair and reasonable under the circumstances. Moreover, the all cash Settlement Fund is substantial and all counsel have prosecuted the case in an efficient, cooperative and diligent manner, bringing the litigation to a swift and successful conclusion for the benefit of all members of the proposed class. Further, the relationship between counsel and the members of the class is contingent in nature and, in light of the alternatives, suggests that the fee sought is eminently fair and reasonable and consistent with awards of attorneys' fees in this and other Circuits around the country. The award of fees and expenses requested by Class Counsel and objectors' counsel is, in the context of this litigation, fair and reasonable and will be granted as heretofore stated.

In complex **[*21]** securities class actions and shareholder derivative litigation, able counsel for plaintiffs can be retained only on a contingent basis. A large segment of the investing public would be denied a remedy for violations of the securities laws and breaches of fiduciary duty by public companies and those entrusted with their stewardship if contingent fees awarded by the courts did not fairly and adequately compensate counsel for the services provided, the serious risks undertaken and the delay before any compensation is received. Filing of contingent lawsuits in this connection should not be chilled by the imposition of fee awards which fail to adequately compensate counsel for the risks of pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts.

The Settlement Fund in this litigation has been placed in an interest bearing account. Accordingly, counsel are appropriately granted interest on the fees and expenses awarded until such fees and expenses are actually paid, at the same rate as interest is earned by the Settlement Fund.

As earlier mentioned, Fleming unfortunately could not reach an agreement as all other **[*22]** counsel did with regard to fee and expenses. It falls on the Court to make this award separate and apart from the rest, notwithstanding these earlier admonitions by the Court:

> The award of attorneys' fees is to be allocated among Counsel in a fashion which, in the opinion of the Chair of Class Counsel's Executive Committee and the Court, fairly compensates counsel for their respective contributions in the prosecution of this matter. (R.D. 334 at p. 6).

> This Court is mindful that the Fifth Circuit stated its approval of leaving apportionment of the fees awarded up to the attorneys themselves. Longden, 979 F.2d at 1101. Class Counsel and Objectors' Counsel should seriously attempt to agree on such an apportionment among themselves. Similarly, Class Counsel should agree to apportion any fee award to Class Counsel among themselves. (R.D. 354 at p. 11).

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 92 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 10 of 14

In the recommendation and stipulation filed by all counsel, except Fleming, it is stated:

> The Chair and Liaison for Class Counsel met with authorized representatives of Former Objectors' Counsel and the Fleming Firm on April 27, 1994, as suggested by this Court. The Chair of Class Counsel, after **[*23]** a review of all the time records, his personal knowledge of the respective roles of counsel, and the observations and comments of Defendants' Counsel, agreed with Former Objectors' Counsel to an apportionment among themselves and a recommendation for the Fleming Firm, as follows:
>
>> The Fleming Firm receive a total of fees and expenses from the Award totaling in the aggregate the sum of $ 350,000.00 for the reasons set forth hereinafter.

(R.D. 373 at pp. 1,2).

The Court is in general agreement with the reasons set forth by counsel in their recommendation and stipulation, as follows:

> The underlying basis for an award to the Fleming Firm differs from that of all other Plaintiffs' counsel in this matter. As the Court is aware, the Fleming Firm represented over 7,000 individual investors in the Energy Income Fund Limited Partnerships * * * as well as approximately 2,000 arbitration proceedings and actively sought to represent more. During the course of this litigation, the Fleming Firm did not act solely in the interest of the Class, as did other Plaintiffs' counsel, but proceeded on two fronts with its efforts being given to its "Texas litigation." From the outset when the **[*24]** Fleming Firm sought to deny certification to the Class through the Notice in which the Fleming Firm insisted that the Notice state that it "continues to object to the settlement and deems it inadequate," the Fleming Firm's first and only concern was for its own clients. On many issues, its advocacy for its clients resulted in actions adverse to the interest of the Class.
>
> In our opinion, there are three potential approaches the Court might adopt as to what, if any, award to make to the Fleming Firm for its contributions to the Class.
>
> The first would be to award the Fleming Firm nothing on the basis that (i) its efforts were primarily on behalf of its Texas clients in direct opposition to the best interest of the Class; (ii) it actively sought to dissuade investors from remaining members of the Class; and (iii) its records are so deficient that awarding any fee would be inappropriate.
>
> The second approach would follow the reasoning of the Defendants as to the fee request of the Fleming Firm which resulted in a suggested reduction of the Fleming Firm's lodestar from $ 1,889,675 to $ 290,000; i.e., an 84% reduction. We suggest that the Fleming Firm's request for costs be reduced **[*25]** by the same percentage, which would result in a total award of fees and costs of approximately $ 350,000.00. As pointed out by Defendants, the reasons for such reduction are (1) the Fleming Firm's inadequate documentation of its fees and costs; (2) its improper claims for work done in connection with the Texas litigation; (3) its improper request for time spent prior to entering the case; and

(4) its duplicative and copy-cat time entries. In short, work that was not undertaken for the purposes of benefitting the Class (as opposed to the lawyers' private clients), or which did not actually result in such a benefit, may not be the basis of a fee award. In re Washington Public Power Supply System Securities Litigation, 779 F. Supp. 1063, 1223-25 (D. Ariz. 1990); In re Agent Orange Product Liability Litigation, 611 F. Supp. 1296 (E.D.N.Y. 1985), aff'd in part and rev'd in part on other grounds, 818 F.2d 226 (2nd Cir. 1987).

The third approach would be based partially on the second approach as urged by the Defendants but would not exclude time claimed by the Fleming Firm prior to September [*26] 1992. The Fleming Firm represented at the Settlement Fairness Hearing, which resulted in the Court approving the settlement, that 2,000 of its clients elected to remain in the Class with the others opting-out. As the Fleming Firm stated at the Settlement Fairness Hearing:

> We have recommended that the majority of our clients opt-out of the settlement and pursue their claims as they are entitled to do.

Having recommended to the majority of its clients that they opt-out of the Class, it ill becomes the Fleming Firm to now argue that such advice was beneficial to the Class, even though it might have been beneficial to their individual clients.

Accordingly, since only 30% of the Fleming Firm's activities benefitted the Class, its lodestar and cost reimbursement should be so reduced resulting in a total award to the Fleming Firm of fee and expenses of $ 700,000.00.

It is the position of the Chair of Class Counsel, concurred with by Former Objectors' Counsel, that the Court should follow the second suggested approach in its determination of what, if anything, the Fleming Firm is entitled to be paid for its efforts on behalf of the Class. Accordingly, we recommend that the Fleming [*27] Firm be paid an aggregate of $ 350,000.00 for fees and costs.

(R. D. 373 at pp. 3-6, footnotes omitted).

In its joint application for fees and expenses Fleming presents a lodestar fee in the sum of $ 1,889,675.00 n4 representing 10,842.75 hours at attorney rates ranging from $ 250 - $ 175 and legal assistant rates of $ 65.00. (R. D. 282, MDL 888 F H & G fee summary). The Court is, to say

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 Changed to $ 1,886,525.00 in its memorandum regarding fees and expenses recently filed. (R. D. 372 at p. 11).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

the least, befuddled. The fee and hours both exceed that of Chair of Class Counsel, Bernstein

Litowitz. The fee exceeds the combined fees of all former objectors counsel, as do the hours. The hours alone would suggest three lawyers working full time for more than a year.

The Court is of the opinion that most of the work performed by Fleming was not performed for the benefit of the class so much as it was performed for the benefit of its over 7000 clients in the Texas litigation. Much of the work was irrelevant to **[*28]** this litigation and Fleming's opposition (R. D. 37) to certification of a class, either for litigation or for settlement, was detrimental to the class.

A portion of Fleming's fee request is proper but the records Fleming has submitted in no way justify the enormous fee it has requested. Fleming has admitted that it kept no contemporaneous time records, and the monthly summaries it created after the fact are for the Court's purposes entirely inadequate. (R. D. 282). From these summaries it can be seen that Fleming seeks to charge the class for almost all of its work in the Texas case -- even projects which had nothing to do with this litigation and could not have benefitted the class. Moreover, the summaries as created imply that the Fleming lawyers consistently duplicated each other's work and that of other counsel. Fleming's efforts on behalf of its Texas clients are admirable, but cannot be rewarded at the expense of this class.

The fact that Fleming is seeking fees for work done all the way back to April 1991 shows that the firm is seeking to have the class pay in part the bill for the Texas case. Fleming did not become involved in this case as one of the objectors' counsel until **[*29]** September 1992 at the earliest. Before then, its only similar litigation was the Texas matter. Moreover, Fleming's summaries for the months before September 1992 make clear that it is, in fact, seeking fees for its work on the Texas case. The narratives are replete with references to Texas discovery matters, Texas causes of action, Texas motions, and even Texas court appearances.

The question of whether, and to what extent, a firm that represents private parties in separate litigation can recover attorney's fees in a class action covering the same matter has arisen in connection with previous settlements. Courts have held that work that was not undertaken for the purpose of benefitting the class (as opposed to the lawyers' private clients), or which did not actually result in such a benefit, could not be the basis for a fee award.

Fleming is entitled to recover, at most, only a fraction of the fees it is seeking for September 1992 and thereafter. In this later period, it did perform some work which, helpful or not, might be seen as directed in part toward the interests of the class. But even during this period, much of Fleming's work did not involve this litigation, some of it may **[*30]** have actually hurt the class, for example the objection to class certification, and most of it benefitted its Texas case. Moreover, as noted above, the time summaries reveal substantial duplication of effort.

Because of the inadequate records submitted by Fleming, there is no reliable way to calculate with any precision how much of Fleming's work was intended to benefit, and did benefit, the class. It appears that some 20 to 25% of Fleming's Texas clients have chosen not to opt out of this class settlement. The remainder will proceed with their actions in Texas. Fleming's fee award should reflect this and it is apparent that its fee arrangements with those non-opt-out parties should provide it with appropriate compensation.

Fleming seeks reimbursement of expenses totaling $ 452,921.47 (R. D. 282, MDL 888 F H & G Expense Summary and R. D. 375 at p. 11) as follows:

| | |
|---|---|
| Telephone Charges | $ 8,407.05 |
| Reproduction of Documents | 82,974.17 |
| Technical Investigative Services | 198,451.80 |

| Experts | 36,348.52 |
|---|---|
| Court Reporters | 20,787.57 |
| Travel Expenses | 54,770.57 |
| Demonstrative Evidence | 51,182.42 |
| | $ 452,921.47 |

The Court is also befuddled by some of these itemizations but need not comment **[*31]** thereon inasmuch as its overall evaluation of this claim is the same as that of the fee claim.

Considering the recommendation of the Chair of Class Counsel, the Fleming matter in its entirety and in context with the totality of every aspect of this litigation and the Fleming role in it, an award of $ 525,000.00, fee and expense inclusive, together with accrued interest thereon, will be made.

Judgment will be entered in accord herewith and with the aforementioned stipulation of all counsel except Fleming. (R. D. 373).

New Orleans, Louisiana, this 18th day of May, 1994.

MARCEL LIVAUDAIS, JR.

United States District Judge

## SUPPLEMENTAL JUDGMENT

Considering the record, the Court's February 2, 1994 judgment, (R. D. 312), and for the reasons this date assigned, the Court supplements the said judgment by making this addendum thereto:

**IT IS FURTHER ORDERED, ADJUDGED and DECREED** that plaintiffs' counsel are hereby awarded attorneys fees and expense reimbursement in an amount representing 25% of the final settlement amount, after reduction for opt-outs and inclusive of costs and expenses, to be paid with interest from date of judgment, February 2, 1994, at the rate the settlement **[*32]** amount earns, according to the terms of the Settlement Agreement. This award shall be allocated as follows:

**1.** The firm of Fleming, Hovenkamp & Grayson, P.C. to receive a total of fees and expenses from the Award totaling in the aggregate the sum of $ 525,000.00;

**2.** Out of the then balance of the Award, the costs and expenses of Class Counsel and Former Objectors' Counsel be paid in full;

**3.** Out of the then balance of the Award, the sum of $ 400,000.00 be paid as a partial fee to Class Counsel;

**4.** The then remaining balance of the Award be paid 75% to Class Counsel and 25% to Former Objectors' Counsel to be divided amongst them pursuant to their agreements.

New Orleans, Louisiana, May 18, 1994.

Case 1:00-cv-02174-MJG    Document 158-6    Filed 04/18/2005    Page 96 of 202

Get a Document - by Citation - 1994 U.S. Dist. LEXIS 6621                    Page 14 of 14

**MARCEL LIVAUDAIS, JR.**

United States District Judge


Service: **Get by LEXSEE®**
Citation: **1994 U.S. Dist. LEXIS 6621**
View: Full
Date/Time: Friday, April 15, 2005 - 5:51 PM EDT

\* Signal Legend:
● - Warning: Negative treatment is indicated
▨ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions


Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 9

**FILED**

MAY 2 2003

LARRY W. PROPES, CLERK
Columbia, SC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

In re Safety-Kleen Corp.                :
Stockholders Litigation                 :          C.A. No. 3:00-CV-736-17
                                        :

## FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE

The Class Representatives and PricewaterhouseCoopers LLP ("PwC"), as those terms are defined

in the Stipulation of Settlement dated January 9, 2003 (the "Stipulation"), by and through their

attorneys or their counsel of record, having executed and filed the Stipulation; the Court having

entered its Preliminary Approval Order thereon on January 13, 2003, directing that notice of the

proposed Settlement of the Action be mailed to the Class and the Merger Class and scheduling a

Hearing to be held to determine whether the proposed Settlement should be approved as fair,

reasonable and adequate; to approve the allocation of the Gross and Net Settlement Fund and to

award Plaintiffs' Lead Counsel Attorneys' Fees and Expenses; said notice having been given; a

Hearing having been held on May 2, 2003, at which all interested persons were given an opportunity

to be heard; and the Court having read and considered all submissions in connection with the

proposed Settlement; and having reviewed and considered the files and records herein, the Court

finds and concludes that:

The above-captioned action was commenced on or about March 7, 2000, and the Second

Amended Consolidated Complaint (the "Complaint") was filed on August 7, 2001.

practicable under the circumstances was in fact given and constituted valid, due and sufficient notice to members of the Class and the Merger Class, complying fully with due process, Rule 23 of the Federal Rules of Civil Procedure, and Section 21(D)(a)(7) of the Exchange Act, 15 U.S.C. § 78u-4(a)(7) as amended by the Private Securities Litigation Reform Act of 1995.

Class Representatives and PwC have applied to the Court for approval of the terms of the Stipulation and for the entry of this Judgment. Pursuant to the Notice and Summary Notice, and upon notice to all parties, a Hearing was held before this Court on May 2, 2003 to consider whether the Settlement set forth in the Stipulation should be approved by this Court as fair, reasonable, and adequate, to approve the allocation of the Net Settlement Fund and to award Attorneys' Fees and Expenses to Plaintiffs' Lead Counsel.

Approval of the Stipulation will result in substantial savings in time and money to the Court and the litigants and will further the interests of justice.

The Stipulation is the product of good faith arms-length negotiations by the Signatories thereto.

NOW THEREFORE, GOOD CAUSE APPEARING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.    The definitions set forth in the Stipulation are incorporated herein.

2.    The Court has jurisdiction over the subject matter of this Action and all Parties in this Action, including Class and Merger Class members.

3.    The Stipulation and Settlement are fair, reasonable and adequate as to the Class and the Merger Class, and are finally approved in all respects.

3

4.     The members of the Class and the Merger Class who have filed timely and valid requests for exclusion are not bound by this Judgment. A listing of those persons is attached hereto as Exhibit A. Members of the Class or the Merger Class who are excluded may pursue their own individual remedies if any.

5.     All other persons and entities (other than Defendants, members of their immediate families, and any subsidiary, affiliate, controlling or controlled person of any such person or entity) who acquired Safety-Kleen common stock during the Class Period or who exchanged Safety-Kleen Corp. ("Old Safety-Kleen") common stock for LES common stock during the Merger Class Period are bound by this Judgment and by the Settlement, including the releases provided in this Judgment.

6.     This Court hereby decrees that neither the Stipulation, this Judgment, nor the fact of the Settlement is an admission or concession by PwC of any liability or wrongdoing whatsoever. This Judgment is not a finding of the validity or invalidity of any claims in the Action or of any wrongdoing by PwC. Neither the Stipulation, nor this Judgment, nor the fact of the Settlement, nor the settlement proceedings, nor the settlement negotiations, nor any related documents shall be used or construed as an admission of any fault, liability or wrongdoing by any person. Neither the Stipulation, nor this Judgment, nor the fact of the Settlement, nor the settlement proceedings, nor the settlement negotiations, nor any related documents shall be offered or received in evidence or construed as an admission, concession, presumption or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce the Stipulation.

7.     Except for any individual claims of those persons and entities identified in Exhibit A hereto, this Court hereby dismisses on the merits and with prejudice the Settled Claims (as defined

4

14.    The Court reserves jurisdiction, without affecting the finality of this Judgment, over: (a) implementing, administering and enforcing this Settlement and the Stipulation and any award or distribution of the Gross or Net Settlement Fund; (b) disposition of the Gross or Net Settlement Fund; and (c) other matters related or ancillary to the foregoing.

15.    An appeal of the portion of this Judgment which awards attorneys' fees or expenses shall have no effect whatsoever on the finality of any other portion of this Judgment, and shall not affect the Effective Date of Settlement.  Class or Merger Class members appealing the Judgment or any portion thereof, must first intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure.

16.    The proposed Plan of Allocation of the Net Settlement Fund, as set forth in the Stipulation, is approved.

17.    All objections to the Settlement are overruled and denied in all respects.

18.    In the event that the Settlement does not become effective or is canceled or terminated in accordance with the terms of the Stipulation, then this Judgment shall be rendered null and void and be vacated, except Paragraph 6, hereof, which shall survive, and all orders entered in connection therewith by this Court shall be rendered null and void.

19.    The Court finds that no just reason exists for delay in entering final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  Accordingly, the Clerk is hereby directed to enter this Judgment forthwith pursuant to Rule 54(b).

Dated: *May 2, 2003*

*Columbia SC*                          IT IS SO ORDERED:

                                        _____
                                        Joseph N. Anderson, Jr.

6

# EXHIBIT 10



West Reporter Image (PDF)

84 F.Supp.2d 933

United States District Court,
M.D. Tennessee,
Nashville Division.
In re **SIRROM CAPITAL** CORPORATION SECURITIES LITIGATION.
No. 3-98-0643.
June 2, 1999.

In securities fraud action, defendants moved to dismiss and for partial summary judgment. The District Court, Campbell, J., held that: (1) plaintiffs sufficiently pled allegations of fraud; (2) fact issues remained as to whether corporate officials knowingly made false assertions of material facts; and (3) fact issues remained as to whether defendants exercised sufficient control to be subject to control person liability.
Motions denied.

West Headnotes

[1] KeyCite Notes 

349B Securities Regulation
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
        349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.18 k. In General. Most Cited Cases

349B Securities Regulation KeyCite Notes
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
        349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.19 k. Persons Entitled to Sue or Recover. Most Cited Cases

To establish claim under provision of Securities Act of 1933 governing civil liabilities on account of false registration statement, plaintiff need only show that he bought security and that there was material misstatement or omission in registration statement. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

[2] KeyCite Notes 

349B Securities Regulation
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
        349Bk25.55 False Statements or Omissions; Accuracy
        349Bk25.56 k. In General. Most Cited Cases

To establish claim under Securities Act provision creating private remedy for buyer of security against seller for material misrepresentations in connection with offer and sale, plaintiff who has established

privity with seller need prove only that there was material misstatement or omission in prospectus or oral communication. Securities Act of 1933, § 12, 15 U.S.C.A. § 77l.

[3] KeyCite Notes 

⇐ 170A Federal Civil Procedure
  ⇐ 170AVII Pleadings and Motions
    ⇐ 170AVII(A) Pleadings in General
      ⇐ 170Ak633 Certainty, Definiteness and Particularity
        ⇐ 170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

Civil rule requiring that fraud be pled with particularity does not apply to claims under Securities Act of 1933 provisions governing civil liabilities on account of false registration statement and creating private remedy for buyer of security against seller for material misrepresentations in connection with offer and sale. Securities Act of 1933, §§ 12, 13, 15 U.S.C.A. §§ 77k, 77l; Fed.Rules Civ.Proc.Rule 9 (b), 28 U.S.C.A.

[4] KeyCite Notes 

⇐ 349B Securities Regulation
  ⇐ 349BI Federal Regulation
    ⇐ 349BI(C) Trading and Markets
      ⇐ 349BI(C)7 Fraud and Manipulation
        ⇐ 349Bk60.11 Transactions Subject to Regulation
        ⇐ 349Bk60.15 k. Connection with Purchase or Sale. Most Cited Cases

⇐ 349B Securities Regulation KeyCite Notes 
  ⇐ 349BI Federal Regulation
    ⇐ 349BI(C) Trading and Markets
      ⇐ 349BI(C)7 Fraud and Manipulation
        ⇐ 349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
        ⇐ 349Bk60.18 k. In General. Most Cited Cases

To establish private claim for damages under Rule 10b-5, plaintiff must prove: (1) use of jurisdictional means (2) to carry out deceptive or manipulative practice with requisite scienter, (3) in connection with (4) purchase of sale (5) of security (6) causing (7) damages. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

[5] KeyCite Notes 

⇐ 170A Federal Civil Procedure
  ⇐ 170AVII Pleadings and Motions
    ⇐ 170AVII(A) Pleadings in General
      ⇐ 170Ak633 Certainty, Definiteness and Particularity
        ⇐ 170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

Complaint alleging fraud or misrepresentation must (1) specify statements that plaintiff contends were fraudulent; (2) identify speaker; (3) state where and when statements were made; and (4) explain why statements were fraudulent. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[6] KeyCite Notes 

⟵ **170A** Federal Civil Procedure
  ⟵ **170AVII** Pleadings and Motions
    ⟵ **170AVII(A)** Pleadings in General
      ⟵ **170Ak633** Certainty, Definiteness and Particularity
        ⟵ **170Ak636** k. Fraud, Mistake and Condition of Mind. <u>Most Cited Cases</u>

If allegation regarding statement or omission in violation of Rule 10b-5 is made on information and belief, complaint must state with particularity all facts on which that belief is formed. Securities Exchange Act of 1934, § 10(b), as amended, <u>15 U.S.C.A. § 78j(b)</u>; <u>17 C.F.R. § 240.10b-5</u>; <u>Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.</u>

[7] KeyCite Notes 

⟵ **349B** Securities Regulation
  ⟵ **349BI** Federal Regulation
    ⟵ **349BI(C)** Trading and Markets
      ⟵ **349BI(C)7** Fraud and Manipulation
        ⟵ **349Bk60.50** Pleading
          ⟵ **349Bk60.51** k. In General. <u>Most Cited Cases</u>

Plaintiff may sufficiently allege securities fraud by identifying defendant as member of group, and suing on basis of fraud in documents that are collective product of group. Securities Exchange Act of 1934, § 10(b), as amended, <u>15 U.S.C.A. § 78j(b)</u>; <u>17 C.F.R. § 240.10b-5</u>; <u>Fed.Rules Civ.Proc.Rule 9 (b), 28 U.S.C.A.</u>

[8] KeyCite Notes 

⟵ **349B** Securities Regulation
  ⟵ **349BI** Federal Regulation
    ⟵ **349BI(C)** Trading and Markets
      ⟵ **349BI(C)7** Fraud and Manipulation
        ⟵ **349Bk60.50** Pleading
          ⟵ **349Bk60.51** k. In General. <u>Most Cited Cases</u>

Plaintiffs in securities fraud action pled fraud with sufficient particularity by alleging that each individual defendant was senior officer and/or director of company, controlled contents of company's quarterly and annual reports, press releases and presentations to securities analysts, and participated in preparation, review and/or filing of reports and SEC filings alleged to be false. Securities Exchange Act of 1934, § 10(b), as amended, <u>15 U.S.C.A. § 78j(b)</u>; <u>17 C.F.R. § 240.10b-5</u>; <u>Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.</u>

[9] KeyCite Notes 

⟵ **349B** Securities Regulation
  ⟵ **349BI** Federal Regulation
    ⟵ **349BI(C)** Trading and Markets
      ⟵ **349BI(C)7** Fraud and Manipulation
        ⟵ **349Bk60.50** Pleading
          ⟵ **349Bk60.53** k. Misrepresentation. <u>Most Cited Cases</u>

Plaintiffs alleging securities fraud must plead specific facts that create strong inference of knowing misrepresentation on part of defendants. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[10] KeyCite Notes 

⇦=349B Securities Regulation
  ⇦=349BI Federal Regulation
    ⇦=349BI(C) Trading and Markets
      ⇦=349BI(C)7 Fraud and Manipulation
        ⇦=349Bk60.50 Pleading
          ⇦=349Bk60.53 k. Misrepresentation. Most Cited Cases

Plaintiffs in securities fraud action sufficiently pled specific facts that created strong inference of knowing misrepresentation by alleging that senior officers and directors of company controlled contents of company's quarterly and annual reports, press releases and presentations to securities analysts, and participated in preparation, review and/or filing of reports and SEC filings alleged to be false. Securities Exchange Act of 1934, §§ 10(b), 21(D), as amended, 15 U.S.C.A. §§ 78j(b), 78u-4; 17 C.F.R. § 240.10b-5; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[11] KeyCite Notes 

⇦=349B Securities Regulation
  ⇦=349BI Federal Regulation
    ⇦=349BI(C) Trading and Markets
      ⇦=349BI(C)7 Fraud and Manipulation
        ⇦=349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          ⇦=349Bk60.27 Misrepresentation
            ⇦=349Bk60.27(1) k. In General. Most Cited Cases

Securities fraud complaint alleges actionable misrepresentation if it alleges that defendant was aware that mismanagement had occurred and made material public statement about state of corporate affairs inconsistent with existence of mismanagement. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

[12] KeyCite Notes 

⇦=170A Federal Civil Procedure
  ⇦=170AXI Dismissal
    ⇦=170AXI(B) Involuntary Dismissal
      ⇦=170AXI(B)5 Proceedings
        ⇦=170Ak1827 Determination
          ⇦=170Ak1831 k. Fact Issues. Most Cited Cases

Issue of whether corporate officers and directors made false assertions concerning income and shareholder equity and value and increase in size of company's loan portfolio raised fact issue that could not be determined on motion to dismiss securities fraud action for failure to state claim. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

[13] KeyCite Notes 

☞349B Securities Regulation
  ☞349BI Federal Regulation
    ☞349BI(C) Trading and Markets
      ☞349BI(C)7 Fraud and Manipulation
        ☞349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          ☞349Bk60.27 Misrepresentation
            ☞349Bk60.27(6) k. Financial or Periodic Reports; Accounting Data and Valuations.
Most Cited Cases



☞349B Securities Regulation KeyCite Notes
  ☞349BI Federal Regulation
    ☞349BI(C) Trading and Markets
      ☞349BI(C)7 Fraud and Manipulation
        ☞349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          ☞349Bk60.28 Nondisclosure; Insider Trading
            ☞349Bk60.28(10) Matters to Be Disclosed
              ☞349Bk60.28(13) k. Particular Matters. Most Cited Cases

Deliberate failure to recognize problem loans, thus understating reserve, constitutes actionable omission or misrepresentation of existing fact which cannot be dismissed as mere matter of internal mismanagement, unsound business practice or poor accounting judgment. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).



[14] KeyCite Notes

☞349B Securities Regulation
  ☞349BI Federal Regulation
    ☞349BI(C) Trading and Markets
      ☞349BI(C)7 Fraud and Manipulation
        ☞349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          ☞349Bk60.27 Misrepresentation
            ☞349Bk60.27(4) k. Facts or Opinions. Most Cited Cases

Material statements that contain speaker's opinion are actionable securities fraud claims if speaker does not believe opinion and opinion is not factually well-grounded. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

[15] KeyCite Notes

☞170A Federal Civil Procedure
  ☞170AXI Dismissal
    ☞170AXI(B) Involuntary Dismissal
      ☞170AXI(B)5 Proceedings
        ☞170Ak1827 Determination
          ☞170Ak1831 k. Fact Issues. Most Cited Cases

Issue of whether statements by corporate officers and directors that company was well-positioned to produce at least 25% annual growth, that balance sheet was healthy, that capital gains would remain more than enough to offset credit losses, and that current ratio of gross loans on credit watch to total loans was within normal range, of offered hard facts about current state of company's affairs, or were optimistic statements about future, raised fact issue that could not be determined on motion to

84 F.Supp.2d 933

dismiss securities fraud action for failure to state claim. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

[16] KeyCite Notes 

↞170A Federal Civil Procedure
  ↞170AXI Dismissal
    ↞170AXI(B) Involuntary Dismissal
      ↞170AXI(B)5 Proceedings
        ↞170Ak1827 Determination
          ↞170Ak1831 k. Fact Issues. Most Cited Cases

Issue of whether alleged omissions and misrepresentations concerning existing financial health of company were actually and truthfully disclosed raised fact issue that could not be determined on motion to dismiss securities fraud action for failure to state claim. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

[17] KeyCite Notes 

↞170A Federal Civil Procedure
  ↞170AXI Dismissal
    ↞170AXI(B) Involuntary Dismissal
      ↞170AXI(B)5 Proceedings
        ↞170Ak1827 Determination
          ↞170Ak1831 k. Fact Issues. Most Cited Cases

Issue of whether company officials had duty to disclose merger in prospectus raised fact issue that could not be determined on motion to dismiss securities fraud action for failure to state claim. Securities Exchange Act of 1934, § 10(b), as amended, 15 U.S.C.A. § 78j(b).

[18] KeyCite Notes 

↞349B Securities Regulation
  ↞349BI Federal Regulation
    ↞349BI(B) Registration and Distribution
      ↞349BI(B)5 Prospectuses and Communications
        ↞349Bk25.55 False Statements or Omissions; Accuracy
          ↞349Bk25.61 Persons Liable
            ↞349Bk25.61(1) k. In General. Most Cited Cases

In order to establish liability for securities fraud due to solicitation, plaintiffs must demonstrate direct and active participation in solicitation of sale. Securities Act of 1933, § 12(a)(2), 15 U.S.C.A. § 77l(a)(2).

[19] KeyCite Notes 

↞349B Securities Regulation
  ↞349BI Federal Regulation
    ↞349BI(B) Registration and Distribution
      ↞349BI(B)5 Prospectuses and Communications
        ↞349Bk25.55 False Statements or Omissions; Accuracy

84 F.Supp.2d 933

☞349Bk25.61 Persons Liable
    ☞349Bk25.61(8) k. Directors and Officers. <u>Most Cited Cases</u>

Corporate officials who actually signed registration statements solicited public to purchase stock, and thus could be subject to liability as statutory sellers of securities in question. Securities Act of 1933, § 12(a)(2), <u>15 U.S.C.A. § 77l(a)(2)</u>.

[20] KeyCite Notes 

☞<u>170A</u> Federal Civil Procedure
    ☞<u>170AXI</u> Dismissal
        ☞<u>170AXI(B)</u> Involuntary Dismissal
            ☞<u>170AXI(B)5</u> Proceedings
                ☞<u>170Ak1827</u> Determination
                    ☞<u>170Ak1831</u> k. Fact Issues. <u>Most Cited Cases</u>

Issue of whether corporate officials who signed registration statement thereby solicited plaintiffs to purchase stock and, in so doing, were motivated by desire to serve their own financial interests, raised fact issues that could not be determined on motion to dismiss securities fraud action for failure to state claim. Securities Act of 1933, § 12(a)(2), <u>15 U.S.C.A. § 77l(a)(2)</u>.

[21] KeyCite Notes 

☞<u>170A</u> Federal Civil Procedure
    ☞<u>170AXI</u> Dismissal
        ☞<u>170AXI(B)</u> Involuntary Dismissal
            ☞<u>170AXI(B)5</u> Proceedings
                ☞<u>170Ak1827</u> Determination
                    ☞<u>170Ak1831</u> k. Fact Issues. <u>Most Cited Cases</u>

Issue of whether corporate official exercised sufficient control to be found subject to control person liability raised fact issue that could not be determined on motion to dismiss securities fraud action for failure to state claim. Securities Act of 1933, § 15(a), <u>15 U.S.C.A. § 77o(a)</u>; Securities Exchange Act of 1934, § 20(a), as amended, <u>15 U.S.C.A. § 78t(a)</u>.

[22] KeyCite Notes 

☞<u>170A</u> Federal Civil Procedure
    ☞<u>170AXVII</u> Judgment
        ☞<u>170AXVII(C)</u> Summary Judgment
            ☞<u>170AXVII(C)2</u> Particular Cases
                ☞<u>170Ak2511</u> k. Securities Cases In General. <u>Most Cited Cases</u>

Genuine issue of material fact as to whether corporate officials complied with generally accepted accounting principles (GAAP) in preparing securities reports precluded summary judgment in securities fraud action.

**\*936** <u>Stanley M. Chernau,</u> Nashville, TN, <u>Robert Paul Sugarman</u>, New York City, <u>Vincent R. Cappucci</u>, New York City, Robert G. Chaffin, Nashville, TN, <u>George E. Barrett</u>, Nashville, TN, <u>Steven E. Cauley</u>, Little Rock, AR, Leo W. Desmond, W. Palm Beach, FL, for plaintiff.
Robert J. Walker, Nashville, TN, John C. Hayworth, Nashville, TN, for defendant.

MEMORANDUM

CAMPBELL, District Judge.

Pending before the Court are Defendants' Motion to Dismiss and for Partial Summary Judgment (Docket No. 34); Plaintiffs' Motion for Leave to Take Discovery or, in the Alternative, to Strike Defendants' Motion for Partial Summary Judgment (Docket No. 48); and Defendants' Request for Oral Argument (Docket No. 53).

For the reasons stated herein, Defendants' Motion to Dismiss (Docket No. 34) is GRANTED in part and DENIED in part. Plaintiff's Section 12(a)(2) claims against Defendants Resha and Harris are DISMISSED. Defendants' Motion for Partial Summary Judgment (Docket No. 34) is DENIED. Plaintiffs' Motion for Leave to Take Discovery or, in the Alternative, to Strike Defendants' Motion for Partial Summary Judgment (Docket No. 48) is DENIED as moot; and Defendants' Request for Oral Argument (Docket No. 53) is DENIED.

## FACTS

This is a federal securities class action brought on behalf of persons who purchased or otherwise acquired the common stock of Sirrom Capital Corporation ("Sirrom") between January 20, 1998, and July 9, 1998, inclusive. Plaintiffs allege claims under the Securities Act of 1933 [15 U.S.C. §§ 77k, 77l (2) and 77o]; under the Securities Exchange Act of 1934 [15 U.S.C. §§ 78i(b) and 78t(a)]; and under Rule 10b-5 promulgated by the Securities and Exchange Commission [17 C.F.R. § 240.10b-5], particularly with regard to Sirrom's Registration Statement ("the Registration Statement") and Prospectus ("the Prospectus") issued in connection with a secondary offering on or about March 5, 1998. Plaintiffs have sued Sirrom and six individual Defendants who allegedly served as officers and "controlling persons" of Sirrom.

Specifically, Plaintiffs allege the following claims against Defendants:

(1) Violation of Section 11 of the Securities Act of 1933 for material misrepresentations and omissions in Sirrom's Registration Statement and Prospectus;

(2) Violation of Section 12 of the Securities Act of 1933 for material misrepresentations and omissions in the Prospectus;

(3) Violation of Section 15 of the Securities Act of 1933 by the individual Defendants as "controlling persons" who allegedly violated Sections 11 and 12, as indicated above;

(4) Violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by an alleged fraudulent scheme to defraud, deceive and mislead the investing public; and

(5) Violation of Section 20(a) of the Securities and Exchange Act of 1934 by the individual Defendants as "controlling persons" who allegedly violated Section 10b and Rule 10b-5.

Plaintiffs seek certification as a class, compensatory damages, costs and attorneys' fees.

**\*937** Defendants have filed a Motion to Dismiss, arguing that this case should be dismissed for nine reasons. Defendants also seek partial summary judgment on the issue of whether Sirrom's accounting procedures comply with generally accepted accounting principles ("GAAP").

## MOTIONS TO DISMISS

In considering a motion to dismiss, the court must accept as true all factual allegations in the complaint. Broyde v. Gotham Tower, Inc., 13 F.3d 994, 996 (6th Cir.1994), cert. denied, 511 U.S. 1128, 114 S.Ct. 2137, 128 L.Ed.2d 866 (1994). The motion should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Id.

A motion to dismiss for failure to state a claim upon which relief can be granted must be viewed in the light most favorable to the party opposing the motion. State of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc., 856 F.Supp. 1229, 1232 (S.D.Ohio 1994). The purpose of a motion to dismiss for failure to state a claim is to allow the defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir.1993).

In deciding a motion to dismiss, the function of the district court is to test the legal sufficiency of the complaint. City of Toledo v. Beazer Materials and Services, Inc., 833 F.Supp. 646, 650 (N.D.Ohio 1993). The district court is without authority to dismiss claims unless it can be demonstrated beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. Id.

## FAILURE TO PLEAD FRAUD WITH PARTICULARITY

Defendants first assert that Plaintiffs' claims should be dismissed, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, for failure to plead fraud with particularity. The Rule requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity. Fed.R.Civ.P. 9(b).

The Court must first determine which, if any, of Plaintiff's claims are "averments of fraud," subject to Rule 9(b). Plaintiffs contend that Rule 9 does not apply to their claims under Sections 11 and 12 of the Securities Act of 1933, since those claims specifically do not deal with fraud. See Consolidated Amended Class Action Complaint (Docket No. 30), ¶¶ 107 and 118 (incorporating all previous allegations except those that may be interpreted to sound in fraud).

SECTION 11 AND SECTION 12 CLAIMS

[1] [2] A number of courts have held that the particularity requirement of Rule 9(b) does not apply to Section 11 and Section 12 claims because proof of fraud or mistake is not a prerequisite to establishing liability under those statutes. See, e.g., In re Consumers Power Co. Securities Litigation, 105 F.R.D. 583, 594 (E.D.Mich.1985); Ross v. Warner, 480 F.Supp. 268, 273 (S.D.N.Y.1979); In re NationsMart Corp. Securities Litigation, 130 F.3d 309, 314 (8th Cir.1997), cert. denied, 524 U.S. 927, 118 S.Ct. 2321, 141 L.Ed.2d 696 (1998). To establish a prima facie case under Section 11, a plaintiff need only show that he bought the security and that there was a material misstatement or omission in the registration statement. Id. at 315. Similarly, to establish a claim under Section 12, once he established privity with a seller, a plaintiff need only prove only that there was a material misstatement or omission in the prospectus or oral communication. Id. at 318.

"The liability of the issuer of a materially misleading registration statement is 'virtually absolute, even for innocent misstatements.' " NationsMart, 130 F.3d at 315 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983)). Because neither Section 11 nor Section 12 requires proof of fraud for recovery, Plaintiffs were not required *938 to have pleaded fraud in connection with their Sections 11 and 12 claims.

Defendants argue that Plaintiff's Sections 11 and 12 claims are grounded or based in fraud and, therefore, fall under Rule 9(b). A number of courts have stated that when claims alleging material misstatement or omission in a registration statement are grounded in fraud, those claims must state with particularity the circumstances constituting the alleged fraud. See, e.g., In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1404-05 (9th Cir.1996); Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co., 940 F.Supp. 1101, 1115 (W.D.Mich.1996) ("Rule 9(b) also applies to § 11 and § 12(2) claims under the Securities Act to the extent they are grounded in fraud rather than negligence."); Shapiro v. UJB Financial Corp., 964 F.2d 272, 288 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies).

Only a defendant facing the particular threat posed by an accusation of fraud may invoke the protections of Rule 9(b). Consumers Power, 105 F.R.D. at 595. That court found that because the plaintiffs specifically separated out their § 11 claims into distinct counts at the end of the complaint, the allegations of fraud did not "convert or contaminate the separate § 11 claims." Id. at 594.

In NationsMart, the plaintiffs made clear that they did not allege, in the context of their Section 11 claim, that the defendants were liable for fraudulent or intentional conduct. NationsMart, 130 F.3d at 315. Even if they had, stated the court, any such allegation would be mere surplusage:

The only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive. The plaintiffs' case should not have been dismissed because they alleged more than was necessary to recover under § 11 of the Securities Act.

Id. [FN1]

> FN1. The court in NationsMart declined to find that the plaintiffs' Sections 11 and 12 claims were grounded in fraud and, therefore, subject to Rule 9(b) for two reasons: (1) the complaint had expressly disavowed any claim of fraud in connection with the Section 11 and Section 12 counts; and (2) "a pleading standard which requires a party to plead particular facts to support a cause of action that does not
>
> include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure." NationsMart, 130 F.3d at 315; see also In re First Merchants Acceptance Corp. Securities Litigation, 1998 WL 781118 at *11-12 (N.D.Ill. Nov.4, 1998); but see

*Hershey v. MNC Financial, Inc.*, 774 F.Supp. 367, 376 (D.Md.1991) ("Rule 9(b) applies to 'all averments of fraud.' Its application should depend on the substance of a plaintiff's allegations, not upon the guise in which he portrays them.").

Here, Plaintiffs' Section 11 claims do not mention fraud, except to expressly exclude any allegations which might sound in fraud. *See* Docket No. 30, ¶¶ 107-127. Plaintiffs speak in terms of Defendants' failure to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true. Docket No. 30, ¶ 113. Since fraud is not a necessary element of a Section 11 claim, and the Court cannot read it into the statute, it need not be pleaded pursuant to Rule 9(b) in Plaintiffs' Section 11 claim. *See In re LILCO Securities Litigation*, 625 F.Supp. 1500, 1503 (E.D.N.Y.1986); *First Merchants Acceptance Corp. Securities Litigation*, 1998 WL 781118 at *11, n. 6 (N.D.Ill. Nov.4, 1998) ("It is illogical to require plaintiffs to plead more than they would have to prove to succeed on a § 11 claim standing alone.").

[3]    Based upon these authorities, the Court finds that Rule 9(b) does not apply **\*939** to Plaintiffs' Section 11 and Section 12 claims (First and Second Claims). Even if it did, however, as found by the *NationsMart* court, above, the remedy would be to strip any allegations of fraud from the claims. Accordingly, Plaintiffs will not be allowed to allege or attempt to prove fraud in connection with their Section 11 and Section 12 claims. Defendants' Motion to Dismiss on this ground is DENIED.
*SECTION 10(b) AND RULE 10b-5 CLAIMS*

[4]    To establish a private claim for damages under Rule 10b-5, Plaintiffs must prove the following: (1) the use of jurisdictional means (2) to carry out a deceptive or manipulative practice with the requisite scienter, (3) in connection with (4) the purchase of sale (5) of a security (6) causing (7) damages. *City of Painesville, Ohio v. First Montauk Financial Corp.*, 178 F.R.D. 180, 186 (N.D.Ohio 1998).

[5]    The parties do not dispute that Rule 9(b) applies to Plaintiffs' Section 10(b) and Rule 10b-5 claims. To satisfy the requirements of Rule 9(b), a complaint alleging fraud or misrepresentation must (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *City of Painesville*, 178 F.R.D. at 188. A plaintiff must, at a minimum, allege the time, place and contents of the misrepresentations upon which he relied. *Id.; see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).
The particularity requirements of Rule 9(b) serve three purposes: (1) to ensure that fraud allegations are concrete enough to give defendants fair notice of the grounds of the complaint; (2) to protect defendants' reputations or goodwill from the harm that comes from being accused of serious wrongdoing; and (3) to inhibit the filing of complaints that are a pretext for the discovery of unknown wrongs or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves. *Consumers Power*, 105 F.R.D. at 591.
The particularity requirement of Rule 9(b) must, however, be read in conjunction with Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires a short and plain statement of a claim. *Id.* Also, Rule 9(b) does not require plaintiffs to plead detailed evidentiary matters. *Id.*
The Private Securities Litigation Reform Act of 1995 ("Reform Act") requires that where a party alleges fraud due to misstatements of fact, that party must specify each statement and describe why the statement was misleading. *City of Painesville*, 178 F.R.D. at 187; 15 U.S.C. § 78u-4(b). [FN2]

FN2. One district court has stated that Section 78u-4(b) of the

Reform Act does nothing more than expand existing Rule 9(b) pleading requirements. *Havenick v. Network Express, Inc.*, 981 F.Supp. 480, 524 (E.D.Mich.1997).

[6]    If the allegation regarding the statement or omission is made on information and belief, the complaint must state with particularity all facts on which that belief is formed. *Id.; see also Havenick v. Network Express, Inc.,* 981 F.Supp. 480, 526 (E.D.Mich.1997). Generally, allegations based on information and belief fail to satisfy the particularity requirement of Rule 9(b). *Consumers Power,* 105 F.R.D. at 591. However, an exception to this rule exists for matters that are peculiarly within the knowledge of the opposing party. *Id.*

[7]    Defendants contend, among other things, that Plaintiffs have failed to specify particular actions or omissions of the particular defendants. Where a plaintiff identifies a defendant as a member of a group, however, and sues on the basis of fraud in documents that are the collective product of the group, then Rule 9(b) is satisfied. *Consumers Power,* 105 F.R.D. at 593. "It thus appears that a plaintiff suing a group of defendants who allegedly committed a *940* variety of distinct fraudulent acts must specify which defendant is alleged to have done what act. However, when a plaintiff sues individual group members on the basis of the collective product of the group, specific allegations about the role each defendant are unnecessary." *Id.*
Here, Plaintiffs contend that the individual Defendants were all "controlling persons" of Sirrom and that each of the individual Defendants was a senior officer and/or director of Sirrom. Docket No. 30, ¶¶ 12-13. Plaintiff also allege that each of the individual Defendants controlled the contents of Sirrom's quarterly and annual reports, press releases and presentations to securities analysts and that each individual Defendant participated in the preparation, review and/or filing of the reports and SEC filings alleged to be false. *Id.,* ¶ 13.

[8]    The Court finds the allegations against the group of individual Defendants to be specific enough to withstand a motion to dismiss. If, after discovery, Defendants can prove that Plaintiffs' allegations as to "controlling persons" or the roles of the individual Defendants are false, such may be an appropriate subject for summary or partial summary judgment.
Having reviewed the Complaint, in the light most favorable to the Plaintiffs and in light of the applicable standards set forth above, the Court finds that Plaintiffs have sufficiently met the particularity requirements of Rule 9(b) and 15 U.S.C. § 78u-4(b).
Defendants also argue that Plaintiffs have not alleged facts giving rise to a strong inference of scienter on the part of any Defendant. To support a Section 10(b) and Rule 10b-5 claim, Plaintiffs must show that Defendants acted with "scienter;" that is, with intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). When the Reform Act was passed in 1995, it added a new section, as noted above, which requires that the complaint in a securities case must state with particularity facts giving rise to a strong inference that the Defendants acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). Courts since 1995 have divided on what is required to sufficiently plead a strong inference of scienter under 15 U.S.C. § 78u-4(b)(2). Compare, *e.g., City of Painesville,* 178 F.R.D. at 187-88 and *Sturm v. Marriott Marquis Corp.,* 26 F.Supp.2d 1358 (N.D.Ga.1998) with *In re Comshare, Inc. Securities Litigation,* 1997 WL 1091468 (E.D.Mich. Sept.18, 1997) and *Morse v. McWhorter,* 1998 U.S. Dist LEXIS 19053 (M.D.Tenn. June 30, 1998).
Plaintiffs argue, and some courts have held, that the standard put forth by the Second Circuit Court of Appeals prior to the Reform Act [*see, e.g., In re Time Warner, Inc. Securities Litigation,* 9 F.3d 259, 269 (2d Cir.1993) and *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) ] still applies under that Act. That standard required either (1) alleging facts to show defendants had both motive and opportunity to commit fraud, or (2) alleging facts that constitute strong circumstantial evidence of reckless or conscious misbehavior. *In re Time Warner,* 9 F.3d at 269.
Numerous courts within the Sixth Circuit have found that the Reform Act expanded or heightened the Second Circuit standard. In the Eastern District of Michigan, for example, the court found, relying upon the Reform Act's legislative history, that it is not enough to plead recklessness or motive and opportunity in order to establish scienter under Section 10(b) and Rule 10b-5. *Comshare,* 1997 WL 1091468 at * 6. Rather, that court held that under the requirements of the Reform Act, plaintiffs must plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants. *Id.; see also Havenick,* 981 F.Supp. at 482; *but see Picard Chemical,* 940 F.Supp. at 1125 (adopting 9th Circuit standard of averring scienter generally by simply declaring that scienter exists).

Magistrate Judge Haynes of this Court has found that the Reform Act heightened **\*941** the pleading standard for securities claims. In *Morse*, the Court agreed with *Comshare* that the legislative history of the Reform Act clearly reveals Congress' intention to heighten the pleading requirements for securities claims and held that plaintiffs must plead specific facts that create a strong inference of knowing misrepresentation. *Morse*, 1998 U.S. Dist. LEXIS 19053 at \* 63.

[9]    This Court agrees with *Comshare* and *Morse* that the legislative history is clear: "Because the Conference Committee intends to strengthen existing pleading requirement, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R.Conf.Rep. No. 104-369 at 41 (1995) (*cited in Comshare*, 1997 WL 1091468 at \*5-6). Thus, the Court has evaluated whether Plaintiffs here have pled specific facts that create a strong inference of knowing misrepresentation.

[10]    Having reviewed the Complaint, in the light most favorable to the Plaintiffs and in light of the applicable standards set forth above, the Court finds that Plaintiffs have sufficiently pled specific facts that create a strong inference of knowing misrepresentation. Defendants' Motion to Dismiss on this issue is DENIED.

                                    FAILURE TO STATE A CLAIM
*CLAIMS OF MISMANAGEMENT*
Defendants contend that Plaintiffs' allegations are merely claims of mismanagement and, thus, are not actionable. The Supreme Court has found that Congress, by Section 10(b), did not intend to regulate transactions which constitute no more than internal corporate mismanagement. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). The Court held that claims of corporate mismanagement and breach of fiduciary duty, without more, are not actionable under the federal securities laws. *Id.* This Court must determine, therefore, whether Plaintiffs' allegations constitute more than corporate mismanagement.

[11]    A complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement. *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992). Here, Plaintiffs allege not merely that loans were overvalued and not timely written down; Plaintiffs also contend that Defendants "made affirmative representations inconsistent with the state of corporate affairs they knew to exist." See *Hayes,* 982 F.2d at 106.
In *Santa Fe,* the Court held that a claim for mismanagement is not actionable if the wrongdoing was not accompanied by any deception, misrepresentation or nondisclosure of material facts. *Santa Fe,* 430 U.S. at 476, 97 S.Ct. at 1302. Plaintiffs here do assert deceptive conduct, misrepresentations and nondisclosure of material facts.

[12]    For example, Plaintiffs assert that Defendants made false and misleading statements in a January 20, 1998 press release, including false assertions concerning income and shareholder equity and the value and increase in the size of Defendants' loan portfolio. See Docket No. 30, ¶ 37. Those statements are affirmative representations which, if proven false, as Plaintiffs allege, are actionable under the securities laws.
Similarly, Plaintiffs aver that Defendants made false and misleading statements in their March 5, 1998 Prospectus, including false assertions concerning income and the value of the loan portfolio, the number and value of problem loans, and Defendants' lending procedures and controls. See Docket No. 30, ¶¶ 40-51. Again, these statements are affirmative representations which, if proven false, as Plaintiffs allege, are actionable under the securities laws. Plaintiffs make similar allegations concerning affirmative statements in Defendants' March 31, 1998 Form 10-K; an April 15, 1998 press release; Defendants' May 13, 1998 Form 10-**\*942** Q; and a June 5, 1998 Wheat First Union report.
Thus, the Plaintiffs have specifically identified affirmative statements by Defendants which Plaintiffs contend were false and/or misleading and were known by Defendants to be false and misleading. The Court finds that Plaintiffs have asserted more than mere corporate mismanagement in this case. Accordingly, Plaintiffs have stated a claim under Section 10(b) and Rule 10b-5. "While it may well turn out, as [Defendants] maintain, that the contested statements are neither material nor misleading when considered in context, that is a determination better made on the kind of record which a motion for summary judgment affords." *Wells Fargo Securities Litigation,* 12 F.3d 922, 930 (9th Cir.), *cert.*

denied, 513 U.S. 917, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994).

[13]  Even though the securities laws do not guarantee sound business practices and do not protect investors against reserves [DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.), cert. denied, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ], the deliberate failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact which cannot be dismissed as a mere matter of internal mismanagement, unsound business practice or poor accounting judgment. Wells Fargo, 12 F.3d at 926. "[W]e do not believe that the broad corporate management exclusion from § 10(b) and Rule 10b-5, set forth in Santa Fe, is implicated when plaintiffs allege specific misrepresentations or material nondisclosures in violation of the federal securities laws." Id. at 927.

The Third Circuit Court of Appeals has stated:

[M]ere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable. Similarly, if a defendant has not commented on the nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves, earnings, assets, or net worth, it is not a violation of the securities laws to fail to characterize these practices as inadequate, meaningless, out of control or ineffective....

However, where a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

Shapiro, 964 F.2d at 281-82 (emphasis added).

As indicated above, Defendants chose to make affirmative statements concerning the financial health of Sirrom. Thus, they were bound to speak truthfully.

For all these reasons, the Court finds that the allegations of Plaintiffs' Complaint, if true, constitute more than mere mismanagement and Defendants' Motion to Dismiss on this ground is DENIED.

THE WHEAT REPORT

Defendants argue that the comments and opinions of Defendant Miller, set forth in the Wheat Report and alleged by Plaintiffs to be false, are statements of vague optimism and not actionable. The specific allegedly false statements reported in the June 8, 1998 Wheat First Union report *943 and allegedly attributable to Defendant Miller are:

(1) that he is very comfortable with analysts' earnings projections;

(2) that he thinks Sirrom is well positioned to produce at least 25% annual EPS growth over the three- to five-year period subsequent to 1998;

(3) that he believes that Sirrom's balance sheet is as healthy as it has ever been and capital gains from SIR's warrant and equity positions in its portfolio companies will remain more than enough to offset credit losses; and

(4) that he is quite comfortable with Sirrom's current ratio of gross loans on credit watch to total loans (7.8%) and that this ratio is well within management's "normal" range of 6% - 10%.

See Docket No. 30, ¶ 77.

Courts have held that vague expressions of optimism as to future performance are mere "puffing" and are not actionable under the securities laws. Alfus v. Pyramid Technology Corp., 745 F.Supp. 1511, 1519 (N.D.Cal.1990). The Supreme Court has held that statements of opinion by top corporate officials may be actionable, however, if they are made without a reasonable basis. Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (cited in Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1428 (3d Cir.1997)).

[14]  The Sixth Circuit Court of Appeals has held that material statements which contain the speaker's opinion are actionable under Section 10(b) if the speaker does not believe the opinion and the opinion is not factually well-grounded. Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir.1993) (citing Virginia Bankshares ). Whether the statements are true or false is not an issue to be decided on a

motion to dismiss. *Mayer, 988 F.2d at 639.* "These assertions are sufficient for purposes of Rule 12(b)(6) because material statements of opinion, if not truly believed and not supported by available facts, are actionable under Section 10(b) of the Securities Exchange Act." *Id.*

The case cited by Defendants, *Raab v. General Physics Corp., 4 F.3d 286 (4th Cir.1993),* narrowly interpreted *Virginia Bankshares* to make liable only those untrue statements of belief which involve "current" facts; predictions of future growth were not found to be actionable. *Brogren v. Pohlad, 960 F.Supp. 1401, 1407 (D.Minn.1997)* (declining to follow *Raab* ). The Sixth Circuit, however, as noted in *Brogren,* has not drawn the distinction articulated in *Raab. Id.* at 1408. This Court must follow Sixth Circuit authority.

[15]    The statements at issue cannot be characterized as simply vague optimism. Defendant Miller's statements--that the company was well-positioned to produce at least 25% annual growth; that the balance sheet was as healthy as it had ever been; that capital gains would remain more than enough to offset credit losses; and that the current ratio of gross loans on credit watch to total loans was 7.8%, well within management's "normal" range of 6% - 10%--appear to be offering hard facts about the *current* state of Defendant's affairs and go beyond vaguely optimistic statements about the future. See *Simon v. American Power Conversion Corp., 945 F.Supp. 416, 429 (D.R.I.1996).* If, after discovery, Defendants can show that there are no genuine issues of material fact as to these alleged statements and that they are entitled to judgment as a matter of law, then summary judgment may be appropriate. At this juncture, however, Defendants' Motion to Dismiss Plaintiffs' allegations about the Wheat Report is DENIED.

*FACTS ACTUALLY DISCLOSED OR IMMATERIAL*

[16]    Defendants allege that certain of Plaintiffs' allegations must be dismissed because the alleged misrepresentations were actually disclosed or were immaterial. The Court finds that whether certain of the alleged omissions and misrepresentations were actually and truthfully **\*944** disclosed raises issues of fact, improper for decision at this juncture. [FN3]

> FN3. For example, Plaintiffs assert, and this Court must view as true for purposes of this Motion, that Defendants improperly valued its Precision Panel and Saraventures loans in public disclosures. Whether that allegation is true or false is not before this Court at this time.

Defendants contend that certain of the alleged misrepresentations were immaterial because of the cautionary language in the Prospectus. This "bespeaks caution doctrine" is essentially shorthand for the principle that a statement or omission must be considered in context. *Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1213 (1st Cir.1996).*

The bespeaks caution doctrine, however, applies to forward-looking statements. *Harden v. Raffensperger, Hughes & Co., 65 F.3d 1392, 1404 (7th Cir.1995).* "The bespeaks caution doctrine provides that when forecasts, opinions or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading." *Id.* "By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements. *Stac Electronics, 89 F.3d at 1408; see also Shaw, 82 F.3d at 1213* (bespeaks caution doctrine did not preclude claim that "reserve adequacy statement" was materially misleading).

As indicated above, Plaintiffs here assert that Defendants made affirmative misrepresentations concerning the existing financial health of the company, in press releases, the Registration Statement and Prospectus, and other public documents. Viewing the allegations as true, for purposes of this Motion to Dismiss, such allegations concerning statements of existing facts state a claim under the securities laws. Accordingly, Defendants' Motion to Dismiss on these grounds--disclosure and immateriality--is DENIED.

*NO DUTY TO DISCLOSE*

[17]    Defendants contend that they had no duty to disclose the "merger" of Precision Panel and

Saraventures in the Prospectus or in the 10-Q and, therefore, Plaintiffs' allegations concerning that omission should be dismissed. Again, Defendants' argument raises questions of fact which cannot be decided on a motion to dismiss. For example, when Defendants knew about the alleged "merger" and when it should have been disclosed will be questions for the trier of fact, not properly for the Court at this time. Accordingly, Defendants' Motion to Dismiss on this ground is DENIED.

*FAILURE TO ALLEGE "SELLER" STATUS*

Section 12(a)(2) of the Securities Act permits suit under that section only against a person who "offers or sells a security." 15 U.S.C. § 77l(a)(2). In determining who is a statutory seller under the Securities Act, the Supreme Court held that Section 12(a)(1) imposes liability on the owner who passed title or other interest in the security to the buyer for value and/or on the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 2078, 100 L.Ed.2d 658 (1988); *Picard Chemical*, 940 F.Supp. at 1132.

Although the definition of "seller" in *Pinter* was in the context of Section 12(1), courts, including the Sixth Circuit Court of Appeals, have held that it applies equally to Section 12(2). *Smith v. American Nat'l Bank and Trust Co.*, 982 F.2d 936, 942 (6th Cir.1992); *F & M Distributors, Inc. Securities Litigation*, 937 F.Supp. 647, 657 (E.D.Mich.1996).

Thus, the Court must determine whether Defendants sold or successfully solicited the purchase of securities, motivated at least in part by a desire to serve their own financial interests or those of the securities owner(s). Plaintiffs apparently admit that the Section 12(a)(2) claim applies only to ***945** Defendants Miller, Morris, Stratton and Williams. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss (Docket No. 47), p. 27 ("The Complaint States Valid Section 12(a)(2) Claims Against Defendants Miller, Morris, Stratton, And Williams").

[18]    In order to establish liability for solicitation under Section 12(2), Plaintiffs must demonstrate direct and active participation in the solicitation of the immediate sale. *Picard Chemical, 940 F.Supp. at 1133*. Plaintiffs allege that the Individual Defendants' acts of solicitation included participating in the preparation of the false and misleading Prospectus. Docket No. 30, ¶ 121. Plaintiffs also allege that Defendants Miller, Morris, Stratton and Williams signed the Registration Statement/Prospectus which Plaintiffs contend was false and misleading. *Id.,* ¶ 39.

[19]    A Prospectus itself is considered a solicitation document. *Picard Chemical, 940 F.Supp. at 1133*. Thus, the Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock. *Id.*

Plaintiffs also allege that the Defendants were motivated by the desire to protect and enhance the Individual Defendants' executive positions and the substantial compensation and prestige they obtained thereby and to enhance the value of the Sirrom common stock of those Individual Defendants who owned such stock. Docket No. 30, ¶ 137. Finally, Plaintiffs aver that Defendants Morris, Resha, Harris and Williams sold Sirrom stock and benefitted thereby. *Id.,* ¶ 139.

[20]    Consequently, taken in the light most favorable to Plaintiffs, the Complaint does allege that Defendants Miller, Morris, Stratton and Williams, who signed the Registration Statement/Prospectus, "solicited" Plaintiffs to purchase Sirrom stock and that in so doing they were motivated by a desire to serve their own financial interests. These are factual allegations which must be determined by the trier of fact and are sufficient to survive a motion to dismiss.

With regard to Defendants Resha and Harris, however, Plaintiffs have not alleged sufficient allegations that they meet the definition of "seller" explained above. In addition, as noted, Resha and Harris did not sign the Registration Statement. Accordingly, Defendants' Motion to Dismiss the Section 12(a)(2) claims [Count II] against Defendants Resha and Harris is GRANTED.

*CONTROL PERSON LIABILITY*

Defendants argue that Plaintiffs' claims against the Individual Defendants as "control persons" must be dismissed, since the primary liability claims should be dismissed. As found above, the Court will not dismiss the primary Section 11, Section 12, Section 10(b) and Rule 10b-5 claims against Defendants.

Defendants also contend that Plaintiffs have failed to sufficiently allege that the Individual Defendants exercised control over the operations of Sirrom. To the contrary, Plaintiffs assert that the Individual Defendants, as senior officers and directors of Sirrom, controlled the contents of Sirrom's public

filings, press releases and presentations to securities analysts. Docket No. 30, ¶ 13. Plaintiffs also aver that Defendants Miller, Morris, Stratton and Williams signed the allegedly false and misleading Prospectus. *Id.,* ¶ 39.

[21]    Whether the Individual Defendants exercised sufficient control to be found liable on these two counts raises factual issues, to be decided by the trier of fact. Defendants have not shown that Plaintiffs can prove no set of facts which would entitle them to relief under these theories. Accordingly, Defendants' Motion to Dismiss the "control person" claims [Counts III and V of the Complaint, pursuant to Section 15(a) and Section 20(a) of the Securities Act] is DENIED.

### SUMMARY JUDGMENT

As provided in Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "**946** shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202, 211 (1986).* Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513-14, 91 L.Ed.2d at 216.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co., Inc. v. Elmore Dev. Co., 921 F.2d 1343, 1349 (6th Cir.1991).* The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir.1989).* While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Anderson, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).*

### DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

[22]    Defendants assert that they are entitled to partial summary judgment, on the issue of whether Defendants complied with generally accepted accounting principles ("GAAP"). Defendants first assert that they did comply with GAAP. It is clear to the Court that there exist genuine issues of material fact with regard to the issue of whether Defendants did comply with GAAP in their accounting procedures.

Nonetheless, Defendants argue that summmy judgment is still appropriate because differences of opinion in the use of GAAP do not constitute material omissions or misstatements, citing *Stavroff v. Meyo, 1997 WL 720475 at *6 (6th Cir. Nov.12, 1997). Stavroff* also holds, however, that violations of GAAP "standing alone" are not tantamount to securities fraud. *Id.* Here, Plaintiffs allege that Defendants not only violated GAAP, but also misrepresented facts and made false, misleading public statements as a result.

The Court cannot determine this issue with no discovery on the matter. Accordingly, Defendants' Motion for Partial Summary Judgment is premature and is DENIED.

### CONCLUSION

For the reasons explained herein, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Plaintiffs' Section 12(a)(2) claims against Defendants Resha and Harris are DISMISSED. In addition, Defendants' Motion for Partial Summary Judgment is DENIED.

Accordingly, Plaintiffs' Motion for Leave to Take Discovery or, in the Alternative, to Strike Defendants' Motion for Partial Summary Judgment (Docket No. 48) is DENIED as moot; and Defendants' Request for Oral Argument (Docket No. 53) is DENIED.

The parties are hereby ORDERED to file with the Court, on or before Wednesday, June 30, 1999, a statement as to whether there is any reason this case should not be referred for alternative dispute resolution, pursuant to Local Rule 20.

IT IS SO ORDERED.

M.D.Tenn.,1999.

In re **Sirrom Capital** Corp. Securities Litigation

84 F.Supp.2d 933

84 F.Supp.2d 933
END OF DOCUMENT

West Reporter Image (PDF) 

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In Re: | ) | Master File |
| | ) | No. 97-11159 WGY |
| SHIVA CORPORATION SECURITIES | ) | |
| LITIGATION | ) | |
| | ) | |
| | ) | |

## ORDER AND FINAL JUDGMENT

On this _27TH_ day of _October_, 1999, a
hearing (the "Hearing") having been held before this Court to
determine: (1) whether the terms and conditions of the
Stipulation and Agreement of Settlement, dated June 24, 1999 (the
"Stipulation"), a copy of which is annexed hereto as Exhibit 1,
are fair, reasonable and adequate for the settlement of all
claims asserted by the Class against the Settling Defendants in
the complaint now pending in this Court under the above caption,
including the release of the Defendants and the Released Parties
and should be approved; (2) whether judgment should be entered
dismissing the complaint on the merits and with prejudice in
favor of the Defendants and as against all persons or entities
who are members of the Class herein who have not requested
exclusion therefrom; (3) whether to approve the Plan of
Allocation as being fair and reasonable and in the best interests
of the Class; and (4) whether and in what amount to award counsel
for plaintiffs and the Class fees and reimbursement of expenses.

The Hearing was held pursuant to the Order for Notice
and Hearing attached hereto as Exhibit 2.

The Court considered all matters submitted to it at the hearing and otherwise.

The Court considered and determined the fairness and reasonableness of the Plan of Allocation and the award of attorneys' fees and expenses requested.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Stipulation, including the definitions contained therein, is incorporated by reference in this Judgment.

2.    The Court has jurisdiction over the subject matter of the Actions and over all parties to the Actions, including all Class Members.  The Court is a proper and convenient venue for the consideration, approval, and administration of the Settlement.

3.    The Notice was disseminated in accordance with the Order for Notice and Hearing, and the Publication Notice was published in accordance with that Order.  The notice given was the best notice to the Class practicable under the circumstances, and provided due and adequate notice of the Settlement and Settlement Hearing, this Order and Final Judgment, and all other matters set forth herein to all Persons entitled to notice, and satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process.

4.    The Stipulation is approved as fair, reasonable and adequate, and in the best interests of the Class,

-- 2 --

and the Class Members and the Parties are directed to consummate the Stipulation in accordance with its terms and provisions.

5. The Class is defined as and includes "all persons who purchased Shiva common stock on the open market during the period of time between April 18, 1996 through March 31, 1997, inclusive." Excluded from the Class are the Defendants herein, members of their immediate families, any entity in which a Defendant has a controlling interest, and the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person or entity. Also excluded are the Persons who made a valid Request for Exclusion from the Class who are listed on Exhibit 3 annexed hereto. The Persons listed on Exhibit 3 are excluded from the Class, and all other members of the Class are bound by this Judgment.

6. The Massachusetts Action complaint is hereby dismissed with prejudice and without costs, except as provided in the Stipulation, as against the Defendants, and Shiva's current and former directors, officers, employees, agents, insurers, co-insurers, and any of their reinsurers.

7. The Defendants and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting any Settled Defendants' Claims against any of the Plaintiffs, Class Members or their attorneys. The Settled Defendants' Claims are hereby compromised, settled, released, discharged and dismissed on the

-- 3 --

merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

8.    Class Members and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting any Settled Claims against any of the Released Parties.  The Settled Claims are hereby compromised, settled, released, discharged and dismissed as against the Released Parties on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

9.    Neither the Stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

(a)  offered or received against the Defendants as evidence of or construed as or deemed to be evidence of any presumption, concession, or admission by any of the Defendants of the truth of any fact alleged by Plaintiffs or the validity of any claim that had been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of Defendants;

(b)  offered or received against the Defendants as evidence of a presumption, concession or admission

-- 4 --

of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any Defendant, or against the Plaintiffs and the Class as evidence of any infirmity in the claims of Plaintiffs and the Class;

(c)    offered or received against the Defendants as evidence of a presumption, concession or admission of any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the parties to the Stipulation, in any other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of the Stipulation; provided, however, that Defendants may refer to it to effectuate the liability protection granted them hereunder; and

(d)    construed against the Defendants or the Plaintiffs and the Class as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial.

(e)    construed as or received in evidence as an admission, concession or presumption against plaintiffs or the Class or any of them that any of their claims are without merit or that damages recoverable under the Consolidated Complaint would not have exceeded the Settlement Fund.

10.    The Court hereby approves the Plan of Allocation as set forth in the Notice as fair and reasonable and in the best interests of the Class.

-- 5 --

11.  Counsel for plaintiffs and the Class are hereby awarded the sum of $ 1,450,000.00 in fees, which sum the Court finds to be fair and reasonable, and $ 318,091.20 in reimbursement of expenses, which shall be paid to Plaintiffs' Lead Counsel from the Settlement Fund with interest from the date such Settlement Fund was funded to the date of payment at the same rate that the Settlement Amount earns.  The award of attorneys' fees shall be allocated among counsel for plaintiffs and the Class in a fashion which, in the opinion of Plaintiffs' Lead Counsel, fairly compensates counsel for the plaintiffs and the Class for their respective contributions in the prosecution of the litigation.

12.  Exclusive jurisdiction is hereby retained over the Parties and the Class Members for all matters relating to this litigation, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order and Final Judgment, and including any application for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the members of the Class.

13.  Any appeal of the approval of the Plan of Allocation, attorneys' fees, or costs shall not prevent the Settlement from becoming effective.

-- 6 --

14.  Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.


Dated:     Boston, Massachusetts
           October 27, 1999


                        _William G. Young_
                        WILLIAM G. YOUNG
                        UNITED STATES DISTRICT JUDGE


F:\SHIVA\97101GAS.063


                        -- 7 --

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Master File No. Civil 02-2677(DSD/FLN)
MDL No. 1511

In re Xcel Energy, Inc.,
Securities, Derivative &
"ERISA" Litigation

------------------------------                **ORDER**

This document relates to:

ALL ACTIONS

------------------------------

       This matter came before the court on April 1, 2005, on

several motions for final approval of class action settlements

in the Securities, Derivative and ERISA Actions against

defendants Xcel Energy, Inc. ("Xcel") and certain of its

officers, directors, and pension plan fiduciaries and for

awards of attorney fees, reimbursement of expenses, and awards

to lead and representative plaintiffs.  In separate orders

dated April 1, 2005, the court approved the settlements as

fair and reasonable and in accordance with the requirements of

due process and Federal Rule of Civil Procedure 23, but it

took under consideration the motions for attorney fees,

reimbursement of expenses, and lead and representative

plaintiff awards.  Based on a review of the file, extensive

record and proceedings herein, and for the reasons stated, the motions for fees, expenses and awards are granted.

## BACKGROUND

This is consolidated multi-district litigation, see In re Xcel Energy Inc. Sec., Derivative & "ERISA" Litig., 254 F. Supp. 2d 1368, 1369 (J.P.M.L. 2003) (Xcel Energy I), which commenced in mid-2002 and was resolved through settlement at the end of 2004. The court observes that this is a relatively short period for resolution of complex litigation of this kind. The actions stem from a dramatic reduction in the market value of Xcel securities following the disclosure in July 2002 of adverse information about its financial ties to its subsidiary, NRG Energy, Inc. ("NRG") through cross-default provisions contained in two of Xcel's credit facilities with banks totaling $800 million, and investigations into its alleged round-trip trading of energy.

All three actions were subject to dispositive motion practice during the litigation. Because the court previously discussed the primary allegations in written decisions on those motions, the court will not repeat the underlying factual allegations here. See In re Xcel Energy, Inc. Sec., Derivative, & "ERISA" Litig., 286 F. Supp. 2d 1047 (D. Minn.

2

2003) (Xcel Energy II); <u>In re Xcel Energy, Inc. Sec.,</u> <u>Derivative & "ERISA" Litig.</u>, 312 F. Supp. 2d 1165 (D. Minn. 2004) (<u>Xcel Energy III</u>); <u>In re Xcel Energy, Inc. Sec.,</u> <u>Derivative & "ERISA" Litig.</u>, 222 F.R.D. 603 (D. Minn. 2004) (<u>Xcel Energy IV</u>). Instead, the court will briefly discuss the litigation proceedings as relevant for its determination of attorney fees, costs and lead plaintiff awards.

**A.    The Securities Action**

In the Securities Action, lead plaintiffs[1] and plaintiffs' co-lead counsel, Chestnut & Cambronne, P.A., and Berger & Montague, P.C., and other plaintiffs' counsel actively litigated the matter for over two and a half years. They investigated the events and transactions underlying the securities claims both prior to filing the initial complaints and before and after filing the amended complaint. They defended the complaint against three motions to dismiss under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78r-4, et seq. (the PSLRA), a critical motion in

---

[1] In an order filed November 13, 2002, the court appointed as lead plaintiffs in the Securities Action a group of eight entities and individuals, namely Chips Investments Limited Partnership, Steven C. Aanenson, Beverly K. Aanenson, Harry C. Andrews, Thomas R. Perry, Jr., Lloyd and Barbara Amundson Charity Foundation, Lake Benton Bancorporation, Inc., and L.A. Amundson Scholarships, Inc.

federal securities litigation.    See Xcel Energy II, 286 F. Supp. 2d at 1060.

Plaintiffs' co-lead counsel retained and consulted with an economic expert who performed a damages analysis. They reviewed and analyzed voluminous publicly available documents as well as several hundred thousands of pages of documents that defendants and twenty non-parties produced during discovery. Discovery also included requests for admission and written interrogatories. Although lead plaintiffs had served notices of taking depositions on defendants, the case resolved prior to depositions being taken. Lead plaintiffs also responded to defendants' written discovery requests, producing interrogatory responses and almost four thousand pages of documents. Additionally, plaintiffs' and defendants' counsel held many meetings and telephonic conferences to coordinate various aspects of the Securities, ERISA, and Derivative Actions. Finally, plaintiffs' co-lead counsel, defense counsel, and defendants' insurance carriers engaged in a two-day mediation ordered by this court with Jonathan Marks. They also had various private talks following the mediation. In the mediation, lead plaintiffs submitted two memoranda of law and over 1,200 pages of supporting documentation. The mediation and subsequent settlement negotiations resulted in

4

an $80 million settlement, which to the court's knowledge is the largest securities fraud settlement in this federal district and the second largest settlement in the Eighth Circuit.[2]

In their attorney fee submission, plaintiffs' counsel reported that they spent a total of 10,401.67 hours prosecuting this litigation, resulting in a collective lodestar of $4,255,949. Hourly rates for the attorneys involved in the litigation ranged from $225 to $650 per hour and paralegal time from $60 to $195 per hour. The lodestar was calculated by multiplying each attorney or paralegal hours by their hourly rate. See Johnson v. Comerica Mortgage Corp., 83 F.3d 241, 244 (8th Cir. 1996) (lodestar method involves multiplying hours expended by a reasonable hourly rate to produce a fee that can be adjusted to reflect the unique characteristics of a given action). Based on the requested attorney fee of 25% of the $80 million settlement, a multiplier of 4.7 results.

March 17, 2005 was the opt-out and objection deadline. The settlement administrator received thirteen timely objections, seven of which pertain to attorney fees. Those

---

[2] See In re BankAmerica Corp. Sec. Litig., 228 F. Supp. 2d 1061 (E.D. Mo. 2002) (approving $490 million settlement), aff'd, 350 F.3d 747 (8th Cir. 2003).

seven objections fall into two general categories: (1) the fees are excessive for a case that has been settled rather than tried and that results in a 4x multiplier (see Objs. of Commonwealth of Pa. Pub. Employees' Ret. Sys. & Pa. Mun. Ret. Sys., N.Y. State Teachers' Ret. Sys., & Pub. Employees Ret. Sys. of Idaho (the "Fund Objectors"), & Ron J. Park, Jr.); and (2) class actions are little more than extortion, and the class action attorneys should be punished for bringing the case that pays little to shareholders by awarding them only nominal attorney fees (see Objs. of Robert P. & Carol L. Sabourin, Irene M. Zieske, & Ron Aumann.). (See Chestnut & Savett Decl. Supp. Mot. Atty. Fees Ex. I.)[3]

**B.    The ERISA Action**

The ERISA Action[4] commenced in September 2002, and thus was pending for nearly as long as the Securities Action. Plaintiffs' counsel investigated the claims, events and underlying transactions, as well as the operations and administration of the plans at issue. As part of their investigation, plaintiffs' counsel interviewed participants of

---

[3] Park appeared at the hearing telephonically. The six other attorney fee objectors, including the three Fund Objectors, did not have a representative attend the hearing.

[4] Plaintiffs in the ERISA Action are Gene Barday, Jr., Donald Newcome and Leonard Banks.

6

the plans and employees, researched Xcel and its predecessor companies, and reviewed numerous documents pertaining to the plans, their operations, underlying events, and damages. They engaged in written and document discovery. Plaintiffs' counsel retained experts in the subject matter of ERISA plan fiduciary obligations and damages. Like lead plaintiffs in the Securities Action, plaintiffs faced a motion to dismiss, which was extensively briefed and denied. See Xcel Energy III, 312 F. Supp. 2d at 1183. Defendants' motion for partial summary judgment was pending when the parties settled the ERISA claims.[5]

The mediation and settlement negotiations in the ERISA Action likewise resulted in a settlement, which has three components. First, defendants agreed to pay $8 million plus interest. Second, certain stock restrictions would be released, which plaintiffs valued between $38 million and $94 million. The restrictions had prevented participants from reallocating employer-match contributions (which were limited exclusively to investment in Xcel common stock) to other fund options in the plans. Finally, plan participants who acquired

---

[5]    During the April 1, 2005 hearing, counsel for defendants and ERISA plaintiffs agreed that the pending partial summary judgment motion was subsumed as part of the settlement.

7

shares during the class period in the Securities Action will recover their losses as permitted under that settlement.

Plaintiffs' counsel in their attorney fee submission indicated that they devoted a total of 2,041.75 hours to the ERISA Action. This resulted in a collective lodestar of $876,611.75. Hourly rates for the attorneys involved in the litigation ranged from $200 to $550 per hour and paralegal time from $50 to $185 per hour. Based on the requested attorney fee of 25% of the $8 million cash portion of the settlement, plaintiffs' counsel would receive a multiplier of 2.16. No class member has raised an objection to the attorney fee request in the ERISA Action.

**C.    The Derivative Action**

Plaintiff Edith Gottlieb commenced a shareholder derivative suit in August 2002 on behalf of Xcel against Xcel's then-board of directors. Defendants moved to dismiss the complaint, and this court granted the motion under Rule 23.1 for failing to make a demand or stating with sufficient particularity why such a demand would have been futile. Xcel Energy IV, 222 F.R.D. at 608. Plaintiff appealed the dismissal to the United States Court of Appeals for the Eighth Circuit. The matter was fully briefed but not argued at the appellate court when the Derivative Action settlement

8

negotiations began.  As part of the settlement, the parties moved to remand the matter back to this court for consideration of the settlement, which the appellate court granted on December 28, 2004.

The settlement provides for corporate governance relief including direct oversight responsibility regarding operational risk management by the finance committee of Xcel's board of directors and to disclose operational risk exposures the company faces.  Other changes include increasing the number of the audit committee annual meetings and requiring that an audit committee member also serve on the finance committee.  In addition, the finance committee will coordinate with Xcel management and the audit committee on issues of major financial and operational risk exposure, and Xcel will increase the number of annual meetings of the governance, compliance and nominating committee to no fewer than four meetings.

In their attorney fee submission, plaintiff's counsel reported that they spent a total of 1,081.90 hours on this litigation, resulting in a total lodestar of $540,452.  Hourly rates for the attorneys and paralegals involved in the litigation ranged from $250 to $585 per hour and from $70 to $95 per hour, respectively.  Plaintiff's counsel had expenses

of $13,372.82. In the Derivative Action, plaintiff's counsel, plaintiffs' co-lead counsel in the Securities Action and defendants' counsel negotiated $250,000 in total for attorney fees and costs. One-half that amount would be paid out of the $80 million securities settlement. No objections have been received to the request for attorney fees in the Derivative Action. The fees requested will provide plaintiff's counsel with less than half of their lodestar, a multiplier of 0.44.

## DISCUSSION

**I.   Standards for Approving Attorney Fees in a Class Action**

An award of attorney fees is committed to the sound discretion of the district court. Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1157 (8th Cir. 1999); see also Fed. R. Civ. P. 23(h). A routine calculation of fees involves the common-fund doctrine, which is based on a percentage of the common fund recovered. See Blum v. Stenson, 465 U.S. 886, 900 n. 16 (1984); In re U.S. Bancorp Litig., 291 F.3d 1035, 1038 (8th Cir. 2002) (awarding attorney fees of 36% from a $3.5 million common fund). In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also "well established." Petrovic, 200 F.3d at 1157.

10

There are strong policy reasons behind the judicial and legislative preference[6] for the percentage of recovery method of determining attorney fees in these cases.  See Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 338-39 (1980) (noting that the common fund doctrine encourages attorneys to bring actions to redress wrongs where it might not be economically feasible to pursue damage claims individually).  Under the percentage method, "[t]he more the attorney succeeds in recovering money for the client, and the fewer legal hours expended to reach that result, the higher dollar amount of fees the lawyer earns ...." LaChance v. Harrington, 965 F. Supp. 630, 647 (E.D. Pa. 1997) (quoting 1 Alba Conte, Attorney Fee Awards § 1.08, at 15 (2d ed. 1993)).  "Thus, one of the primary advantages of the [percentage of recovery] method is that it is thought to equate the interests of class counsel with those of the class members and encourage class counsel to prosecute the case in an efficient manner." Id.

---

[6]  For purposes of the attorney fee award in the Securities Action, the court notes that the PSLRA incorporates the common fund percentage method.  15 U.S.C. § 78u-4(a)(6) (providing that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

The court will exercise its discretion and use the percentage method to award fees in the Securities and ERISA Actions. But before the court begins its detailed analysis, it starts with two observations.

The first observation is a simple one and one of which litigants and their counsel in civil litigation, and especially in complex civil litigation, too often lose sight. The Federal Rules of Civil Procedure "shall be construed and administered to ensure the *just, speedy, and inexpensive determination* of every action." Fed. R. Civ. P. 1 (emphasis added); see <u>Perkins v. Gen. Motors Corp.</u>, 965 F.2d 597, 600 (8th Cir. 1992) (litigants must avoid engaging in tactics that thwart the purpose of moving cases along in a just, speedy and inexpensive manner). Under Rule 1, as officers of the court, attorneys share the responsibility with the court of ensuring that cases are "resolved not only fairly, but without undue cost or delay." Fed. R. Civ. P. 1 advisory committee's notes on 1993 amendments.

All counsel—both those representing plaintiffs and defendants—conducted this litigation in an exemplary manner and fulfilled their obligations under Rule 1. This is the type of complex litigation that easily could have dragged on for several more years. Instead, it had a relatively short

stay of two and a half years on this court's docket because counsel litigated the case efficiently and inexpensively. The lodestar of plaintiffs' counsel could easily have been much higher had not counsel cooperated with one another through the litigation and settlement process. Instead, all plaintiffs' counsel presented a modest lodestar because they moved the case along efficiently to a just result in a remarkably short period of time.

The second observation is that the percentage method imposes a fiduciary responsibility on the court when awarding attorney fees because often persons with small individual stakes will not file objections and the defendant who created the fund has little interest in how the fund is allocated between the class and class counsel. In re BankAmerica Corp. Sec. Litig., 228 F. Supp. 2d 1061, 1064 (E.D. Mo. 2002) (citing Rawlings v. Prudential-Bach Props., Inc., 9 F.3d 513, 516 (6th Cir. 1993)), aff'd, 350 F.3d 747, 751 (8th Cir. 2003). The court takes this responsibility seriously.

The Eighth Circuit has not established factors that a district court should consider when calculating the reasonable percentage to award attorney fees in a common fund case, see U.S. Bancorp, 291 F.3d at 1038, although it has under the alternative lodestar method, see Grunin v. International House

13

of Pancakes, 513 F.2d 114, 127 (8th Cir. 1975) (four factors to consider are the number of hours of work, the reasonable hourly rate, the contingent nature of success and the quality of the attorney's work).[7]   Prior Eighth Circuit cases, however, have turned to the twelve-factor test from Johnson v. Georgia Highway Express, 488 F.2d 714, 719-20 (5th Cir. 1974), many of which are similar to the ones in Grunin.  See Harris v. Union Electric Co., No. 80-0196C, 1985 WL 5817, at *2 (E.D. Mo. Sept. 30, 1985) (applying Johnson factors to award reasonable attorney fees out of a settlement fund in a § 10b-5 case); cf. Easley v. Anheuser-Busch, Inc., 758 F.2d 251, 265 (8th Cir. 1985) (applying Johnson to non-class employment discrimination claim); Nyman v. Investors Diversified Servs., Inc., No. Civ. 4-75-22, 1981 WL 1705, at *1 (D. Minn. Oct. 27, 1981) (citing Johnson factors in analyzing reasonableness of attorney fees in a shareholder derivative case under Fed. R. Civ. P. 23.1).  The Johnson factors are:

> (1) The time and labor required; (2) The
> novelty and difficulty of the questions;

---

[7]   The Eighth Circuit also has not established a "benchmark" percentage that the court should presume to be reasonable in a common fund case, subject to upward or downward deviations depending on the specific circumstances of the case, as other circuits have.  See, e.g., In re Sunbeam Sec. Litig., 176 F. Supp. 2d, 1323, 1335 (S.D. Fla. 2001) (noting the size of the settlement did not warrant an upward or downward departure from the "benchmark" of 25%).

(3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee for similar work in the community; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The undesirability of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases.

Johnson, 488 F.2d at 719-20 (internal quotations omitted).

Plainly, not all of the individual Johnson factors will apply in every case, so the court has wide discretion as to which factors to apply and the relative weight to assign to each. See e.g., Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 854 (10th Cir. 1993) ("[R]arely are all of the *Johnson* factors applicable; this is particularly so in a common fund situation." (citation omitted)); In re Catfish Antitrust Litig., 939 F. Supp. 493, 502 (N.D. Miss. 1996) ("Even though the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered.").

In awarding the attorney fees in this case, the court will exercise its discretion by analyzing a number of factors and considerations to ensure that the attorney fees are

15

reasonable based upon the individualized and unique circumstances of these actions. The court will consider the (1) the benefit conferred on the class, (2) the risk to which plaintiffs' counsel were exposed, (3) the difficulty and novelty of the legal and factual issues in the case, including whether plaintiffs were assisted by a relevant governmental investigation, (4) the skill of the lawyers, both plaintiffs and defendants, (5) the time and labor involved, including the efficiency in handling the case, (6) the reaction of the class and (7) the comparison between the requested attorney fee percentage and percentages awarded in similar cases. After the court determines the reasonable percentage, it will cross-check the reasonableness of the attorney fees by comparing the percentage award to the lodestar.

## II.    The Securities Action

Plaintiffs' counsel in the Securities Action request that the court award 25% of the $80 million settlement plus interest. They also request reimbursement of $481,422.94 for expenses and a collective award of $100,000 to lead plaintiffs.

### A.    The Benefit Conferred to the Class

The benefit conferred to the class and the result achieved is accorded particular weight here. See, e.g., In re

16

<u>Terra-Drill P'ships Sec. Litig.</u>, 733 F. Supp. 1127, 1129 (S.D. Tex. 1990) (noting that the <u>Johnson</u> factors emphasize "the results obtained"). Plaintiffs' counsel achieved a substantial settlement of $80 million, which, as explained above, to the court's knowledge is the largest securities fraud class action settlement in the District of Minnesota and the second largest in the Eighth Circuit.

Although the court will discuss the risks in the next factor, suffice it to say here that plaintiffs' co-lead counsel achieved this result in the face of considerable risks. They obtained a just result without the assistance of a governmental investigation of securities fraud.[8] This further justifies awarding 25% of the settlement funds based on the extraordinary results achieved. See <u>In re Sunbeam Sec. Litig.</u>, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (citing <u>Ressler v. Jacobson</u>, 149 F.R.D. 651, 654 (M.D. Fla. 1992),

_____

[8] The Minnesota Public Utilities Company ("MPUC") held some hearings after the class period about Xcel's ties to NRG and the cross-default provisions. The Securities Exchange Commission ("SEC") and the Commodities Futures Trading Commission had issued subpoenas about the allegations of round-trip trading. <u>Xcel Energy II</u>, 286 F. Supp. 2d at 1054. These investigations, however, did not aid lead plaintiffs or their counsel in prosecuting the Securities Action. For example, their damages expert opined that they could not attribute damages to the round-trip trading allegations as the market barely responded to the disclosure of the investigation.

17

which awarded 30% as attorney fees based on the significant fact that counsel achieved an excellent result "without the benefit of any active assistance from any governmental agency"); In re RJR Nabisco Sec. Litig., MDL No. 818 (MBM), 1992 WL 210138, at *8 (S.D.N.Y. Aug. 24, 1992) (awarding 25% fee and noting that plaintiffs' counsel, not a governmental agency, exclusively developed the facts in aid of the plaintiffs' case).

**B.    The Risks Involved**

The risks plaintiffs' counsel faced must be assessed as they existed in the morning of the action, not in light of the settlement ultimately achieved at the end of the day. See, e.g., Harman v. Lyphomed, Inc., 945 F.2d 969, 974 (7th Cir. 1991) (attorney fee award "reflects a worthwhile *ex ante* arrangement for counsel"); In re Prudential Sec. Ltd. P'ships Litig., 912 F. Supp. 97, 100 (S.D.N.Y. 1996) (considering "the consequent risk of non-payment viewed as of the time of filing the suit"). Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees. See, e.g., In re Prudential-Bache Energy Income P'ships, No. 888, 1994 WL 202394, at *6 (E.D. La. May 18, 1994) (risk is an important factor in determining the fee

18

award because both trial and judicial review are unpredictable and positive results are never guaranteed).

The risk of no recovery in complex cases of this sort is not merely hypothetical. Precedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy. See, e.g., Glover v. Standard Fed. Bank, 283 F.3d 953 (8th Cir. 2002) (reversing class certification); In re Milk Prods. Antitrust Litig., 195 F.3d 430, 437-38 (8th Cir. 1999) (affirming dismissal of complaint without leave to replead).

After surviving defendants' motion to dismiss, see Xcel Energy II, 286 F. Supp. 2d at 1054-60, lead plaintiffs continued to face many hurdles to bring about a successful result in this case. Lead plaintiffs' securities fraud claims involved the failure to disclose the cross-default provisions in Xcel's credit facilities and round-trip energy transactions. The court has already noted that this case did not benefit from meaningful governmental investigations. The court further notes that it also did not involve accounting fraud, a restatement of financials, or any allegations whatsoever of insider trading.

Lead plaintiffs also faced formidable obstacles from defendants themselves, who argued that (1) the Class-Period public statements were not materially false and misleading despite the alleged omissions because Defendants fully disclosed the nature of the Xcel-NRG relationship and Xcel's support of NRG, (2) Xcel was not required to disclose the cross-default provisions because they were not material, (3) even if the provisions were material, the cross-default provisions were in no immediate danger of becoming operative until late June 2002, (4) because of the late date at which the provisions may have been material, the class period was for a limited period of time and involved nominal damages and (5) lead plaintiffs could not prove fraudulent intent — scienter — because no evidence existed that defendants intentionally withheld information about the cross-default provisions from the investing public or that defendants had a personal motive to commit fraud. See In re Aetna Sec. Litig., No. MDL 1219, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001) (awarding $81 million in fees, 30% of the settlement, in a three-year-old case that had disputed issues of scienter, causation, and damages). These defenses, if successful, would have drastically reduced or completely eliminated the Class' ability to obtain any recovery in this case.

20

In conclusion, the court determines that the risk factor, achieving an $80 million settlement against all these complex factual and legal challenges, supports the reasonableness of the 25% attorney fee award.

C.    **The Difficulty and Novelty of the Legal and Factual Issues**

Although plaintiffs survived the PSLRA motion to dismiss, the case still presented many difficult and novel legal questions that would have been tested in dispositive motion practice or at trial. For example, virtually no precedent exists to establish that the alleged failure to disclose the cross-default provisions constituted securities fraud. As such, it presented an issue of first impression. The case was also made more difficult because it had none of the usual indicia of securities fraud, such as accounting improprieties, a restatement of financials, any insider trading, or an investigation by the SEC into the primary allegations of securities fraud this case.

D.    **The Skill of Counsel**

Plaintiffs' co-lead counsel have significant experience in representing shareholders and shareholder classes in federal securities actions around the country and in this district in particular. Counsel — both the lawyers

21

representing lead plaintiffs and defendants — conducted themselves in an exemplary manner. See In re King Res. Co. Sec. Litig., 420 F. Supp. 610, 634 (D. Colo. 1976) (considering the reputations of defense counsel in determining the fee as their stature reflects the challenge faced by the plaintiffs' attorneys). Defendants' attorneys (Jones Day; Briggs and Morgan, P.A.; and Rider Bennett, LLP) consistently put plaintiffs' counsel through the paces. All counsel consistently demonstrated considerable skill and cooperation to bring this matter to an amicable conclusion. Thus, the effort of counsel in efficiently bringing this case to fair, reasonable and adequate resolution is the best indicator of the experience and ability of the attorneys involved, and this factor supports the court's award of 25%.

### E.    The Time and Labor Involved

Over two and a half years, plaintiffs' counsel expended 10,401.67 hours to litigate and resolve this case. As the court discussed earlier in relation to Rule 1, plaintiffs' counsel presented a reasonable lodestar in a case that was not yet ancient, but easily could have become so. But for the cooperation and efficiency of counsel, the lodestar of plaintiffs' counsel would have been substantially more and would have required this court to devote significant judicial

22

resources to its management of the case. Instead, counsel moved the case along expeditiously, and the court determines that the time and labor spent to be reasonable and fully supportive of the 25% attorney fee.

### F.    The Reaction of the Class

Pursuant to the court's preliminary order granting approval, the settlement administrator mailed notices to more than 265,000 potential class members. The notice specifically advised them that plaintiffs' counsel would apply to this court for an attorney fee award of 25% of the settlement plus expenses and that members of the class could object to the requested fee. The court considers both the number and quality of objections when determining how a class has reacted to an attorney fee request. See, e.g., In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 179 (E.D. Pa. 2000) (six objectors were an "extremely limited" number); Ressler, 149 F.R.D. at 656 (the lack of objections is "strong evidence of the propriety and acceptability" of fee request); In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa. 1990) (considering the absence of serious objection to counsel's fee request). Here, of the over 265,000 notices sent, only seven of the thirteen objections

23

received concern the attorney fee award. The court will now specifically address the objections.

The seven objectors question the attorney fees that result from a 25% award.[9] The general grounds for these objections are that (1) the fees are excessive for a case that has been settled rather than be subjected to summary judgment or trial and that results in a 4x multiplier (see Objs. of the Fund Objectors and Ron J. Park, Jr.); and (2) class actions have little purpose and attorneys should not be rewarded for bringing such cases (see Objs. of Robert P. and Carol L. Sabourin, Irene M. Zieske, and Ron Aumann). (Chestnut & Savett Decl. Supp. Mot. Atty. Fees Ex. I.) The court overrules all objections.

The court notes first that the Fund Objectors unquestionably support the adequacy of the $80 million settlement and the quality of the legal services provided by plaintiffs' co-lead counsel. Nevertheless, they and Park believe the requested attorney fee award is not reasonable because it would be too high. Although the Fund Objectors point this court to cases that awarded percentages less than

---

[9] No lead plaintiff in the Securities Action objects to the attorney fee percentage requested. The largest shareholder in the lead plaintiff group specifically approved the fee requested. (See Aanenson Decl. Supp. Mot. Atty. Fees.)

24

twenty-five and that resulted in multipliers of less than 4.7, the Pennsylvania Fund acknowledges the courts' trend to "approve attorneys' fees in the neighborhood of 25% with lodestar multiples in excess of four." (<u>Id.</u>, Pa. Obj. at 2.)

What the court gleans from this authority is that courts award percentages below and above 25% and below and above the 3x multiplier the Fund Objectors propose.  This merely reflects the considerable discretion the court has in awarding attorney fees based on the uniqueness of the cases at hand.

For example, the Fund Objectors cite <u>In re BankAmerica</u>, 228 F. Supp. 2d 1061 (<u>BankAmerica I</u>), which awarded 18% of a $460 million settlement.  However, several differences exist between <u>BankAmerica</u> and this case that impact each case's respective risks.  First, unlike <u>Xcel Energy</u>, <u>BankAmerica</u> involved a proxy fraud claim under Section 14(a) of the Exchange Act and a prospectus fraud claim under Section 11 of the Securities Act, neither of which require a showing of fraud or scienter.  <u>See In re BankAmerica Corp. Sec. Litig.</u>, 78 F. Supp. 2d 976, 989-91 (E.D. Mo. 1999).  Second, although <u>BankAmerica</u> involved a section 10b-5 claim, there the defendants in a post-class article in the <u>Wall Street Journal</u> revealed that they knew during the class period of the undisclosed material information but affirmatively chose not

25

to divulge it. Id. at 997, 999. Third, as a practical matter, although the BankAmerica court declined to award a 25% amount, it still awarded 18%, which resulted in an attorney fee in excess of $88 million, over four times the dollar amount that plaintiffs' counsel seek in this case. See BankAmerica I, 228 F. Supp. 2d at 1065-66.

To the extent that the Fund Objectors imply that the courts "traditionally accounted for economies of scale by awarding lower fees as the size of the fund increases" or set a multiplier cap (Chestnut & Savett Decl. Ex. I, Pa. Obj. at 2), the court reads the precedent otherwise. See, e.g., In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 303, 307 (3d Cir. 2005) (Rite Aid I) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund" and multipliers "need not fall within any pre-defined range, provided the district court justifies the award.").

The court also rejects the Fund Objectors' argument that an award of 25% would thwart the legislative purposes of the PSLRA. "[U]nder the [PSLRA], the aim of the fee award analysis 'is not to assess whether the fee request is reasonable,' but 'to determine whether the presumption of reasonableness has been rebutted.' Id. at 301 n.10. The

26

court finds, based on the risks involved and results reached in similar cases, that the Fund Objectors have not rebutted the presumption of reasonableness.

The court also overrules Park's objection. Park asks the court to use a lodestar "measuring stick." But this method is not the approved and "well established [method] in this circuit." Petrovic, 200 F.3d at 1157. His objection seeks to limit the attorney fees to an hourly rate commensurate with rates in fee-shifting cases or what defendants paid their counsel here, and he proposes that the attorney fee should not come out of the common fund settlement because it diminishes his recovery. However, Eighth Circuit common fund precedent governs this matter, and the rates defendants paid their counsel are not contingent and thus cannot be compared. To the extent Park is concerned that plaintiffs' counsel did not submit sufficient billing information, the court has reviewed the extensive affidavits submitted by each firm that not only set out the specific services rendered on behalf of the class, but the hours and rates of each professional who provided the services.

The court also overrules the three objections in the second category, which fall into the realm of complaints that (1) "all class actions are ludicrous, make a mockery of the

27

judicial system, and only the overzealous attorneys make out"
or (2) the case has little merit and attorneys should not be
compensated when "all they have proved is that Litigation is
costly and time consuming." (Chestnut & Savett Decl. Ex. I.)
The court, however, determines that this class action and the
counsel who litigated it provided substantial benefits to the
class and brought about a just, speedy, and efficient
resolution of this case. See Fed. R. Civ. P. 1.

Upon careful consideration of merits of the seven
objections and the minuscule number of total objections
received in light of the size of the class, the court
concludes that the reaction of the class supports an award of
25% of the settlement fund as attorney fees.

**G.    The Comparison to Similar Cases**

The court determines that the 25% award here comports
with awards in similar cases. The court has looked to cases
from this district, other districts, and to attorney fee
studies referenced in other cases. First, courts in this
circuit and this district have frequently awarded attorney
fees between twenty-five and thirty-six percent of a common
fund in other class actions. See, e.g., U.S. Bancorp, 291
F.3d at 1038 (awarding 36% of $3.5 million settlement fund);
In re Select Comfort Corp. Sec. Litig., No. 99-884 (D. Minn.

28

Feb. 28, 2003) (awarding 33.3% of the $5,750,000 settlement); In re Monosodium Glutamate Antitrust Litig., 2003 WL 297276, at *3 (D. Minn. Feb. 6, 2003) (awarding 30% in attorney fees from a $81.4 million settlement); Cooper v. Miller Johnson Steichen Kinnard, Inc., No. 02-CV-1236 (D. Minn. July 22, 2003) (awarding 25% of a $5.65 million settlement); In re E.W. Blanch Holdings, Inc. Sec. Litig., No. 01-258 (D. Minn. June 16, 2003) (awarding 33.3% of a $20 million settlement); KK Motors v. Brunswick Corp., No. 98-2307 (D. Minn. March 6, 2000) (awarding 33.3% of $30 million settlement fund); In re Airline Ticket Commission Antitrust Litig., 953 F. Supp. 280, 285-86 (D. Minn. 1997) (awarding 33.3% of $86 million fund); In re SciMed Life Sec. Litig., No. 3-91-0575 (D. Minn. July 17, 1995) (awarding 33.3% of $5 million fund plus costs); In re Control Data Sec. Litig., No. 3-85-1341 (D. Minn. Sept. 23, 1994) (awarding 36.96% of $8 million fund); In re Employee Benefit Plans Sec. Litig., 1993 WL 330595 (D. Minn. June 2, 1993) (awarding 33.3% of the $4.2 million cash payment and 33.3% of the $6.5 million debentures to be issued); Harris v. Republic Airlines, Inc., 1991 WL 238992, at *2 (D. Minn. Nov. 12, 1991) (awarding "a sum slightly in excess of 30% of the common fund").

Second, this award comports with attorney fee awards in other securities actions from other federal courts around the country. See, e.g., In re Rite Aid Corp. Sec. Litig., __ F. Supp. 2d __, 2005 WL 697461, at *1-*2 (E.D. Pa. Mar. 24, 2005) (Rite Aid II) (awarding as attorney fees 25% of a $126,641,315 settlement, resulting in a multiplier of 6.96), on remand from 396 F.3d 294 (3d Cir. 2005) (Rite Aid I); In re Sunbeam, 176 F. Supp. 2d at 1335 (awarding 25% of $110 million settlement and noting the size of the settlement did not warrant an upward or downward departure from the "benchmark" of 25%); Ikon Office Solutions, 194 F.R.D. at 194-95 (awarding 30% of an $111 million settlement).

Third, in addition to these specific cases, the court will borrow from an analysis submitted in the Rite Aid case by Professor John C. Coffee of Columbia University, which was cited with approval in Rite Aid I, 396 F.3d at 298. Professor Coffee considered statistical data from other securities fraud class actions and found: (1) a 31% average recovery in securities class actions involving settlements over $10 million; (2) a 27-30% median range over the course of a two-year period in selected federal district courts; and (3) 25-30% recoveries were "fairly standard" in "mega fund" class actions involving settlements between $100 and $200 million.

30

<u>See</u> <u>id.</u> at 298.    Professor Coffee's reference to a median

percentage of 27%-30% was based on a study by the Federal

Judicial Center.    <u>Id.</u> at 303.    The requested fee of 25%

percent actually falls below the range of attorney fee

percentages in cases analyzed by Professor Coffee.    Thus, this

factor — comparison to other cases — supports the 25%

requested in this case.

**H.    Lodestar Crosscheck**

Although not required, the court will exercise its

discretion and verify the reasonableness of the 25% attorney

fee award by cross-checking it against lodestar.    <u>See</u>

<u>Petrovic</u>, 200 F.3d at 1157 (lodestar approach is "sometimes

warranted to double check the result of the 'percentage of the

fund' method").    The lodestar cross-check need entail neither

mathematical precision nor bean counting but instead is

determined by considering the unique circumstances of each

case.    <u>Rite Aid I</u>, 396 F.3d at 303, 306.    The resulting

multiplier need not fall within any pre-defined range, so long

as the court's analysis justifies the award, such as when the

multiplier is in line with multipliers used in other cases.

<u>Id.</u> at 307 n.17.    As stated before, the lodestar cross-check

does not trump the court's primary reliance on the percentage

31

of common fund method. Rite Aid I, 396 F.3d at 307; Petrovic, 200 F.3d at 1157.

Based on the collective lodestar of plaintiffs' counsel, a multiplier of 4.7 results from awarding 25% of the $80 million settlement fund as attorney fees. Courts in other securities class actions have approved attorney fees based on the percentage method that resulted in lodestar multipliers in excess of four. See, e.g., In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 134-35 (D.N.J. 2002) (awarding 28% of a $194 million settlement that resulted in a lodestar multiplier of 4.3); In re Cendant Corp. PRIDES Litig., 51 F. Supp. 2d 537 (D.N.J. 1999), vacated and remanded, 243 F.3d 722 (3d Cir. 2001), on remand, No. 98-2819 (D.N.J. June 11, 2002) (approving percentage fee that resulted in a multiplier of 5.28); Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (percentage fee resulted in a "modest multiplier of 4.65"); Di Giacomo v. Plains All Am. Pipeline, 2001 WL 34633373, at **10-11 (S.D. Fla. Dec. 19, 2001) (approving percentage fee that resulted in multiplier of 5.3). Despite this precedent, the court must exercise its own independent discretion to determine whether the multiplier cross-checked here results in an attorney fee that is unreasonably large and therefore should be adjusted downward.

The court determines that the result is reasonable taking into account the uniqueness of this case. Plaintiffs' counsel achieved an $80 million settlement in a securities fraud case that involved an untested legal theory of disclosing credit agreement terms, the lack of any fruits from a meaningful governmental investigation, and not any allegation of accounting fraud, restatement of financials, or insider trading. Under these circumstances, the court concludes that the 25% attorney fee, when cross-checked against a lodestar multiplier of 4.7, is reasonable. See Rite Aid II, __ F. Supp. 2d at __, 2005 WL 697461, at *2 (noting 25% attorney fee from a $126 million settlement, resulting in a lodestar of 6.96 was reasonable in a rare case that involved the largest class recovery against an auditor and did not involve any official investigation).

## I.  Reimbursement of Expenses

Plaintiffs' counsel also request reimbursement of $481,422.94 for the expenses that they advanced to prosecute this case, which the court now grants. The court is satisfied from its review of the declarations from plaintiffs' counsel that each of the expense categories for which reimbursement is sought is non-duplicative and appropriate for payment from a class settlement fund, including expenses of photocopying,

postage, messenger services, document depository, telephone and facsimile charges, filing and witness fees, computer-assisted legal research, expert fees and consultants, and meal, hotel, and transportation charges for out-of-town travel. See In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 108 (D.N.J. 2001) (noting similar cost categories).

**J.    Lead Plaintiff Award**

The PSLRA permits the court to order an award to lead plaintiffs for the services they rendered in a securities class action. See 15 U.S.C. §78u-4(a)(4) ("Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class."). In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including the personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery. Denney v. Jenkens & Gilchrist, 2005 WL 388562, at *31 (S.D.N.Y. Feb. 18, 2005). Furthermore, courts

34

consider not only the efforts of the representative plaintiffs in pursuing claims, but also the important policy role they play in the enforcement of the federal securities laws on behalf of persons other than themselves. See In re Dunn & Bradstreet Credit Servs. Customer Litig., 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding two class representatives $55,000 each and three class representatives $35,000 each). Such enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.

Lead plaintiffs here have fully discharged their PSLRA obligations and have been actively involved throughout the litigation. These individuals communicated with counsel throughout the litigation, reviewed counsels' submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws. The court, therefore, awards the $100,000 collectively to the lead plaintiff group to be distributed among the eight lead plaintiffs in a manner that plaintiffs' co-lead counsel shall determine in their discretion.

35

### III. The ERISA Action

Plaintiffs' counsel in the ERISA Action request an attorney fee award of 25% of the $8 million settlement, reimbursement of expenses totaling $66,780.30, and $2,000 to each of the three representative plaintiffs. Based on the factors set out above, the court grants their request in the exercise of its discretion using the percentage method to award attorney fees, which it notes is common in litigation of this sort. See, e.g., Staton v. Boeing Co., 327 F.3d 938, 968-69 (9th Cir. 2003) ("Application of the common fund doctrine to class action settlement does not compromise the purposes underlying fee-shifting statutes."); Florin v. NationsBank of Ga., N.A., 34 F.3d 560, 563 (7th Cir. 1994) ("[T]he terms of ERISA's fee-shifting provision do not purport to control fee awards in cases settled with the creation of a common fund."); In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 886 F. Supp. 445, 456 (E.D. Pa. 1995) (common fund awards further ERISA's underlying policies).

### A.    The Benefit Conferred to the Class

Plaintiffs' counsel achieved a considerable result for the ERISA class. In addition to the $8 million cash payment to a common fund, members of the ERISA class will retain their rights to make claims as permitted in the Securities Action

36

and the restrictions on match contributions are removed.  The value of this latter form of relief plaintiffs estimate to be between $38 and $94 million, resulting in a substantial "nonmonetary benefit," from which plaintiffs' counsel do not seek a percentage but which the court considers as a benefit to be taken into account in awarding attorney fees.  See Ikon Office Solutions, 209 F.R.D. at 98-99 (approving settlement and attorney fees in an ERISA case where the primary relief obtained was removing reallocation of match contribution restrictions, with no cash payment to the class).  Moreover, as with the settlement in the Securities Action, continued litigation, which could have extended several years, would have delayed recovery by the class.  Instead, the settlement immediately confers benefits.

**B.   The Risks Involved**

As with all forms of complex litigation, plaintiffs faced many challenges.  Although plaintiffs survived defendants' motion to dismiss, they were facing a partial summary judgment motion at the time of settlement.  As in the Securities Action, defendants in the ERISA Action denied liability and damages and challenged plaintiffs' standing.  As plaintiffs' counsel point out, this area of ERISA law is in its developmental stages.  Virtually no precedent exists testing

whether long-established ERISA and trust principles apply to
401(k) plans, although the <u>Enron</u> and <u>Qwest Communications</u>
cases are moving through the federal court system at this
time. <u>See</u> <u>In re Enron Corp. ERISA Litig.</u>, No. H 01-CV-3913
(S.D. Tex); <u>In re Qwest Communications ERISA Litig.</u>, Civ.
Action No. 02-RB-464 (CSB) (D. Colo.). Some ERISA claims of
this sort have met with no success. <u>See</u> <u>In re Schering-Plough</u>
<u>ERISA Litig.</u>, 2004 WL 1774760, at *5 (D.N.J. June 28, 2004)
(dismissing fiduciary duty claims because such recovery is for
individual participants and not the plan itself). In short,
plaintiffs faced many risks with no guarantee of success.

**C.    The Difficulty and Novelty of the Legal and Factual
        Issues**

In <u>Xcel Energy III</u>, this court noted that breach of duty
of disclosure under ERISA is "an area of developing and
controversial law." <u>Xcel Energy III</u>, 312 F. Supp. 2d at 1176
(citing <u>In re Enron</u>, 284 F. Supp. 2d at 555). Plaintiffs'
ERISA claims faced not only difficult questions of the loyalty
of plan fiduciaries who are also officers and directors of the
Xcel, but also the interplay between ERISA and federal
securities laws. Defendants' motion for partial summary
judgment, which questioned the standing of the representative
plaintiffs, also raised legal and factual questions about the

ERISA claims. Had this case continued, many difficult legal and factual issues would have remained. This factor, therefore, supports the 25% award.

### D.    The Skill of Counsel

The attorneys representing plaintiffs are experienced ERISA counsel and represent other plaintiffs in many other ERISA breaches of fiduciary duty lawsuits around the nation. Here, they faced the same defense attorneys as lead plaintiffs did in the Securities Action. Like that action, defense counsel mounted formidable defenses and tested plaintiffs' ERISA theories and the standing of the plaintiffs in dismissal and summary judgment motions. Plaintiffs' counsel demonstrated their knowledge, skill and efficiency and presented the court with a notable settlement. Had it not been for the skill of counsel, there may have no recovery for the class whatsoever. Thus, this factor suggests that the award of 25% is just and reasonable.

### E.    The Time and Labor Involved

Plaintiffs' counsel expended 2,041.75 hours litigating this matter for over two and a half years of litigation, which resulted in a lodestar of $876.611,75. They committed substantial resources to prosecute the ERISA Action. For example, they engaged in motion practice involving dismissal

39

and summary judgment motions, reviewed documents and other forms of discovery, retained experts on fiduciary law and damages, and negotiated a favorable settlement. Like plaintiffs' co-lead counsel in the Securities Action, plaintiffs' counsel here moved this litigation along efficiently to a just, speedy, and inexpensive resolution.

**F.  The Reaction of the Class**

No member of the ERISA class objected to the terms of the settlement or the request for attorney fees. The notice advised class members that counsel would seek up to a third of the cash settlement as attorney fees, although they eventually moved for a lesser percentage. This silence can be read as an endorsement of the results received and the services rendered by plaintiffs' counsel.

**G.  The Comparison to Similar Cases**

To the court's knowledge, no District of Minnesota case has awarded attorney fees in an ERISA case of this nature. However, the 25% request compares to the securities and antitrust cases in which courts in this district and the Eighth Circuit have awarded percentages in this range, if not higher. From the limited authority plaintiffs' counsel cited in this area, the court is satisfied that its discretionary award of 25% comports with similar cases from other courts.

See, e.g., Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002) (awarding 28% of a $97 million settlement in an action challenging freelancers ability to access employer's employee stock purchase plan); Berger v. Xerox Corp. Ret. Income Guar. Plan, 2004 WL 287902, at *2 (S.D. Ill. Jan. 22, 2004) (awarding 29% attorney fee); Kolar v. Rite Aid Corp., No. Civ. A. 01-1229, 2003 WL 1257272 (E.D. Pa. Mar. 11, 2003) (awarding over $5 million in attorney fees from an ERISA settlement valued at $67.76 million, of which only $10,760,000 was cash, in a case challenging as imprudent investment in company stock); Millsap v. McDonnell Douglas Corp., 2003 WL 21277124, at *13 (N.D. Okla. May 28, 2003) (awarding 25% of a $36 million settlement in an ERISA § 510 case for additional unaccrued benefits to employees vested in a pension plan).

Based upon these seven factors, the court awards as reasonable 25% of the $8 million cash-portion of the ERISA settlement.

**H.   Lodestar Cross-check, Expenses and Incentive Award**

In the exercise of its discretion, the court also determines that the 25% award is reasonable when cross-checked against lodestar.   Here, the attorney fee of plaintiffs' counsel will result in a multiplier of 2.16.   For the reasons stated above in approving the attorney fee in the Securities

41

Action, when cross-checked against a multiplier of 4.7, the court likewise finds that the cross-check requires no deviation from the percentage awarded. See Kolar, 2003 WL 1257272, at *5 (approving 25% attorney fee that resulted in a 4.5 multiplier).

In conclusion, the court awards plaintiffs' counsel in the ERISA action 25% of the $8 million settlement as their attorney fees, and it determines that their request for reimbursement of costs to be reasonable. Finally, the three plaintiffs reviewed pleadings, conferred with counsel, provided information about the plan, responded to discovery, and reviewed and consented to the settlement. The court, therefore, awards $2,000 each to the three representative plaintiffs for their time and effort in pursuing this litigation. See id. at *6 (approving $3,750 incentive award to plaintiff); see also Berger, 2004 WL 287902, at *3 (approving $20,000 incentive fees to each named plaintiff).

## IV. The Derivative Action

Under both Minnesota and federal law, the purpose of a derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of the 'faithless directors and managers.'" Kamen v. Kemper Fin.

42

Servs. Inc., 500 U.S. 90, 95 (1991) (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548 (1949)). Litigation of this nature is notoriously difficult. See Maher v. Zapata Corp., 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'" (citation omitted)). After this court dismissed this case, counsel negotiated a settlement while it was pending at the Eighth Circuit. When settlement was reached, which involved changes to Xcel's corporate governance, plaintiff's counsel reached an arms'-length agreement that they would receive a combined fee and expense amount of $250,000. Because the attorney fee is not based on a percentage from a common fund, the court's attorney fee analysis is based on an older case from this district, Nyman v. Investors Diversified Servs., Inc., 1981 WL 1705 (D. Minn. Oct. 27, 1981), which specifically awarded fees in a case under Fed. R. Civ. P. 23.1. That case cited the twelve-factor test from Johnson. Id. at *1. Like the reasonableness analysis above, the court notes that not all of the Johnson factors apply. However, based on the ones that do, the court now approves $250,000 for attorney fees and costs as fair and reasonable.

## A.    The Benefit Conferred to the Class

Despite the relief in this case being nonmonetary, plaintiff's counsel negotiated what can be coined "therapeutic relief" for the class.    The benefits conferred go to the very nature of the corporate governance that plaintiff challenged as deficient.    The settlement provides corporate governance changes that affect the duties and responsibilities of the audit, finance, and corporate governance committees of the board as it relates to operational risk.    The changes also require that the board investigate, assess, and revise existing systems of oversight monitoring and communication in an effort to prevent the nondisclosure of operational risks in the future.    These benefits are meaningful and justify an award of attorney fees.

## B.    The Risks Involved and The Difficulty and Novelty of the Legal and Factual Issues

The court needs to look no further than its own order dismissing the shareholder derivative litigation to assess the risks involved.    Xcel Energy IV, 222 F.R.D. at 608.    Plaintiff had already lost once.    Whether she would have prevailed at the Eighth Circuit is now a matter of unnecessary speculation.    Even if she had prevailed on appeal, plaintiff would have faced many hurdles in continued litigation, including whether

44

defendants' misconduct was protected by Minn. Stat. § 300.64, subd. 4. Thus, the risks involved fully support the attorney fee award.

### C.    The Skill of Counsel

Plaintiff's counsel have substantial experience in complex class and derivative litigation here and around the nation. Their experience inevitably led to a successful result, despite its dismissal and the pending appeal.

### D.    The Time and Labor Involved

Plaintiff's counsel spent a total of 1,081.90 hours litigating this case here and at the Eighth Circuit, resulting in a lodestar of $540,452.[10] As in the other actions, all counsel litigated the Derivative Action in an efficient and just manner, which supports the award of attorney fees.

### E.    The Reaction of the Class

Like the ERISA Action, no class member objected to the attorney fees provision in the settlement agreement. This factor thus supports the award.

### F.    The Comparison to Similar Cases

---

[10] Because this is not a percentage method common fund case, the court determines that a lodestar cross-check is unnecessary. Even it the court engaged in that process, the negotiated fee is reasonable because it results in plaintiff's counsel receiving less than half of their lodestar.

45

Although not many cases exist to which a comparison can be made, the court determines that <u>Nyman</u> is a distinguishable outdated lodestar precedent that, by its differences, nevertheless supports the award of attorney fees. The <u>Nyman</u> court rejected a request that it award the lodestar of $303,299.65 because that amount exceeded 100% of the recovery, making it an unreasonable request. The court reduced the fee to $165,000, which was "reasonable compensation." 1981 WL 1705, at *3. Unlike that case, plaintiff's counsel here are not seeking lodestar, and although the settlement has no cash component, counsel still achieved a settlement that conferred significant benefits to the class.

In sum, the court concludes that the combined attorney fee and cost award of $250,000 to plaintiff's counsel in the Derivative Action is just and reasonable.

## CONCLUSION

For the foregoing reasons, and based upon a thorough review of the record and case law, the court has determined that the requested attorney fees, reimbursement of expenses and awards to lead and representative plaintiffs are fair and reasonable and will be approved. Accordingly, **IT IS HEREBY ORDERED** that:

46

1.    As to the Securities Action, the motion for attorney fees, expense reimbursement, and lead plaintiff awards [Docket No. 169] is granted.  Plaintiffs' Co-Lead Counsel are awarded twenty-five percent (25%) of the settlement fund, or $20 million, plus interest at the same rate earned by the $80 million settlement fund.  The award of attorney fees shall be allocated among Plaintiffs' counsel by Plaintiffs' Co-Lead Counsel in a manner that fairly compensates counsel for their respective contributions in the prosecution of this litigation.  Plaintiffs' counsel are also awarded $481,422.94 to reimburse them for costs and expenses, plus $100,000 as an award to Lead Plaintiffs.  These amounts shall be paid and distributed in accordance with the terms of the Securities Action settlement agreement.

2.    As to the Securities Objections, the objections of Commonwealth of Pennsylvania Public Employees' Retirement System and Pennsylvania Municipal Retirement System; New York State Teachers' Retirement System; Public Employees Retirement System of Idaho; Ron J. Park, Jr.; Robert P. and Carol L. Sabourin; Irene M. Zieske; and Ron Aumann are overrules.

3.    As to the ERISA Action, the motion for attorney fees, expense reimbursement and representative plaintiff awards [Docket No. 155] is granted.  Plaintiffs' counsel are

47

awarded twenty-five percent (25%) of the $8 million settlement fund.    Plaintiffs' counsel are also awarded costs of $66,780.30.    The three representative plaintiffs each are awarded $2,000.  These amounts shall be paid and distributed in accordance with the terms of the ERISA Action settlement agreement.

4.    As to the Derivative Action, the motion for attorney fees and expense reimbursement [Docket No. 162] is granted. Plaintiff's counsel are awarded a total of $250,000 as attorney fees and costs.    These amounts shall be paid and distributed in accordance with the terms of the Securities Action and Derivative Action settlement agreements.

Dated: April 8, 2005

                              s/David S. Doty
                              David S. Doty, Judge
                              United States District Court

48

# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x
KEVIN LEMMER,                       )
                                    )
                  Plaintiffs,       )
                                    )
            v.                      )    CASE NO. 98 CIV 5748 (AGS)
                                    )
GOLDEN BOOKS FAMILY ENTERTAINMENT   )
INC., et al.,                       )
                                    )
                  Defendants.       )
-----------------------------------x
GREEN FUND and CYNTHIA GREEN COLIN, )
                                    )
                  Plaintiffs,       )
                                    )
            v.                      )    CASE NO. 98 CIV 7072 (AGS)
                                    )
GOLDEN BOOKS FAMILY ENTERTAINMENT   )
INC., et al.,                       )
                                    )
                  Defendants.       )
                                    )
-----------------------------------x

<u>ORDER AND FINAL JUDGMENT</u>

On this 12th day of October, 1999, a hearing having been held before this Court to determine: (1) whether the terms and conditions of the Stipulation and Agreement of Settlement, dated August 10, 1999 (the "Settlement Stipulation") are fair, reasonable and adequate for the settlement of all claims asserted by the Class against the Defendants in the complaint now pending in this Court under the above caption, including the release of the Defendants and the Released Parties and should be approved; (2) whether judgment should be entered dismissing the complaint on the merits and with prejudice in favor of the Defendants and as against all persons or entities who are

members of the Class herein who have not requested exclusion therefrom; (3) whether to approve the Plan of Allocation as a fair and reasonable method to allocate the settlement proceeds among the members of the Class; and (4) whether and in what amount to award counsel for plaintiffs and the Class fees and reimbursement of expenses. The Court having considered all matters submitted to it at the hearing and otherwise; and it appearing that a notice of the hearing substantially in the form approved by the Court was mailed to all persons or entities reasonably identifiable, who purchased common stock and/or 8.75% convertible trust originated preferred securities ("TOPRS") of Golden Books Family Entertainment, Inc. ("Golden books") during the period between May 13, 1997, and August 4, 1998, inclusive (the "Class Period"), except those persons or entities excluded from the definition of the Class, as shown by the records of Golden Books' transfer agent, at the respective addresses set forth in such records, and that a summary notice of the hearing substantially in the form approved by the Court was published in The New York Times pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the Plan of Allocation; the Bankruptcy Court in the Chapter 11 proceeding entitled In re Golden Books Family Entertainment, Inc., et al., Case Nos. 99-B-10030 to 99-B-10032 (TLB) (Jointly Administered) (Bankr. S.D.N.Y.) having issued orders approving the participation of Golden Books in this Settlement, and confirming a Plan of Reorganization for Golden Books which expressly provides that its effectiveness is dependent

- 2 -

on the Effective Date of this Settlement occurring, and which further expressly provides for the survival of any present or former officer's or director's entitlement to indemnification and advancement of expenses to the fullest extent permitted by the Delaware General Corporation Law, as amended from time to time, with respect to any matter encompassed within the definition of Settled Claims if any such matter is asserted by persons who would otherwise be entitled to participate in this Settlement but who excluded themselves from the Class herein, and such orders are no longer subject to appeal or other judicial review; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and expenses requested; and all capitalized terms used herein having the meanings as set forth and defined in the Settlement Stipulation.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.   The Court has jurisdiction over the subject matter of the litigation, the Plaintiffs, all Class Members and the Defendants.

2.   The Court finds the prerequisites to a class action under Fed. R. Civ. P. 23 (a) and (b)(3) have been satisfied in that: (a)  the number of Class Members is so numerous that joinder of all members thereof is impracticable; (b)  there are questions of law and fact common to the Class; (c) the claims of the Class Representatives are typical of the claims of the Class

- 3 -

they seek to represent;  (d) the Class Representatives have and
will fairly and adequately represent the inter ts of the Class;
(e) the questions of law and fact common to the members of the
Class predominate over any questions affecting only individual
members of the Class; and (f) a class action is superior to other
available methods for the fair and efficient adjudication of the
controversy.

3.    Pursuant to Rule 23 of the Federal Rules of
Civil Procedure, and for the purposes of the settlement only, this
Court hereby finally certifies this action as a class action on
behalf of all persons who, during the period between May 13, 1997,
and August 4, 1998, inclusive, purchased common stock or TOPRS of
Golden Books.  Excluded from the Class are the Individual Defen-
dants, the officers and directors of Golden Books, members of their
immediate families and their legal representatives, heirs, succes-
sors or assigns and any entity in which Golden Books or the
Individual Defendants have or had a controlling interest, and
Golden Press Holdings, L.L.C. ("GPH") and its investors.  Also
excluded from the Class are the persons and/or entities who
requested exclusion from the Class as listed on Exhibit A annexed
hereto.

4.    The Settlement Stipulation is approved as fair,
reasonable and adequate, and in the best interests of the Class,
and the Class Members and the Parties are directed to consummate

- 4 -

Exhibit A

# EXHIBIT 14

Service: **Get by LEXSEE®**
Citation: **1984 U.S. Dist. LEXIS 23595**

*1984 U.S. Dist. LEXIS 23595, *; 1984-2 Trade Cas. (CCH) P66,234*

BONNIE PHEMISTER, ET AL., Plaintiffs, v. HARCOURT BRACE JOVANOVICH, INC., ET AL., Defendants.

No. 77 C 39

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

1984 U.S. Dist. LEXIS 23595; 1984-2 Trade Cas. (CCH) P66,234

September 14, 1984

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff class members moved to approve a settlement of their antitrust class action against defendant business, and plaintiffs' counsel petitioned for fees and costs.

**OVERVIEW:** The class members alleged that the business violated the Sherman Act by unlawfully monopolizing the bar review business. The class members proposed a settlement that combined a cash distribution as well as substantial discount rights for products distributed by the business. The court held that the settlement agreement was fair, reasonable, and adequate, and that the request for attorneys' fees and costs was fair and reasonable. In considering a settlement, the court could not speculate what the result might have been had the case been tried. The court balanced several factors to determine whether the settlement was fair and reasonable, and found that the settlement was an excellent result compared to the class members' prospects at trial, that counsel thought the settlement was appropriate, and that the settlement was unobjectionable to the vast majority of the class members. The amount requested for attorney fees was appropriate because the questions involved were novel and difficult, and the calculation of the fees was based on a reasonable number of hours and reasonable hourly rates.

**OUTCOME:** The objections to the settlement agreement were overruled, and the settlement was approved. The counsel's request for fees and for reimbursement of costs was granted.

**CORE TERMS:** settlement, discount, antitrust, notice, purchaser, multiplier, claimant, lodestar, objector, class member, competitor, lectures, class action, common fund, reimbursement, eligible, subclass, Sherman Act, joint venture, cash payment, lawsuit, clerk, litigated, allowance, coupon, class certification, collusion, pendency, monopoly, faculty

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Class Actions > Judicial Discretion 
**HN1** ⚖ The law favors and encourages settlement of class actions, and the district court should not indulge in speculation as to the merits or particular facts supporting the parties' respective legal positions. More Like This Headnote

Civil Procedure > Class Actions > Judicial Discretion

*HN2* In arriving at the conclusion that a proposed distribution of cash benefits in a class action is fair and reasonable under the circumstances, the district court considers the evidence and exercises its responsibility to consider the proper allocation of the settlement fund among class members without conducting a trial. Such decisions in class actions almost always override the wishes of some class members for a bigger slice of the pie. More Like This Headnote

Civil Procedure > Settlements > Settlement Agreements

*HN3* The district court, in considering a settlement, is not permitted to speculate what the result might have been had the case been tried. More Like This Headnote

Civil Procedure > Settlements > Settlement Agreements
Civil Procedure > Class Actions > Judicial Discretion

*HN4* The United States Court of Appeals for the Seventh Circuit points to the following factors that a district court should consider in deciding whether a settlement is fair and reasonable: (1) the strength of plaintiff's case on the merits balanced against the amount offered in settlement; (2) the opinion of counsel as to the fairness of the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) whether there was collusion between the parties in reaching the settlement; (5) the length, complexity, and cost of further litigation; (6) the defendant's ability to pay; and (7) the reaction of class members to the proposed settlement and their objections, if any, to the terms. More Like This Headnote

Civil Procedure > Settlements > Settlement Agreements
Civil Procedure > Class Actions > Judicial Discretion

*HN5* It is appropriate for the district court to rely on the judgments of the experienced counsel who litigate a case that the settlement is fair. Counsel are not required to support the settlement by staging a trial on the merits, which the settlement aims to preclude. In the absence of fraud or collusion, the district court finds no basis for reopening the negotiations and substituting its judgment for that of counsel. More Like This Headnote

Civil Procedure > Class Actions > Judicial Discretion

*HN6* Unlike the calculation of attorney's fees under the "common fund" doctrine, where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under the Civil Rights Attorneys Fees Act, 42 U.S.C.S. § 1988 reflects the amount of attorney time reasonably expended on the litigation. Thus, the percentage of recovery method in a common fund case is proper. Numerous courts have found this simple percentage method appropriate. More Like This Headnote

Civil Procedure > Class Actions > Judicial Discretion

*HN7* The United States Court of Appeals for the Seventh Circuit recommends, but does not mandate, the so-called lodestar method of fee calculation. Under this method, the starting point is to determine a "lodestar" fee by determining the number of hours reasonably spent on the case and multiplying by the attorney's reasonable billing rate. This "lodestar" is then adjusted in the light of a list of other factors. More Like This Headnote

Civil Procedure > Class Actions > Judicial Discretion

*HN8* In awarding fees by the lodestar method, the court is required to determine the customary rates for similar work in the community. More Like This Headnote

**OPINIONBY: [*1]**

MORAN

**OPINION:** FINDINGS OF FACT AND CONCLUSIONS OF LAW

I. FINDINGS AND CONCLUSIONS - SETTLEMENT

Before the Court is plaintiffs' motion to approve the settlement of this antitrust class action. After reviewing plaintiffs' memorandum and supporting affidavits, and the objections of certain class members, the Court has sufficient information to assess the settlement against such factors as (1) the relative strength of plaintiffs' claims, (2) the difficulties of proof or strong defenses plaintiffs are likely to encounter at trial (3) the anticipated duration of the trial and subsequent hearings on damages for each class member and (4) the degree of opposition to the settlement. Plaintiffs' counsel also have petitioned for fees and reimbursement of costs, and, after consideration of plaintiffs' memorandum and supporting affidavits, and the objections of certain class members, the Court is prepared to rule on that petition.

Starting from the premise that *HN1* the law favors and encourages settlement of class actions, Dawson v. Pastick, 600 F.2d 70, 75 (7th Cir. 1979), and that the Court should not indulge in speculation as to the merits or particular facts supporting the parties' **[*2]** respective legal positions, Armstrong v. Board of School Directors, 616 F.2d 305, 314-15 (7th Cir. 1980) following are the Court's Findings and Conclusions of Law:

A.The Lawsuit and Its History

1. This class action lawsuit was filed January 8, 1977. It has three counts, each of which is a separate class action.

2. Count I alleges that defendants violated Section 2 of the Sherman Act by unlawfully monopolizing the bar review business in Illinois. This allegation was directed at the conduct of Bar Review, Inc. ("BRI"), a corporation that in 1974 was acquired by defendant Harcourt Brace Jovanovich, Inc. ("HBJ") and subsequently was merged into HBJ's subsidiary, defendant Harcourt Brace Jovanovich Legal & Professional Publications, Inc. ("LPP"). Plaintiffs alleged that BRI had violated the Sherman Act by (a) acquiring its sole competitor, Thomas J. Harty, Inc., in 1968, and (b) eliminating by other than competitive means a new competitor, Josephson's BRC of America, Inc., which tried unsuccessfully in the years 1971 to 1975 to establish a course in competition with BRI. Plaintiffs alleged that as a result of this conduct, purchasers of BRI's courses in Illinois paid higher **[*3]** prices than they otherwise would have paid.

3. Count II alleges that defendants violated Section 1 of the Sherman Act by an agreement to divide markets. Under this agreement, allegedly made in the early 1970's, BRI agreed with Bay Area Review Course, Inc. ("BAR") that (1) BAR would stay out of states where BAR was established, (2) BAR would stay out of states where BRI was established, and (3) the two would open a joint venture in the State of New York rather than compete there. Then, in 1974, HBJ acquired both BRI and BAR and thereby perpetuated this alleged market-division agreement in violation of Section 1 of the Sherman Act and Section 7 of the Clayton Act. As a result, plaintiffs alleged that defendants' prices in Illinois, New York, and California were higher than they otherwise would have been.

4. Count III of the suit attacked defendants' practice of selling their bar review lectures and their written law summaries as an individual package. This was alleged to be an unlawful trying arrangement in violation of the Sherman Act.

5. This suit was continuously litigated for almost eight years and was settled only on the eve

of trial.

6. The original class **[*4]** was certified on January 9, 1979. Several motions to dismiss all or part of plaintiff' claims were then litigated and denied. The massive task of notifying over 59,000 class members of the pendency of the suit was completed in 1980 (current addresses had to be secured from bar or alumni authorities for all class members). Discovery on the merits took nearly four hours. Over forty depositions were taken throughout the United States. Documents in enormous quantities were subpoenaed and examined from defendants, their accountants, and their competitors.

7. In mid-1983, defendants renewed their attack on the class certification of Count III by filing a motion to decertify. The parties also sharply disagreed over the proper way to design the trial proceedings on liability and damages. These matters were pending when the settlement was arrived at shortly before the trial was scheduled to begin.

8. The trial on the liability would have taken six weeks or more according to the parties' estimates. In addition, thousands of mini-trials on damages might have been required.

B. Nature of the Settlement

9. The settlement encompasses the originally certified class (purchasers **[*5]** between January 8, 1973 and January 9, 1979) and a new settlement subclass of purchasers after January 9, 1979 through the winter of 1984. There are some 150,000 persons altogether who were eligible to participate in the settlement. This expansion of the class for purposes of settlement was insisted on by defendants as a condition of any settlement. Defendants' objective was to eliminate future litigation over the events in the complaint. Such expansion was consistent with plaintiffs' earlier litigation strategy. In 1979, after the original class certification, plaintiffs had unsuccessfully urged Judge Bua to keep the class open-ended by adding future years' purchasers. See Judge Bua's memorandum opinion of April 1, 1979.

10. The settlement provides that the class members will receive cash plus substantial discount rights. Defendants established a fund of $2,750,000 for the class and for payment of attorneys' fees and costs. After payments to plaintiffs' counsel of court-approved attorneys' fees and costs, the entire remainder will be allocated among eligible claiming class members.

11. The parties requested that the Court approve the following formula for allocating **[*6]** the cash payments and allowances to class members. The parties are determining (a) the number of purchasers of Illinois bar review courses who timely filed valid "Intent to Claim" forms (the "Illinois Total") and (b) the number of purchases of bar review courses for all states other than Illinois who timely filed valid "Intent to Claim" forms (the "Non-Illinois total"). According to the formula, each claimant in the Illinois Total is eligible to receive a uniform cash payment or allowance (the "Illinois Payment") that is three times the uniform cash payment or allowance (the "Non-Illinois Payment") that is available to each eligible claimant in the Non-Illinois Total. The dollar amount of the Illinois Payment and the Non-Illinois Payment will be set at the levels that, when all eligible claims are tallied, will account for the entire amount available for distribution.

12. In addition to the cash payment or allowance, each eligible claimant is entitled to receive a discount coupon good towards the purchase of future bar review or other professional education courses. The coupon entitles the bearer to a single discount of $25 off the price of any of defendant LPP's professional **[*7]** education courses for any state bar examination, for the Law School Aptitude Test, for the Certified Public Accounting Examination or for the Graduate Management Aptitude Test. The coupon is transferable and will expire thirty months after the date of its mailing to class members. If the claimant so requests, he or she may elect not to receive this discount coupon and in lieu thereof may receive up to an

additional $25 worth of discount rights on defendants' books and publications as described in the next paragraph.

13. In addition to the cash payment or allowance and discount coupon, each eligible claimant has the right to purchase at a discount, directly from defendants, certain publications from a specific list. The discount is 50% of the publications' suggested retail prices, up to a total discount of $50. A claimant who elects not to take the discount coupon described above is entitled to an additional $25 in 50% discounts; hence, such claimants are eligible for a total of $75. The publications and books that will be available for purchase at discount under this provision include (a) HBJ's numerous legal and professional books and publications and (b) a list of approximately **[*8]** 50 titles designed to include HBJ's best-selling current fiction and non-fiction hardback books. The titles to be included in this list will be determined by the parties at the time publication order forms are sent to class members so that the list will be as current and attractive as possible. The parties submitted a list to the Court with the form which the class members could have chosen had the list been sent in May 1984.

14. The Settlement Agreement left the determination of attorneys' fees and costs to the Court. The Notice of Class Action Settlement advised the class that plaintiffs' counsel would petition the Court for attorneys' fees of not more than $785,000 and for reimbursement of out-of-pocket costs of no more than $125,000, and that the fees and costs ultimately approved would be paid out of $2,750,000 fund established by the defendants. The Notice also advised that the petition for fees would be available for inspection in the Clerk's office on and after July 16, 1984.In addition, plaintiffs' counsel advised the Court that a copy of the fee petition was mailed to each class member who requested one.

15. The Notice of Class Action Settlement approved **[*9]** by the Court for mailing to the class adequately described the nature of the litigation, the settlement, the newly certified class (purchasers after January 9, 1979), the benefits to be conferred by the settlement, the right of the members of the originally certified class to object to the settlement, and the right of persons in the new settlement class (purchasers after January 9, 1979) to exclude themselves form the class.

16. The Notice was mailed to approximately 150,000 identifiable class members. In addition, a summary of the Notice was published in the August 1984 American Bar Association Journal and newspapers in major cities in the United States.

17. In response to the Notice, approximately 90,000 class members filed claims. Forty-nine class members have filed objections (about three one-hundredths of one per cent). None appeared at the hearing. Less than fifty class members in the expanded class opted out of the class in response to the Notice of Settlement.

C. Summary of Plaintiffs' Evidence and Prospects for Success

18. Plaintiffs' Illinois monopolization claim asserted in Count I appears to be the strongest of their claims. Nonetheless, it faced **[*10]** serious factual and legal difficulties. As detailed in the Affidavit of George Galland, plaintiffs' Count I case depended heavily on the testimony of a single witness, Michael Josephson, who unsuccessfully tried to establish a course in Illinois in competition with defendants' BRI course in the early 1970's. Mr. Josephson's general credibility was subject to challenge because of his status as a long-term bitter competitor of defendants. In most cases, Mr. Josephson's version of events was subject to a contrary version from several witnesses on defendants' side. Finally, his principal explanation of why he failed to establish a successful Illinois course -- failure to assemble an adequate faculty -- was weakened by advertising claims he made in writing about the strength of that faculty. (See Exhibit A to Affidavit of George Galland.)

19. The most important of the anticompetitive acts defendants allegedly committed against

Mr. Josephson was the rapid expansion in 1970 of the size of their teaching faculty at the time Mr. Josephson began preparation of his Illinois course. While plaintiffs claimed that this was done to keep Mr. Josephson from assembling a first-rate **[*11]** faculty, the defendants were prepared to argue that such expansion was a legitimate response to a new competitor and that Mr. Josephson was able to hire an adequate faculty despite this expansion.

20. Defendants planned to argue that Josephson's competition in Illinois would have made little difference in the price of the Illinois course. For example, in California, where Mr. Josephson's course has competed vigorously with defendants' courses, prices have continued to rise steadily and are now slightly higher than defendants' prices in Illinois. (Affidavit of George Galland, Exhibit B).

21. Plaintiffs' Count II asserts that defendants' bar review predecessors, BRI and BAR made an agreement not to compete with each other and to divide the market through a joint venture in New York. Plaintiffs' counsel candidly concede that plaintiffs would have had a formidable burden to prove the "fact of damage" to the class as a result of any such agreement.

22. No evidence was developed that BAR, in the absence of such a "cooperation" agreement, would have opened a course on its own in Illinois in competition with BRI. There was testimony that BAR's President had no interest in expanding **[*12]** BAR's operations to any major state unless in the form of a joint venture with others who would do the work of administration. Moreover, BAR on its own did not open an independent bar review course in any major state after 1970. See Affidavit of George Galland.

23. Similarly, there was little evidence to show that BRI would have, in the absence of a "cooperation agreement" with BAR, opened a course in competition with BAR in California. Richard Conviser, President of BRI, testified that he once explored the possibility of a California course but decided against it. (Id. Exhibit D)

24. Plaintiffs might not have been able to show that BRI and BAR would have both competed in New York. The evidence suggests that neither BAR nor BRI would have competed in New York but for their joint venture. Under that joint venture, BAR supplied the money (which BRI then lacked) and BRI supplied the administrators and teachers (which BAR was not interested in supplying). (Id. Exhibit E) The joint venture in New York did not decrease competition in that State and may have increased competition by adding a new entrant.

25. Plaintiffs' Count II damage theories depend on showing, **[*13]** at least as to California and New York, that the entry of another competitor in a market that was already competitive would have led to lower prices. (In California and New York there has been intense competition throughout the class period.) According to plaintiffs' damage expert, Professor Sam Peltzman of the University of Chicago, economic theory along cannot ascribe any additional impact on price to the addition of a third competitor to an already competitive market.

26. Finally, plaintiffs had no direct proof of a geographic territorial agreement. Such an agreement would have had to have been inferred from various other acts of cooperation and various proposed projects between BAR and BRI.

27. Count III alleged that the policy of selling lectures and books as a unified package was an illegal tying arrangement under the Sherman Act. While the uncertainties in Counts I and II were mainly factual, plaintiffs correctly point out that those in Count III were mainly legal.

28. The viability of Count III was threatened by the pendency in the <u>Supreme Court of Jefferson Parish Hospital District v. Hyde,    U.S.  , 1984-1 Trade Cases P65,908</u> (March 27, 1984). **[*14]** Plaintiffs have advised the Court that the pendency of that case was a crucial

factor in plaintiffs' (and presumably defendants") settlement strategy. (Id., P13(a)) In Hyde, a tie-in case, the Department of Justice urged the Supreme Court to abandon the per se rule for tying arrangements. Such a result would have destroyed the viability of Count III. Hence, in judging whether to settle, plaintiffs had to take into account the serious possibility that the imminent Supreme Court decision would altogether kill Count III, or, if not kill it, seriously weaken it. *

* Hyde was decided after the settlement. In a 5-4 vote, the Court declined to abandon the per se rule for typing arrangements but did restrict the scope of the theory. The Seventh Circuit recently described the plaintiff's burden in a typing case in Jack Walters & Sons Corp. v. Morton Buildings, Inc.,   F.2d  , 1984-2 Trade Cases P66,080 (June 22, 1984).

29. One of the defendants' major arguments regarding Count III was that lectures and books were one product, not two. Under the Hyde test, for there to be two products, there must be "two separate product markets," and the question would be [*15] whether "there is a sufficient demand for the purchase of [the tied product] separate from [the tying product] in which it is efficient to offer [the tied product] separately from [the tying product]."

30. Several competitors of defendants gave pretrial depositions or statements that firmly supported defendants' one-product defense. (Affidavit of George Galland, P13(d))

31. At the time of the settlement, there was pending defendants' fully briefed motion to decertify the Count III class. The motion asserted that no uniform method for "fact of damage" existed in Count III and that the Court would become embroiled in endless individual damage disputes. Plaintiffs' proposed uniform theory of damages raised substantial legal questions. It depended on the assertion that persons who would have bought both lectures and books were damaged by virtue of being deprived of the chance to sell their books on the used book market that would have developed in the absence of the tie. This theory required a substantial amount of proof of the characteristics of what that used book market would have been, even though there has been little historical experience in the area of law summaries. [*16] Moreover, after Hyde, plaintiffs' entire damage theory became questionable.

C. Objections of Class Members

The "Illinois Preference" Objections

32. Eight class members (Morton H. Steinman, Thomas M. Kennedy, Kenneth C. Twisselman II, Austin J. Hoffman II, Michael W. Cogan, Henri D. Bartholomot, Robert A. Spiegel, and Michael J. Albun) object to plaintiffs' proposed damage formula because it gives each purchaser of the Illinois course a cash payment that is three times the payment to each purchaser of non-Illinois course.

Plaintiffs respond that this objection overlooks the fact that all purchasers of the Illinois course had a claim (Count I) that no one else in the class had, as well as claims (Counts II and II) that other class members had. Plaintiffs also argue that Count I was by a substantial margin the strongest of the three claims. To treat Illinois purchasers the same as non-Illinois purchasers, plaintiffs content, would not have been defensible. Plaintiffs submitted to the Court the methods utilized by their experts to estimate the value of each claim and how that led to the proposed three-to-one ratio for distribution of the settlement's cash benefits. [*17] *

* Class member Michael Cogan asserts that the three-to-one ratio is prima facie evidence of collusion between plaintiffs appointed to represent non-Illinois class members.Mr. Cogan acknowledges that he has not read the materials plaintiffs submitted in support of the settlement. He mistakenly states that the named plaintiffs are all in the Illinois subclass and have something to gain from the three-to-one distribution. In fact, only two of the five named plaintiffs are in the Illinois subclass, and one of the three plaintiffs' firms, Hoffman & Associates, has specifically prosecuted the interests of the two California class repr90,000 throughout the lawsuit.

The Court finds that the proposed distribution of cash benefits as between claimants under Counts I, II and III is fair and reasonable under the circumstances. *HN2*In arriving at this conclusion, the Court considered the evidence and exercised its responsibility to consider the proper allocation of the settlement fund among class members without conducting a trial. Such decisions in class actions "almost always override the wishes of some class members for a bigger slice of the pie." Curtis-Wright Corp. v. **[*18]** Helfand, 687 F.2d 171, 174-75 (7th Cir. 1982). Thus, the Court finds no merit to those objectors who challenged the greater cash allocation to the Count I class.

The "Multiple Purchaser" Objections

33. Ten class members (Norman Riedmueller, Matthew Weston-Dawkes, Robert L. Ellis, Terry Gross, Paul J. Heldenbrand, Michael J. Album, William R. Drexel, Robert Spiegel, Edward M. Lieberman, and Jeanette A. Flaherty) object to the fact that the settlement does not allow multiple claims to be submitted by persons who brought more than one bar review course from the defendants.

Plaintiffs' response is to point to the evidence showing that the defendants offered a substantial discount to persons who had previously purchased a course from them. (See affidavit of Richard Duffy, attached to Plaintiffs' Response to Class Members' Objections.) Plaintiffs contend that this discount eliminated any viable case plaintiffs' counsel could make that class members had been damaged by a second or subsequent purchase. Plaintiffs' damage experts concurred in this approach. The Court agrees.

34. Class member James Leone argues that "the prices at which subsequent courses were purchased **[*19]** from defendants should be viewed as allegedly improperly elevated even after such discounts."

Plaintiffs acknowledge the validity of the argument in a simple price-fixing case, where it can be presumed that all prices, discounted or non-discounted, are tainted by the conspiracy. However, the multiple purchasers' claims to additional compensation are based on Count III, which is a tie-in claim. Plaintiffs, relying on their experts, submit that it is impossible to say what the discount structure of defendants' courses would have been if defendants had been required to market their lectures and books separately instead of on a tied basis. Thus, the experts were unable to offer any evidence of the damages, if any, that might have been suffered by a multiple purchaser. For plaintiffs' experts to have attempted to prove what the discounted prices might have been, according to the experts, was pure speculation. The court accepts plaintiffs' position regarding the Leone objection.

The Attorneys' Fee Objection

35. Eleven class members (James D. White, Norman Riedmueller, Tom Ryan, Russel D. Jones, Murray a. Bloom, Henri D. Bartholomot, Richard Schnoll, Kenneth J. Pedersen, Doron **[*20]** Hershkovitz, Edward M. Lieberman, and Richard C. Yeskoo) have objected to the fees and costs requested by plaintiffs' counsel. None of the objectors have challenged counsel's evidentiary materials or offered his or her own evidence. The Court's ruling on the petition for fees follows discussion of the fairness and adequacy of the settlement.

The Objections to the Discounts

36. Twenty-nine class members (Morton H. Steinman, Terry Gross, Susan Wing, Norman Riedmueller, Russell D. Jones, Richard Yeskoo, Robert L. Ellis, Michael J. Album, Michael W. Cogan, Fred Kolikoff, Jonathan Austern, Edward M. Lieberman, and the 18, now 17, Jacobs, Williams and Montgomery objectors) object to various aspects of the "discounts" feature of the settlement. Messrs. Kolikoff, Steinman, Austern and Gross object because the entire settlement is not for cash alone. Messrs. Ellis and Album object because class members do not have an option to choose cash in lieu of discount rights. Mr. Yeskoo objects that the discount feature is valueless to him because he does not purchase law books. Mr. Jones objects because he has access to "similar discounts from many publishers, through book clubs [*21] or otherwise, on an almost routine basis." Mr. Riedmueller objects on the ground that 50% discount is "not much better than is available in the market place." Ms. Wing objects because paperbacks are excluded from the list and because she believes that the discount should be 70%. Mr. Cogan, Mr. Lieberman, and the Jacobs, Williams & Montgomery objectors object to the discounts because of their potential benefit to the defendants.

37. As to the objection that the whole settlement should be for cash, or that there should be an option between cash and discount rights, plaintiffs respond that their settlement strategy aimed to get as much cash as possible for the class. After months of hard bargaining, the most cash plaintiffs could exact on the eve of trial was $2,750,000. Plaintiffs view the discount rights as a pure plus for the class and not a benefit obtained in lieu of cash.

38. Plaintiffs support the list of books to be made available because it will contain a wide variety of legal and professional publications that will be available, many of which, paintiffs argue, are not available anywhere at any significant discount. Plaintiffs note that the 50% discount [*22] is much better than those available from discount book stores. As an example, plaintiffs point out that Crown Books' current discount on best selling hardback books is only 20% in Chicago. As to book clubs, their discounts to members are far less that 50%; members must pay mailing and handling charges for each best seller ordered, which class members will not pay.

39. Regarding Ms. Wing's suggestion to include paperbacks in the book list, plaintiffs report that it was rejected by defendants during settlement negotiations. After receiving Ms. Wing's objection, plaintiffs resubmitted the proposal to defendants and it was rejected again. (Galland Affidavit P6.)

40. With respect to those objections directed to the inadequacy or imbalance of cash discounts available on book purchases from the defendants, the Court overrules each. It is not unusual for antitrust class actions to be settled by giving class members benefits in a form other than cash. In In re Cuisinart Food Processed Antitrust Litigation, supra, objectors who complained that no cash was being paid to settle a price fixing case were unsuccessful in upsetting a settlement that provided only discount purchasing [*23] rights. The court there cited several settlements involving cash and/or other non-cash benefits.1983-2 Tr. Cas. at p. 65,680. The Court believes that the discount rights are valuable and providee a significant benefit to class members, as evidenced by the fact that less than one per cent of the claimants have objected to their inclusion in the settlement. In addition, no evidence has been submitted by any objector that shows the discount rights are without value.

The "Too Little"Objection

41. Several class members -- Edward M. Lieberman, Michael Cogan, Henri O. Bartholomot, and the Jacobs, Williams & Montgomery objectors -- object that the settlement contains too little cash. These objections appear to be predicated on the view that plaintiffs would have

done better by trying the suit than they will do in the settlement. No evidence is offered to support the objection. These objections are without merit. *HN3*The Court, in considering a settlement, is not permitted to speculate what the result might have been had the case been tried. Armstrong v. Board of School Directors, supra.

42. The Jacobs, Williams & Montgomery defendants rely exclusively on the fact that **[*24]** in 1981, a bar review course was sold in Minnesota for $350, while the Illinois course that year cost more than $500. They contend that the only explanation for the "substantial difference in cost between the Minnesota courses and the Illinois course must be defendants' violation(s) of the Federal Anti-Trust Laws."

Plaintiffs' response is that there is no reason to think that differences in prices of different bar review courses in Minnesota and Illinois in a given year are attributable to antitrust violations in Illinois. Plaintiffs argue that the products are not necessarily the same; defendants operate no course in Minnesota, and the Minnesota bar exam differs from the Illinois exam. Second, plaintiffs suggest that the costs of giving courses in Minnesota and Illinois are not necessarily the same, and price depends on cost. Third, plaintiffs point to the absence of any evidence that the supply and demand for bar review courses are the same in the two states. Fourth, plaintiffs challenge the objectors' assumption that because defendants operate the only course in Illinois, they must have violated the antitrust laws. Plaintiffs point out that it is not unlawful to have or **[*25]** even to acquire a monopoly; it is only unlawful to acquire or preserve a legally-acquired monopoly through unlawful means.

Plaintiffs contend that it is more meaningful to compare the prices of the courses in Illinois and California. Defendants operate highly similar courses in both states. In Illinois, they allegedly have a monopoly; in California, they have had vigorous competition throughout the class period. Defendants' California course costs more today than defendants' Illinois course. Plaintiffs' position regarding this objection is accepted and the objection is overruled.

43. Class member Michael Cogan cites a recent settlement of a Georgia antitrust case against defendants as a basis for claiming a better settlement could have been attained. Mr. Cogan notes that each class member in that case will receive at least $50.

Plaintiffs reject as invalid any comparison between two unrelated lawsuits. Moreover, plaintiffs point out that the cash payment to the Illiois subclass here (which has the claim most closely resembling the Georgia case) is likely to be comparable to the payment made in the Georgia case.

44. Plaintiffs further note that the "too little" **[*26]** objections are based on the theoretical minimum amounts the class would receive if all 150,000 class members were to file claims. In fact, it appears that the total number of claims filed will be less than 100,000. Thus, the Illinois non-Illinois claimants probably will receive cash and $75 discount rights, the total value of which will exceed the benefits realized in the Georgia case. Therefore, the objection is overruled.

Miscellaneous Objections

45. Class member Helene K. Monat objects that this settlement does not require the defendants to cease selling lectures and summaries as a package. Plaintiffs' response is that, as numerous courts have noted, such objections beg the question by assuming that the practice under attack is illegal, whereas the reason for the settlement is to avoid the formidable hurdles plaintiffs always face in proving that the challenged practice was illegal. Bennett v. Behring Corp., 1982-2 CCH Tr.e Cas. P64,825 at p. 72,111 (S.D. Fla. 1978). Plaintiffs cite cases in which antitrust settlements in tying cases were affirmed notwithstanding the absence of any provision for dissolving the tie. E.g., Grunin v. International House of Pancakes, **[*27]** 513 F.2d 114, 123-24 (8th Cir. 1975), cert. denied,

423 U.S. 864 (1975). Plaintiffs also cited recent Seventh Circuit and Supreme Court decisions that increased plaintiffs' burden of proof in tie-in cases. The Court agrees that plaintiffs' Count III claim had become tenuous at the time of the settlement and that Count III class members were well served by the settlement despite the absence of injunctive relief.

46. The Jacobs, Williams & Montgomery objectors, all of whom practice law in Chicago, complain that no detailed information was contained in the settlement notices justifying plaintiffs' fee request.Plaintiffs' response is that the Notice is not the appropriate place for justifying a fee petition. However, plaintiffs point to paragraph 10 of the Notice in which class members are advised of the maximum fees for which counsel could petition, and are informed that after July 16, 1984, the petition and supporting materials would be on file with the clerk. Plaintiffs also represented that a copy of the fee petition was sent to each class member who requested it. The Court agrees that the class was adequately advised regarding the amount counsel for the class intended [*28] to seek as fees and the right of the class to inspect the petition for fees in the Clerk's office.

47. Class member Elias T. Blawie objects that the Notice of Class Action Settlement did not reach him and he only obtained a copy from a colleague at his firm. Plaintiffs' response is that such occurrences are inevitable in a class of 150,000 people, particularly where the initial addresses available for mailing were those used by class members at the time of their enrollment in defendants' courses. Plaintiffs further note that Mr. Blawie was able to file a timely claim. Finally, the parties agree that late claims will be honored if there is a plausible explanation for the delay.

48. Class member James D. White objects to the notice's use of the term "cash or cash allowances in the Notice" on the ground that it is confusing. Plaintiffs' response is that it is clear from the Notice what these terms mean. Plaintiffs also note that no one except Mr. White has suggested that this terminology is confusing.The objection is overruled.

E. The Fairness and Adequacy of the Settlement under Armstrong

49. In Armstrong v. Board of School Directors of City of Milwaukee, [*29] 616 F.2d 305, 314 (7th Cir. 1980), HN4 the Seventh Circuit pointed to the following factors that a district court should consider in deciding whether a settlement is fair and reasonable: (1) the strength of plaintiff's case on the merits balanced against the amount offered in settlement; (2) the opinion of counsel as to the fairness of the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) whether there was collusion between the parties in reaching the settlement; (5) the length, complexity, and cost of further litigation; (6) the defendant's ability to pay; and (7) the reaction of class members to the proposed settlement and their objections, if any, to the terms. Armstrong, supra, 616 F.2d at 314.

The Strength of the Case for Plaintiffs on the Merits, Balanced against the Amount Offered in Settlement

50. The proposed settlement will give all claiming class members cash and discount rights having a total monetary value equal to a substantial percentage of what they paid for the courses they bought. The exact amounts of cash will depend on the number and distribution of persons filing claims. At the present time, approximately 90,000 class members [*30] have filed claims. Thus, it would appear that the total benefits to be realized by Illinois class members (who get three times the cash that non-Illinois class members will receive) will be $45 in cash plus the discount right, and the total value to the non-Illinois class members will be $15 cash plus the discount rights.

51. The Court finds that this is an excellent result compared to plaintiffs' prospects had litigation continued. On the basis of work by plaintiffs' Count I expert, Professor Sam

Peltzman of the University of Chicago, plaintiffs estimated that in the event of total success at trial on Count I for every class member, the single-damage recovery for the average class member would have been between $38 and $72 (depending on one's assumptions about whether discounts for early sign-up would have been available in Illinois), with a most-likely figure of about $60 (Peltzman Affidavit P6). Under the settlement, claiming Count I class members will receive cash and discount rights that in total, exceeds estimated single damages.

52. This is an excellent result by traditional antitrust settlement standards. Many antitrust settlements that achieve substantially **[*31]** less than single damages for the class are considered fair and adequate settlements. In some of these cases, the class received less than ten per cent of estimated damages. See In re Folding Carton Antitrust Litigation, 557 F.Supp. 1091, 1097 (N.D. Ill. 1983) (summarizing cases and percentages). This result is overwhelmingly preferable to continued litigation, particularly in light of the above-described factual and legal difficulties the plaintiffs would have faced in establishing their case.

Many of the important anticompetitive acts the defendants allegedly committed to acquire their alleged monopoly occurred prior to 1973, the first year of the class period. The prolonged passage of time presented problematical issues of causation and damage for class members who purchased bar review courses during the latter part of the class initially certified. See, Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 296 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1080).

53. Defendants had a substantial argument that additional competition from the Josephson Bar Review Course in Illinois would have made little difference in the price of the Illinois course. The evidence **[*32]** showed that in California, where Josephson's course has competed vigorously with defendants for twelve years, the prices of both Josephson's and defendants' courses have continued to rise steadily and are now slightly higher than defendants' prices in Illinois, where defendants allegedly have a monopoly.

54. Given these difficulties, there was no guarantee that plaintiffs would prevail on Count I at trial, and even in the event of success, the damage amounts awarded by a jury might have been small. The Count I settlement recovery is a fine result compared to this prospect.

55. The settlement ascribes no independent value to the claims asserted in Count II, the territorial division claim. (All Count II subclass members, however, will receive settlement benefits as members of the Count III subclass and some of them will receive additional benefits as members of the Count I class). As described above, the evidence obtained in discovery and provided by plaintiffs' experts, although relevant to plaintiffs' other claims, showed that in the event of trial, plaintiffs had little prospect of proving the "fact of damage" to the class as a result of the alleged territorial **[*33]** agreement. See, Galland Affidavit, P12 and Peltzman Affidavit, P5.

56. The Court finds no reason to question counsel's judgment that the prospects for success of Count II were relatively poor. Since class members in the Count II subclass will be rewarded through their membership in Count III and/or Count I, the Court finds that ascribing no settlement value to Count II was reasonable under the circumstances.

57. In light of the factual and legal problems facing Count III, and the pending motion for decertification, the Court finds that the settlement value ascribed to Count III is fair and reasonable. The settlement clearly is an excellent one for Count III class members. In settling a claim that had a substantial chance of being lost, all Count III class members get cash and rights worth that in total, represent a substantial percentage of what each class member paid for the course.

The Opinion of Counsel As to the Fairness of the Settlement and Whether There Was

Collusion Between the Parties in Reaching the Settlement

58. *HN5* It is appropriate for the Court to rely on the judgments of the experienced counsel who litigated this case that this settlement is fair. Cotton **[*34]** v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977). Counsel are not required to support the settlement by staging a trial on the merits, which the settlement aims to preclude. In the absence of fraud or collusion, neither of which is present here, the Court finds no basis for reopening the negotiations and substituting its judgment for that of counsel. See, In re Art Materials Antitrust Litigation, 100 F.R.D. 367, 371 (N.D. Ohio 1983). In re Cuisinart Food Processor Antitrust Litigation, 1983-2 Tr. Cas. P65,680 (D. Conn. 1983).

In the time this litigation has been pending before this Court, the Court has become familiar with the parties and their counsel and it entertains no doubt whatever that the issues have been litigated in good faith and with great vigor throughout. Counsel have kept the Court apprised of the intermittent progress of the settlement negotiations, which were conducted at arms' length. The court has observed nothing to suggest that collusion, coercion, or conflict of interest played any part in reaching the final settlement compromise.

Reaction of Class Members to the Settlement

59. The response of the class to the settlement notice is a relevant **[*35]** factor to consider in judging the fairness and adequacy of the settlement. In re Corrugated Container Antitrust Litigation, 1981-1 Tr. Cas. P64,114, p. 76,701 (S.D. Tex. 1981). Forty nine class members have filed timely objections. In this case, approximately 150,000 persons received notice by mail or publication. The number of claimants, when finally tallied, will be about 90,000. Only 49 filed objections. It appears that the settlement was deemed unobjectionable by more than 99 per cent of those in the class and those filing claims.

60. None of the objections relating to the settlement, its value, the allocation of cash between the Count I and Count III classes, the failure to allow class members to make multiple claims and the form of notice are deemed persuasive by the Court and the Court finds them insufficient to warrant rejection of the settlement.

Consistent with the foregoing, the Court being fully advised on the matter, and upon the entire record herein, it is hereby ORDERED as follows:

A. The Court hereby overrules each objection to the Settlement and hereby approves the terms of the Settlement Agreement and finds them to be fair, reasonable and **[*36]** adequate.

B. The court finds that every effort was made to assure that all potential class members received notice of the proposed Settlement Agreement and the hearing thereon, either directly or by publication, and that the Notice requirements of Rule 23, F.R.C.P., were satisfied.

C. Each plaintiff and member of the class, who has not timely excluded him or herself, is deemed to be bound by the Settlement Agreement.

D. This action is dismissed with prejudice.

E. There being no just reason for delay, the Clerk of the Court is directed to enter this judgment as a final judgment pursuant to Fed.R.Civ.P. 54(b).

II. FINDINGS AND CONCLUSIONS -- PLAINTIFFS" COUNSEL'S PETITION FOR FEES AND COSTS

Plaintiffs' counsel have petitioned for attorney's fees of $785,000 and for reimbursement of out-of-pocket costs advanced on behalf of the class of $99,512.08. The Notice of Settlement advised the class that counsel would petition the Court to award fees in an amount not to exceed the amount aforementioned and for reimbursement of up to $125,000 in costs. Plaintiffs have supported their petition with an evidentiary appendix that contains, among other things: **[*37]** affidavits of a member of each firm petitioning for fees; an itemized listing of hours spent by each attorney working on the case; a study published in 6 Class Action Reports 116-140 reflecting fee awards in securities and antitrust class actions; billing records of defendants' counsel in the case of In re Burlington Northern, inc., MDL 374 (N.D. Ill.), a discrimination case that was recently settled and in which fees were awarded; and an Affidavit of (then Professor) Richard A. Posner filed in support of a fee petition submitted in Arenson v. Board of Trade, No. 71 C 855 (N.D.Ill.), an antitrust class action.

Eleven class members object to the attorneys' fees and costs requested as "too high." Although the petition for fees and costs has been on file in the Clerk's office since July 16, 1984, and plaintiffs' counsel have represented to the Court that copies of the petition were sent to class members who requested it, none of the objecting class members has challenged counsel's evidentiary materials or offered his or her own evidence.

The Court has reviewed the petition and exhibits filed by counsel and considered the objections and applicable standards and makes the **[*38]** following findings and conclusions with respect to the petition for fees and costs:

1. The settlement reached in this case occurred after nearly eight years of hard-fought litigation. Plaintiffs were represented by two Chicago firms, Davis, Miner, Barnhill & Galland, and Hartunian, Futterman & Howard, Chtd., and a California firm, Hoffman & Associates. The Court is personally familiar with the two Chicago firms and the individual lawyers from those firms who prosecuted this case, and knows them to be highly skilled class action lawyers with a record of success in antitrust and other class cases. The Court also finds that the work of Hoffman & Associates, as detailed in the fee petition, contributed to the successful prosecution of the plaintiffs' claims.

2. The Court also is familiar with the work of the attorneys in the firm of Winston & Strawn who bore the brunt of defending this case. The Winston & Strawn attorneys are highly skilled with considerable experience in trying and defending antitrust cases. These lawyers were formidable adversaries for plaintiffs' counsel.

3. In considering the fee petition and request for costs, the Court has considered: the hours worked **[*39]** in terms of reasonableness, duplication of effort and rates requested; the contingent nature of the case; the quality of services rendered; the benefits conferred upon the class. See, In re Folding Carton Antitrust Litigation, 84 F.R.D. 245 (N.D.Ill. 1979)

4. Plaintiffs' fee petition furnishes detailed information regarding the hours attributed to the five general categories of work performed by plaintiffs' counsel over eight years. These categories are: initial investigation; efforts devoted to class certification and notice; conduct of merit discovery; trial preparation through settlement; settlement administration. The Court notes that plaintiffs' counsel have devoted a not insubstantial number of hours to settlement administration subsequent to filing their petition, and that no compensation is sought for that time.

5. The detailed time records submitted support the view of plaintiffs' counsel that they were extremely efficient in allocating work, particularly in their use of paralegals, and that there was virtually no duplication of effort. The Court is aware of the intensity with which counsel for both sides litigated this case, and finds that the number **[*40]** of hours for which compensation is sought (3089.75 over eight years) is highly reasonable since the settlement occurred on the eve of the trial.

6. There is no magic arithmetic formula for a reasonable attorneys' fee in a "common fund" case. The Seventh Circuit has not mandated use of a single method for fixing fees. See, e.g., Henry v. Webermeier,   F.2d  , No. 83-2228 (June 19, 1984), slip opinion at 6. However, two methods have received wide recognition by the courts. The first, as recently discussed by the Supreme Court, examines the amount of the fund recovered and sets the fee as a reasonable percentage of that fund. The second method makes a more detailed analysis, starting with hours reasonably spent times reasonable billing rate and adjusting that figure in light of a number of relevant factors. Under either method, the fee sought by petitioners is reasonable.

a. The Requested Fee As a Percentage of the Recovery

7. Contingent fee arangements in non-class action damage lawsuits use the simple method of paying the attorney a percentage of what is recovered for the client. The more the recovery, the more the fee. The percentages agreed on vary,  [*41]  with one-third being particularly common.

8. In Blum v. Stenson, 104 S.Ct. 1521 (1984), the Court contrasted fee awards in "common fund" class actions (which is what a settlement like this one is) with fee awards directly against defendants under the Civil Rights Attorneys Fees Act, 42 U.S.C. § 1988:

*HN6* Unlike the calculation of attorney's fees under the "common fund" doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.

104 S.Ct. at 1529-1530 n.16 (emphasis addaed). Thus, the Court clearly recognized the propriety of using the percentage of recovery method in a common fund case. Numerous courts have found this simple percentage method appropriate. See, e.g., Miller v. Woodmoor, 1979 CCH Fed. Sec. L. Rpts. § 96,853 (D. Colo. 1978) at pp. 95,470-95,471; Philadelphia Electric Co. v. Anaconda American Brass Co., 47 F.R.D. 557, 560 (E.D.N.Y. 1969); Bottger v. King Resources Co., 420 F. Supp. 610, 630-31 (D. Colo. 1976).

9. As a percentage of the common fund, the fee sought by petitioners is reasonable by any standard.  [*42]  The "common fund" consists of $2,750,000 in cash plus whatever total of discount rights is ultimately exercised by the eligible class members. If all class members who file claims used all their discounts, the total value of the settlement would approach $10,000,000, in which case the $785,000 fee sought by petitioners would be less that 8% of the fund. No one knows the total amount of discounts that will be actually claimed, but the following table shows the fees claimed as a percentage of the value of the settlement under various assumptions.

| % of Discount Rights Exercised by Class | Total Fund (,Requested Fee [(1) + $2,750,000] | As a % of Fund |
|---|---|---|
| 50% | 8,675,000 | 9.05% |
| 25% | 5,717,500 | 13.70% |
| 10% | 3,935,000 | 19.90% |

10. Thus, even under the relatively pessimistic assumption (more than 505 of the class filed claims) of a mere 10% use of the available discount rights, the fee sought by petitioners will be less than 20% of the total fund they achieved for the class.

11. Historical experience in antitrust and securities class suits shows that this is extremely

fair to the class. As the Court noted in Miller v. Woodmoor Corp., supra,

In class actions **[\*43]** brought to redress violations of the federal securities laws, the "normal" range of awards of attorneys' fees has been twenty to thirty per cent of the benefits to the classs.

1979Fed.Sec.L.R. at p. 95,471. In 1981 a survey was made of reported fee awards in antitrust and securities cases. The survey of 52 recoveries within the range of $1,500,000 to $10,000,000 (which is the probable range of the ultimate recovery here) found that on the average the court-awarded figure for fees an costs was about 21% of the total recovery. 6 Class Action Reports 122-124 (1981), Evidentiary Appendix Ex. 8.

b. The "Lodestar" Method

12.The $^{HN7}$ Seventh Circuit has recommended (but not mandated) the so-called lodestar method of fee calculation. Under this method, the starting point is to determine a "lodestar" fee by determining the number of hours reasonably spent on the case and multiplying by the attorney's reasonable billing rate. This "lodestar" is then adjusted in the light of a list of other factors. Waters v. Wisconsin Steel Works, 502 F.2d 1302, 1322 (7th Cir. 1974)

13. Petitioners' fees are more than reasonable as calculated by the lodestar method. Petitioners' requested **[\*44]** lodestar fee is $556,717.50 for 3,089.75 hours spent over almost eight years. On its face, this figure is clearly reasoanble. Except for a brief lull in 1978 while the parties awaited a class decision from Judge Bua, this case was continuously and heatedly litigated, and almost went to trial. Yet petitioners are requesting reimbursement for an average of just 386.5 hours a year.

14. This is efficient work, particularly in light of the size of the case, its severe management difficulties, and its excellent results. The Court has no reason to doubt that petitioners went to great length in this case to avoid duplication and waste. The three plaintiffs' law firms are very small; duplication was a luxury they could not afford. A strict division of labor was imposed so that at almost any given time, each plaintiffs' lawyer was working on a separate task. Because of this efficiency, all the hours claimed deserve compensation. See, Hensley v. Eckerhart, 103 S.Ct. 1933, 1939-1940 (1983).

15. The time records make clear that petitioners also used paralegals whenever possible to save attorneys' time, especially on the class notice task. By spending over 1,250 hours **[\*45]** on this case, paralegals thereby freed up counsel for more difficult work. Court rulings on fee petitions frequently emphasize this factor in judging the reasonableness of counsel's hours. See, e.g., Johnson v. Georgia Highway Express, 488 F.2d 714, 717 (5th Cir. 1974).

16. $^{HN8}$ In awarding fees by the lodestar method, the court is required to determine the "customary rates for similar work in the community." Blum v. Stenson, supra, 104 S.Ct. at 1546 * The rates sought by petitioners are in line with the market rates charged by firms engaged in civil ligitation of this supremely complicated nature. Petitioners seek $170 per hour for senior attorneys' time, and rates varying from $95 to $135 per hour for associates' time. Petitioners also seek $40 per hour for paralegal time.

* The test is not what rates the petitioning counsel charge their clients. Blum v. Stenson, 104 S.Ct. at 1544; Strama v. Peterson, 561 F. Supp. 997, 999 (N.D. Ill. 1983).

17. The rates sought by petitioners here are in line with rates that were charged by defendants' counsel, Mr. Stack, * and with the rates charged ($165 to $225 for senior

attorneys) by defense counsel in the Burlington Northern **[\*46]** case. See, Chrapliwy v. Uniroyla, Inc., 670 F.2d 760, 768 n.18 (7th Cir. 1982), cert. denied, 103 S.Ct. 2428 (1983). They are also in line with rates that have been approved by the Seventh Circuit and by judges in this District. In Ridgeway v. Local 134, IBEW, No. 74 C 3045 (N.D.Ill.), Judge Bua recently approved as reasonable an agreed fee calculation for Davis, Miner, Barnhill & Galland based on an hourly rate of $170 (Evidentiary Appendix, Ex. 10). In Charpliwy v. Uniroyal, Inc., supra, the Seventh Circuit affirmed rates, on the basis of market rates in 1981, ranging from $75 to $200. 670 F.2d at 768. The current rates requested by petitioners fall within the range that was reasonable in 1981. Similarly, in Gaines v. Sears Roebuck & Co., supra, this Court in 1980 found that rates of $150 an hour for experienced counsel were "in line with those for attorneys of comparable experience and ability in this are." 1980 CCH Fed.Sec.L.R. p.97,396 at P97,496 (1980).

* Mr. Stack's rate of $175 per hour is documented in Exhibit B to the "application for Inerim Compensation" filed by Winston & Strawn in May 1984 in In re Jartran, Inc., Debtor, 81 B 16118 (N.D.Ill.), cited by petitioners in their brief in support of the petition for fees. **[\*47]**

18. It is clearly appropriate to apply a current hourly rate to petitioners' hours, regardless of the year these hours were spent. The Seventh Circuit explained why in Gautreaux v. Chicago Housing Authority, 690 F.2d 601, 612 (7th Cir. 1982), cert. denied, 103 S.Ct. 1438 (1983):

It is appropriate in this case to award a current hourly rate (rather than various historical rates) for all the hours claimed. In the first place, the appellants' attorneys have had no fees at all during an intensely inflationary period. The use of current market rates in comparable circumstances has been approved in Copeland v. Marshall, 641 F.2d 880, 893 & n.23 (D.C. Cir. 1980) (en banc); Northcross, supra, 611 F.2d at 635: Hernandez v. Finley, slip op., No. 74 C 3473 (N.D.Ill. Feb. 20, 1981) at 4; Custom v. Quern, 482 F. Supp. 1000, 1006 (N.D. Ill. 1980).

This Court has agreed: "The use of current rates has merit, for the reasons set forth in City of New York v. Darling-Delaware, 440 F. Supp. 11332 (S.D.N.Y. 1977)." Gaines v. Sears, Roebuck & Co., 1980 CCH Fed.Sec.L.R. P97,376 at p. 97,496 (N.D.Ill. 1980).See also, In re Ampicillin Antitrust Litigation, 81 F.R.D. 395, 402 (D.D.C. 1978); **[\*48]** Chrapliwy v. Uniroyal, Inc., 509 F. Supp. 442, 457 (N.D. Ind. 1981), reversed in part on other grounds, 670 F.2d 760 (7th Cir. 1982); International Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1253, 1275 (8th Cir. 1980); Jorstad v. IDS Realty Trust, 643 F.2d 1305 (8th Cir. 1981).

19. In sum, petitioners' requested lodestar of $556,717.50 is based on a reasonable number of hours and on reasonable hourly rates.

20. Consistent with the Settlement Notice in which counsel represented to the Class that the fee request would be limited to $785,000, only a small upward adjustment ("multiplier") is possible in this case. (A multiplier of 1.462 would raise the lodestar to just above the maximum $785,000 that can be awarded.) Under the Waters factor, a larger multiplier than this would be appropriate. Of the eight Waters factors, at least four are clearly applicable here.

a. The Novelty and Difficulty of the Questions Involved.

21. This was not a garden-variety antitrust class action. Most such class actions are price-fixing suits filed in the wake of a federal criminal indictment. This one involved no help from the government whatsoever and raised much **[\*49]** more speculative and difficult claims.

22. When the case began, there was substantial doubt as to plaintiffs' standings to sue under 15 U.S.C. § 4. Several courts, including the Eighth Circuit, had held that consumers could not be "injured in their business or property" under 15 U.S.C. § 15, a question only put to rest by the Supreme Court two years after this suit began.

23. The class certification fight presented numerous difficult questions. While price-fixing class actions are commonplace, there have been scarcely any reported decisions certifying Sherman § monopolization claims (such as Count I) as class actions. The six-year scope of plaintiffs' original class, the fact that three separate claims were involved, and the nineteen different markets covered by Count III made class certification extremely difficult.

24. Count III was clearly on the fringe of antitrust law. It was always problematic as to whether lectures and law summaries were one product or two, and the law on this subject badly deteriorated during the pendency of the suit. See, e.g., Hirsch v. Martindale-Hubbell, Inc., 674 F.2d 1343 (9th Cir. 1982), cert. denied, 103 S.Ct. 305 (1982). **[*50]**

25. Since the suit was settled, that deterioration has accelerated. In Jefferson Parish Hospital District v. Hyde, 104 S.Ct. 1551 (1984) and in Jack Walters & Sons Corp. v. Morton Buildings, Inc.,    F.2d   , 1984-2 Trade Cases P66,080 (7th Cir. 1984), the Supreme Court and Seventh Circuit established a test of "separate markets" for each product in order for them to be considered separate. Plaintiffs would have had severe difficulty under this test since it has not been customary to market bar review lectures on a separate basis.

26. The proof of "fact of damage" on Count III also presented the most perplexing problems, as the six briefs filed on this subject on 1983 attest. Defendants pressed the following arguments: (a) that no class member was damaged because he did not want to buy one or the other product; (b) that even those class members who wanted only one product were not damaged unless they could prove that the "untied" price of the other product would have been less than the total price actually paid, Kypta v. McDonald's Corporation, 671 F.2d 1282 (11th Cir. 1982), cert. denied, 103 S.Ct. 127 1982); (c) that plaintiffs would be unable to show, on a classwide **[*51]** basis, what the price of summaries would have been on the "used book" "markets" that were essential to plaintiffs' unified damage theory.

27.Whatever the ultimate disposition would have been of these issues, it was clear that plaintiffs' theory of Count III damages had little precedent that would help the resolution of these issues. Nevertheless, a substantial recovery for the Count III class was achieved. Thus, this case presented extreme difficulty in both procedure and substance. This argues strongly for an upward adjustment of the "lodestar" beyond the factor requested by petitioners.

(b) The Amount Involved and the Results Obtained.

28. This traditional Waters factor remains a crucial consideration in "common fund" cases, as the Supreme Court recently reemphasized. Blum v. Stenson, supra, 104 S.Ct. at 1529-30 n.16 (1984). The Court finds that the recovery here is very large both in absolute terms and in terms of what could have been expected given the difficulties of the case.

(c) The Experience, Reputation and Ability of the Lawyers Performing the Service

29. This court has extensive experience with Davis, Miner, Barnhill & Galland and Hartunian, Futtterman **[*52]** & Howard, Chtd., as noted above, and is familiar with their reputations and ability.

(d) Whether the Fee is Fixed or Contingent

30. The risk to counsel in this case of a "dry hole" was obvious. First, the risk of losing in a case with very large expenses and amounts of attorney time was greater than in most

antitrust class actions because of the unusual subject matter. Second, this case exposed counsel to unique criticism. The class in this case consists of perhaps 30% of the country's practicing lawyers. A loss in this case would have been a blight on counsel's reputation because it would have been publicized throughout the American legal community.

31. This risk calls for a substantial multiplier. Then professor Richard A. Posner, now a Judge of our Court of Appeals, stated the following in a affidavit (Ex. 11 in the Eventiary Appendix) filed in Arenson v. Board of Trade, 372 F. Supp. 1349 (N.D.Ill. 1974), an antitrust class action:

The award of substantial attorneys' fees to the lawyers for the plaintiffs in a successful antitrust class action is important in order to encourage the bringing of such actions. Necessarily, these lawsuits are handled on a [*53] contingent-fee basis, and the uncertainty of antitrust law and the complexity of the facts in most antitrust cases create a substantial risk that the lawsuit will fail and the lawyers for the class therefore receive no fee. Because these are big cases, the investment of the attorney's time and effort -- an investment that he loses entirely if the suit is unsuccessful -- is very large; and payment of his fee may be long postponed due to the length of the typical antitrust case. In addition, the successful prosecution of an antitrust case requires highly specialized legal skills and aptitudes that are in great demand by conventional clients. Substantial fees are necessary if the lawyers having these skills are to be induced to devote their attention to the plaintiffs' side in antitrust class actions, rather than to the more secure forms of pracatice for which their skills equip them.

Professor Posner further stated that "An award limited to normal time charges would, in my judgment, typically undercompensate the lawyers for the class . . ." Posner Aff. 4. He pointed out:

Suppose that a lawyer has a choice between (1) working for $100 an hour, win or lose, or (2) working [*54] for $100 if he wins, nothing if he loses. Clearly he will prefer the former. As I suggested earlier the lawyers whom we want to handle antitrust class actions are fully competent to handle antitrust or equivalent work on a work-done rather than on a contingent basis.

Posner Aff. 4-5. As Professor Posner points out, unless lawyers in these contingent cases are offered the prospect of a premium over straight-time non-contingent rates in the event of success, they will prefer to do non-contingent work, and it will prove impossible to attract top-flight lawyers to prosecute these class actions. This Court agrees.

32. The Seventh Circuit has long emphasized risk as a crucial factor in determining upward adjustments. See, e.g., Chrapliwy v. Uniroyal, Inc., 670 F.2d 760, 770 (7th Cir. 1982), cert. denied, 103 S.Ct. 2428 (1983); Mills v. Eltra Corp., 663 F.2d 760, 763 (7th Cir. 1981).

33. The requested multiplier is certainly in line with the multipliers allowed in other class cases. See, e.g., Gaines v. Sears, Roebuck & Co., supra, (multiplier of 1.5); Mills v. Eltra Corp., supra, multiplier of 1.5 for a relatively straight-forward suit); Arenson v. Board of Trade, 372 F. Supp. [*55] 1349 (N.D.Ill. 1974) (Bauer, J.) (multiplier of 4.0 in an antitrust case which resulted only in injunctive relief); Cenco Securities Litigation, No. MDL 291 (N.D.Ill. June 30, 1981) (Crowley, J.) (multiplier of 4.0 in securities fraud case).

34. Other cases have awarded mutlipliers in excess of or comparable to those petitioners seek here, in circumstances in which neither the success nor the risk compared to petitioners' here. See, e.g., Municipal Authority of Bloomsburg v. Commonwealth of Pennsylvania, 527 F. Supp. 982 (M.D.Pa. 1982) (multiple of 4.5); In re Glassine & Greaseproof Antitrust Litigation, MDL No. 475 (E.D. Pa. December 22, 1981) (multiple of 3.0); Pacific Plumbing Supply Co. v. Crane Co., 1982-1 Trade Cases P64,473 (W.D.Wash. 1982) (multiple of 3.0).

35. While determination of a proper multiplier is an inexact science, the Court is satisfied that given the risks inherent in this case, the multiplier requested, 1.462, is more than fair to the class.

36. This has been an expensive suit for petitioners, because of three factors: (1) the cost of locating accurate addresses for, and individually notifying, over 59,000 class members in 1980 of the pendency **[*56]** of the case; (2) the cost of traveling to numerous out-of-state cities to depose or interview witnesses; and (3) the large number of depositions taken by both sides. The total of the out-of-pocket costs advanced was $99,512.08. These costs are itemized in the Evidentiary Appendix and a supplementary affidavit. The Court has examined these costs and finds that they were reasonably incurred in light of counsel's obligations to notify the class and vigorously prosecute this case.

Consistent with the foregoing, the Court being fully advised on the matter, and based upon the entire record herein, it is hereby ORDERED as follows:

A. Petitioners' request for fees in the amount of $785,000 and for reimbursement of costs in the amount of $99,512.08 is fair and reasonable and is hereby granted. The Settlement Administrator is directed to pay these amounts to petitioners from the Settlement Fund.

B. The objections of the several class members to the petition for fees and reimbursement of costs are overruled.

C. There being no just reason for delay, the Clerk of the Court is directed to enter a final judgment order reflecting the Court's ruling on the petition for fees **[*57]** and costs pursuant to Fed.R.Civ.P. 54(b)

Service: **Get by LEXSEE®**
Citation: **1984 U.S. Dist. LEXIS 23595**
View: Full
Date/Time: Friday, April 15, 2005 - 5:53 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
▨ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.